H133gam1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          15 CR 588 (ER)

AHMED MOHAMMED EL GAMMAL,

            Defendant.

------------------------------x

                                        New York, N.Y.
                                        January 3, 2017
                                        3:00 p.m.


Before:

                HON. EDGARDO RAMOS,

                                        District Judge


                      APPEARANCES

PREET BHARARA
      United States Attorney for the
      Southern District of New York
BRENDAN F. QUIGLEY
NEGAR TEKEEI
ANDREW J. DeFILIPPIS
      Assistant United States Attorneys


FEDERAL DEFENDERS OF NEW YORK
      Attorneys for Defendant
SABRINA P. SHROFF
ANNALISA MIRON
DANIEL G. HABIB

H133gam1

THE DEPUTY CLERK:  In the matter of the United States v. El Gammal.  Counsel, please state your appearances for the record.

MR. QUIGLEY:  Good afternoon, your Honor.  Brendan Quigley, Negar Tekeei, and Andrew DeFilippis for the United States.

MS. SHROFF:  For Mr. Gammal, Federal Defenders of New York by Sabrina Shroff, Annalisa Miron, Daniel Habib and Hannah Sotnick.

THE COURT:  Good afternoon to you, and good afternoon to you, Mr. El Gammal.

THE DEFENDANT:  Good afternoon.

THE COURT:  This matter is on for a final pretrial conference, and I know we're at least calling it that, and there are also some motions that we needed to get to.  And in addition, unless something else came in over the last five minutes, I think I received something from the government a little over an hour or so ago.  So I don't think we're going to get everything done that we need to get done today, because I haven't had an opportunity to go over some of the briefing.  So we'll need to come back either Thursday afternoon or Friday afternoon as the parties are available.

But I did want to cover, before we get to some of the motions, just some of the mechanics.  First of all, the parties

H133gam1

are aware that the trial will take place in the courtroom on the fifth floor. Not in this courtroom. I believe it is courtroom --

MS. SHROFF: Your Honor, from what you said, I think 506.

THE COURT: 506. We'll be in courtroom 506. Have the Federal Defenders made a determination as to which they prefer by way of trial day?

MS. SHROFF: Yes, your Honor. 9:30 to 4.

THE COURT: 9:30 to 4, Monday through Friday.

MS. SHROFF: Yes, please.

THE COURT: Very well. The trial will take place 9:30 to 4, Monday through Friday. As the parties are aware, I'm sure, I do start on time. So please, I do expect the lawyers to be here or to be available 9 o'clock every morning so we can take care of whatever issues come up. In my experience, issues come up every day. And if what I just heard from back there is any indication, I'm sure there will be stuff coming up every day in this trial as well.

I'll take two breaks, one midmorning, one midafternoon. I tend to take the morning break at about 11 o'clock. I typically take an hour and 15 minute lunch hour. However, because of the truncated day, I may take just one hour. And also in the afternoon, again, I plan on one break, but if I see that the jury is getting heavy lidded, I may take

H133gam1

an additional break in the afternoon just to make sure everyone is bright eyed.

Now, let me ask.  Do the parties have any objection or any view on my questioning Mr. El Gammal prior to the beginning of trial concerning any plea offers that have been made?

MR. QUIGLEY:  Your Honor, we think that would be prudent in light of the Supreme Court's decision in *Lafler* and *Frye*.

Just for the record, we did extend a plea offer to Mr. El Gammal a few weeks ago.  We understand that was rejected.

THE COURT:  Was it in writing?

MR. QUIGLEY:  It was, your Honor, yes.

THE COURT:  Okay.

MS. SHROFF:  I don't think it was a few weeks ago.  I think Mr. Quigley should provide the Court with a date.

THE COURT:  Best as you can.

MR. QUIGLEY:  A few days before Christmas, your Honor. I don't know the exact date.

THE COURT:  So then I will question Mr. El Gammal on the day of trial prior to voir dire concerning the plea offer that was made.

As I believe I we spoke about before, I don't allow speaking objections.  So if you have an objection, stand up, say "objection, hearsay," "objection, asked and answered."

Nothing beyond that. And if there is any need to have any further discussion, I'll let you know. Any discussion will be had at sidebar.

One other thing that I do not allow is for discovery to be made in front of the jury. So, for example, if a witness makes reference to a document, I would prefer that the lawyers do not look to me and say "your Honor," in front of the jury, "that document was not provided to us and I would demand it be provided as soon as possible." Don't do that in front of the jury.

With respect to the jury selection, I do have a voir dire form. I know that you folks did recommend that questions be asked. I think I took most of them.

Can you give these, three to one side and three to the other.

The only thing that I believe I did not include, and I don't know which one of you made these requests, were questions to the jury concerning where were you born, where are your parents from, things of that nature. I think that the other questions that I ask concerning views on particular organizations, etc., are sufficient to trigger responses of that type.

I do use the struck method in selecting a jury, and so I forget how big a venire we're going to have. I believe it will be upwards of 100 or so. And I expect that jury selection

will take at least one day -- I'm hoping it doesn't take much longer than that -- because I think we'll have a lot of people that are going to want off for one reason or another because of the nature of the charges.

And what I do is I put, so there is going to be -- I'm not going to be able to do the math now, but however many jurors minus strikes the parties will have are going to be put in the box.  And I'll do the math and we'll get back to you on this on Thursday or Friday, depending on when we get together.  But there will be in the box a sufficient number of jurors so that theoretically if both sides exercise all of their peremptories, what we will have left will be the jury.  And then we'll do another round with I think one strike each per side, and what we will have left will be the alternates.

And I figure four alternates for this case would be sufficient?

MR. QUIGLEY:  That should be fine, your Honor, yes.

THE COURT:  Assuming it's going to be a three, maybe a four-week trial, going into four weeks.

MS. SHROFF:  We leave it up to the Court, your Honor.

THE COURT:  We'll go with four alternates.

The way that I use the form, and I think it is consistent with the practice that a lot of my colleagues do on the bench, is I tell the jury before we begin that I'm going to ask Juror No. 1 every question in part one of the form and they

H133gam1

should listen along, and I'll provide them each with a copy of the form, everyone will have a copy of this form, and everyone will be provided with a pen.  And I will direct everyone to listen.  And if there is an affirmative response to any question in part one, I will ask them to circle it.  Because what I will do is with Juror No. 1 in the box, I will go through with that juror every question on part one.  So right now, there are 60 questions in part one.  I will go over with Juror No. 1 60 questions.  With respect to every other juror, then I'll go through part one first with the entire venire that's in the box.  With respect to each subsequent potential juror, I will simply ask him or her do you have any affirmative responses to any of the part one questions.  And then I'll go directly to those questions rather than go through all of the questions with that juror.

It will be during that process, during the process we go through part one that generally speaking we will take care of any challenges for cause.  Because the responses to the part one questions will trigger any objections.  That's where we get to any bias that they may have or any experience that they may have that may render them inappropriate for this particular trial.

And if there is a challenge for cause that is upheld, that potential juror will be removed immediately.  They will be replaced immediately.  And so, for example, if I'm talking to

Juror No. 1, and he says he can't preside over this case for one reason or another and the parties agree and I agree, he will immediately be replaced by someone from the venire, from another person in the venire, and that person will become potential Juror No. 1 and I'll start with that person with all the questions from beginning to end.

So once we have in the box however many jurors who have been able to make it through part one, and presumably, therefore, are not objectionable for cause, then I go back and I start again with potential Juror No. 1 and I go over all the part two questions. And I ask each juror in the box each question on part two. And those are questions that are not so much going to bias but to their backgrounds, who they are, where they live, who their parents are, education, family, etc. That's just to give you an idea of who these people are to give you some sense of how you may want to exercise your peremptory challenges.

Any questions on any of that?

MR. QUIGLEY: Just one, your Honor, if I may. Is your Honor's practice to refer to the jurors by name or by number? We've not asked for an anonymous jury and we don't intend to, but I think our slight preference would be to have them referred to by number rather than by name, given the nature of the case.

MS. SHROFF: Given the nature of the case they didn't

want a jury questionnaire.  Given the nature of the case they didn't want to proceed in the way every other case of this nature would have proceeded.  Mr. Gammal has been in general population for this entire case.  There is nothing about this case that should lead the jury to believe that something could possibly happen to them.  And this case should be treated like every other case in an Article III courtroom.

THE COURT:  I'm inclined to do that.  Both for the reasons stated on the record by Ms. Shroff, and also for the other reason that I always get hopelessly confused if I try to remember each juror's number.  So we'll refer to them, and what I typically do is as I address each one I'll confirm that you're Ms. Smith or Mr. Jones and we'll take it from there.

So then at the end of the process of having gone through with each person in the box each question on part two, and then at that point we'll do the peremptory challenges.  And I take it there is no need, no one is asking for any additional peremptory challenges than the rules provide for, correct?

MS. SHROFF:  No, your Honor.

MR. QUIGLEY:  No, your Honor.

THE COURT:  So we'll have that number of jurors in the box plus the total number that would add up to the peremptory challenges for both sides, and assuming you all use up your peremptory challenges, who's ever left will be our jury.  If you waive any particular round, then you lose that challenge,

H133gam1

and then the first 12, even though there may be additional people in the box, will be the jury. And that should take care of that.

Any questions on that?

MR. QUIGLEY: Not from the government, your Honor.

MS. SHROFF: No, your Honor.

THE COURT: So that takes care of the mechanics, unless the parties have any additional issues they wish to raise concerning the conduct of the trial.

MS. SHROFF: Your Honor, I am assuming we'll pick a jury the normal way. So if there is a sensitive issue with a particular juror, we'll have a sidebar on it.

THE COURT: Correct. I will emphasize to them and it says on the form that if there is any issue that they don't wish to discuss in public, we can discuss it at the sidebar.

MS. SHROFF: I will say we've not had much luck in getting Southern District to consider, but definitely in state court, but occasionally in the Eastern District of New York, lawyers are allowed do their own voir dire. We would ask the Court to consider allowing us to do that.

THE COURT: Denied.

MS. SHROFF: Okay, thank you.

THE COURT: With that, I know there are a number of motions and I want to start first with the CIPA motion and I will read the Court's opinion into the record.

H133gam1

The Court has received an ex parte motion from the government seeking a protective order pursuant to Section 4 of the Classified Information Procedures Act, 18 U.S.C. App. 3 at Section 4, and Federal Rule of Criminal Procedure 16(d)(1), regarding disclosure of certain classified information. The Court has also received a motion from the defendant requesting that the Court deny the government's request to file its Section 4 application ex parte and compel disclosure thereof to cleared defense counsel. For the following reasons, the government's motion is granted and the defendant's motion is denied.

The government seeks authorization to withhold from discovery materials describing certain communications or statements. The government seeks a determination that the materials in question are not discoverable pursuant to *Brady v. Maryland* or Federal Rule of Criminal Procedure 16, and that they are not relevant and helpful under *United States v. Aref*, 533 F.3d 72.

Pursuant to Section 4 of CIPA, the Court, upon sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure. 18 U.S.C. App. 3 at Section 4. The Federal Rules of Criminal Procedure likewise permit the Court to, for good cause, deny discovery or

inspection or grant other appropriate relief. CIPA was designed to establish procedures to harmonize a defendant's right to obtain and present exculpatory material upon his trial and the government's right to protect classified material in the national interest. *United States v. Pappas*, 94 F.3d 795. However, CIPA was not intended to expand a traditional rules of criminal discovery under which the government is not required to provide criminal defendants with information that is neither exculpatory nor, in some way, helpful to the defense. *United States v. Varca*, 896 F.2d 900. Rather, CIPA applies the general law of discovery in criminal cases to classified information and further restricts discovery of that information to protect the government's national security interests. *See United States v. Klimavicius-Viloria*, 144 F.3d 1249, and *United States v. Johnson*, 139 F.3d 1359, which provides that CIPA has no substantive impact on the admissibility or relevance of probative evidence. *See also U.S. v. Baptista-Rodriguez*, 17 F.3d 1354, explaining that CIPA simply ensures that questions of admissibility will be resolved under controlled circumstances calculated to protect against premature and unnecessary disclosure of classified information.

The Second Circuit case of *Aref* outlines the standard governing this Court. The Second Circuit there adopted and applied the standards set forth in *Roviaro v. United States*, 353 U.S. 53, to determine when the disclosure of classified

H133gam1

information is appropriate.  *Roviaro* asks first whether the classified information is discoverable and then whether the government has properly invoked the state secrets privilege with respect to that information.  For the states secrets privilege to apply, there must be a reasonable danger that compulsion of the evidence will expose matters, which, in the interest of national security, should not be divulged. *Reynolds v. United States*, 345 U.S. 1.

If the information is both discoverable and privileged, then the Court must decide whether it is also helpful or material to the defense.  That is, useful to counter the government's case or to bolster a defense.  *Aref*, 533 F.3d at 80.  To be helpful or material to the defense, evidence need not rise to the level that would trigger the government's obligation under Brady to disclose exculpatory information. The Court of Appeals for the D.C. Circuit explained the standard as follows:

"We hold, in short, that classified information is not discoverable on a mere showing of theoretical relevance in the face of the government's classified information privilege, but that the threshold for discovery in this context further requires that a defendant seeking classified information is entitled only to information that is at least 'helpful to the defense of the accused.'"

*United States v. Yunis*, 867 F.2d 617*; see also U.S. v.*

*Passaro*, 577 F.3d at 207, explaining that CIPA permits the district court to exclude irrelevant, cumulative or corroborative classified evidence; and *U.S. v. Smith*, 780 F.2d 1102, noting that a district court may order disclosure only when the information is at least essential to the defense, necessary to the defense, and neither merely cumulative nor corroborative, nor speculative.

Only when information is relevant or helpful to the defense must the Court then take the third step of balancing the public interest of protecting the flow of information against the individual's right to prepare his defense. In *Yunis*, the D.C. Circuit noted that much of the government's national security interest lies not so much in the contents of the conversations, as in the time, place, and nature of the government's ability to intercept the conversations at all.

The government's ex parte motion was supported by declarations submitted by officials with classification review authority. I am satisfied that those declarations sufficiently establish that the materials at issue are classified. In addition, the Court has carefully reviewed the materials in question. On consent of the government, I held an ex parte conference with counsel for the defendant to become better informed of their theories of defense. I conclude that, based on my review, defense counsel's presentation, and in accordance with the legal principles described above, that the information

H133gam1

sought to be kept classified would not be relevant and/or helpful to the defense.  The Court finds that granting the government's motion will not impinge upon the defendant's right to a fair trial.

I have also considered defendant's motion that I deny the government's request and allow the participation of cleared defense counsel.  That request is denied.

As a preliminary matter, it is clear that Section 4 of CIPA and Federal Rule of Criminal Procedure 16(d)(1) both authorize ex parte proceedings.  Therefore, defendant's contention that ex parte submissions are improper absent exceptional circumstances finds no support in that authority or in the case law.  Indeed, as the Second Circuit has stated, where the government moves to withhold classified information from the defense, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules.  *United States v. Abu-Jihaad*, 630 F.3d 102.  For that reason, courts routinely uphold the practice of proceeding ex parte when the substance of classified information that the government seeks to be withhold from discovery is explicitly discussed in the relevant motion.  *See, e.g.*, *U.S. v. Zazi*, 10 CR 60, a John Gleeson case reported at 2011 WL 2532903, at *3, indicating with respect to the government's request to delete irrelevant classified materials from discovery, an adversary proceeding would be particularly anomalous, as it would provide defense

H133gam1

counsel access to sensitive information to which, if the government is correct, they're not entitled under any theory.

Moreover, as indicated above, the Court has held an ex parte conference with defense counsel during which we held a robust conversation about defense counsel's view of the evidence and their legal theories.  While perhaps not ideal, such a procedure has been held to adequately balance the government's need to protect sensitive classified information with a criminal defendant's ability to mount an adequate defense.

For these reasons, the government's motion is granted and the defendant's motion is denied.

A protective order will issue and all papers submitted in connection with that motion shall remain under seal with the Court.

I received today a motion from the government to allow them to use certain maps in their opening statements.  Have the defendants been able -- has defense team been able to review that submission?

MS. SHROFF:  Your Honor, we had maybe five minutes to review it.  We took a quick look at it.  So, I haven't -- I don't think any one of us looked up the cases they cited or anything like that.

THE COURT:  Okay.

MS. SHROFF:  I e-mailed one of the government's

lawyers about a question I had about the cases they cited, and I didn't get a response back. So I haven't finished reviewing the motion at all. And I don't think we took too long in replying. I think we just got it. I can't keep track of the timing on everything, but I do think we got it literally 30 minutes --

THE COURT: I think I got it this morning, late this morning.

MR. DeFILIPPIS: Your Honor, we have the answer to the defense's questions. I can say it on the record or privately to defense counsel.

THE COURT: I'm sorry?

MR. DeFILIPPIS: We have the answer to the question that Ms. Shroff posed just about an hour ago, and I'm happy to say it on the record or to Ms. Shroff privately.

THE COURT: Why don't you tell us all.

MR. DeFILIPPIS: So the question was whether in the cases we cited in the Southern District defense counsel objected to the use of maps. And in each of the terrorism cases cited, the answer is that defense counsel objected. In the other cases they did not.

THE COURT: Based on my review of the maps, they appear to be straightforward maps, unadorned except that I did note that there were certain red boxes in some of them. Do you know what those are?

H133gam1

MR. DeFILIPPIS:  Your Honor, I'm not -- I think the red boxes that exist on the existing maps are a function of Google Earth, and I'm not expert enough in that to say what they are.  But we may, as I indicated in the government's letter, we may draw a circle around or in some sense highlight the particular cities we want to reference as we talk about them.  But in terms of -- I think I recall what your Honor is referring to.  I don't know what the shading is.

THE COURT:  That's not something you intend to rely on or to focus on.

MR. DeFILIPPIS:  Correct, right.

THE COURT:  I'm inclined to let them use the maps.  So far as I know, the relative position on the globe of Syria, Egypt, and Turkey is not going to be at issue in this case.  Correct?

MS. SHROFF:  Well, I don't know.  First of all, it is a Google map they've gone on the Internet and printed out.  That's one.  Second, your Honor, the opening is supposed to be the government laying out its charge, right.  It is supposed to be simple and straightforward.  The government informing -- not making an argument, an argument is for the summation, and the opening it is to lay out what the government is going to show through credible evidence what the evidence will show.  I don't think they need a map.

But to the extent the Court wants to allow them to use

H133gam1

a map here, I am assuming that the Court would allow us the same leeway.

THE COURT:  Absolutely.  And again, they provided me with the maps that they intend to use.  They appear to me to be fairly non-controversial depictions of some cartographer's view of where these countries are and where they are in relation to each other.

I think I would be of a different view if the government were to thereafter draw a stick figure of a man with one leg in Turkey and one leg in Syria, but I don't expect that is something they would do.

I think it would be helpful to the jury, perhaps many are not aware of where precisely these countries are in relation to each other.  To that extent, I think it would be helpful to the jury if it is a non-controversial issue as to which I think the government should be allowed to use a demonstrative.

But, if you do some research and find I am going dangerously off course, I am happy to reconsider.

MS. SHROFF:  I would never think you are going dangerously off course.  As long as it is good for the goose, it is good for the gander.

THE COURT:  If you are going to use a map or any other demonstrative in your opening statement, you should first show it to the government so they can raise an issue if they have an

H133gam1

objection.

MS. SHROFF:  Certainly, your Honor.

THE COURT:  Okay.  Now with respect to the government's third motions in limine, I just received the defense response today so I'm not going to be able to rule on that until we next meet.

Mr. Quigley.

MR. QUIGLEY:  Just one quick thing on that, your Honor, and I have not reviewed that in full.  But just after perusing it, there was one reference to the defense I think believed that we were going to argue that Mr. Abu Geer was going to travel to Syria.  I want to point for the record that's not our -- we don't intend to argue that.

THE COURT:  Mr. who?

MR. QUIGLEY:  I think it was the individual referenced in one of the exhibits, 120-U I want to say.  Yes, in their argument regarding Government's Exhibit 100-U-T, they said they anticipate we'll use that exhibit to insinuate that the defendant was helping a particular individual travel to Syria.  That's not our theory as to that communication.  We want to make that clear.

MS. SHROFF:  Then maybe the government can clarify for us what exactly their theory is on getting that document into evidence.

THE COURT:  I'm sorry, this is Government Exhibit U-T?

H133gam1

MR. QUIGLEY:  100-U, yes, your Honor.  It is an admission by the defendant, and it is about how he knows CC-2.

THE COURT:  I received a motion from the defense to allow a particular expert to testify by video.  Assuming there is no objection to the expert testifying, is there an objection to him testifying by video?

MR. QUIGLEY:  We -- yes, your Honor.  And we may oppose him testifying at all, but we're definitely going to object to him testifying by video.  I think that was just filed yesterday and we'll file a response in the next day or two.

THE COURT:  Okay.  Try to file a response by tomorrow so we can get together either Thursday or Friday to discuss it.

MR. QUIGLEY:  Will do, your Honor.

THE COURT:  I ask this with some trepidation.  Where are we with the translations and the conversations concerning the translations?

MR. QUIGLEY:  Your Honor, I don't think there has been any change from when we put in our opposition to the defendant's motion, which I guess was yesterday or on the 1st.  We have not had any conversations about the translations since then.

THE COURT:  Ms. Miron.

MS. MIRON:  Your Honor, we ask the Court to seriously consider the remedy of precluding the new Arabic expert when the defense is willing to stipulate to the original

translations coming in.  It sounds like the government was in a bind, because they learned too late that their old interpreter wouldn't testify at trial.  I don't know when that was learned exactly.  But, we have been forced into the position where we've had approximately one week before trial to review this 500-page spreadsheet of revisions.  Not every page contains redlines, but the majority of pages do, and there are some significant changes to the exhibits.  And the Court gave the government a deadline back in October of presenting draft exhibits.  Those exhibits have now changed as of a week before trial in significant ways.

So, I provided the Court a copy of the 500-page document, but I want to point out this new interpreter has, first of all, added inserts into the government's proposed exhibits about what he believes is being implied.  So on page two where it was not translated until we received the new revisions this interpreter wrote "May God reward you with goodness (for what you did)."  This is a communication from Samy El-Goarany to Mr. Gammal.  And I don't think that's a fair reading.  We're consulting with our own expert.  This kind of subtle change, we noticed this going page by page through this.

THE COURT:  I have not studied the 500-page document.

MS. MIRON:  Of course.

THE COURT:  When you say he includes stuff that I guess that he intuits?

Mr. Quigley, do you know what it is he did?

MR. QUIGLEY:  There are several places or a number of places where he has put in translator's notes to clarify meaning.

But I would just add that these new interpretations or the revised translations were produced on December 23.  So even with the government's having to change translators, these were still produced over two weeks before trial.  That's consistent with the schedule in many other cases in the district.  The November deadline was when we had a December trial date.

So, it is unfortunate, it put us in a bind as well having to change translators.  There are other things we would like to have been doing over the last few weeks rather than redoing or having to revise all these translations, but we did the best we could to get them done promptly.

THE COURT:  I'm confused as to the remedy that you seek, Ms. Miron.  So you're asking me to direct the government to go with their initial draft translations?

MS. MIRON:  Well, we believe they were -- they were given to us as final translations, first of all, on November 5.  So we made reliances based on that representation.  So it was never a draft that we're asking to be admitted into this trial.  We're asking to be able to stipulate to the final translations that were presented to us in a timely manner.

THE COURT:  Maybe this is part of your defense theory,

and if so, just tell me.  But if the government says those translations or the government now says those translations are not accurate, do you agree or disagree?

MS. MIRON:  Your Honor, this is the problem.  I don't speak Arabic, I don't read Arabic, so we have to consult with our interpreter as to whether that's true or not true.  I think as to page two we fully disagree with the insertion of "for what you did."

THE COURT:  Right.

MS. MIRON:  There are other -- for example, the new interpreter spells Mr. Gammal's name J-A-M-A-L.  And he writes this when he's making an interpretation of what Attia says to Mr. Gammal.  So he's implying in this new interpretation that Attia spells Mr. Gammal's name with a J.  And as the Court is aware, there is a dispute between the parties as about whether or not Mustafa Tarek was referring to Mr. Gammal when he said Mr. Jamal.  And so this is a prime example of us having to go back to our interpreter, asking why did he insert a J as opposed to a G there.

I've made a quick look at the other exhibits.  There are other places where interpretation uses the G for Gammal.  And we think it is wrong to use a J when speaking in Egyptian Arabic.  But this is a big issue.

So I don't think the remedy that we seek is outrageous.  We are not saying no interpretations can come in.

We're saying those we relied on when we consulted with our interpreter, proposed to the government our corrections, they reviewed them and agreed with most of them and then we proceeded with our case. So we've made strategic decisions. We're in a situation where we don't have time to review every single one of these closely with our interpreter again.

So, I think we believe that the old final translations are accurate. The new interpretations are for the most part inaccurate, the ones we have reviewed that are significant. There are minor changes, we agree. I wouldn't be raising this issue if it was just capitalized letter versus non-capitalized letter.

There are significant changes in the meaning. So what we're asking for is a court order, precluding these late translations, because we don't have time to review the underlying documents and to consult with our own Arabic expert and present testimony about a different meaning of the same words.

THE COURT: I frankly have not been involved in a case where there was any controversy concerning translations, so the parties at the end of the day agreed. But to the extent that you have expert translators, isn't this something for the jury?

MS. MIRON: It puts us in a position where we're not permitted to present an adequate defense about the communications and the meaning that the government is

H133gam1

eliciting.

THE COURT:  I'm incredibly sensitive to that, Ms. Miron, and I'm thinking maybe there are some set of translations which are important to the defense.  And maybe if we were to isolate those, I don't want to give anyone any extra work, but my concern is with putting before the jury the best possible translations that we have, so they are able to make a determination based on the facts.  I'm thinking maybe we isolate some issues that are substantive and important.  We can make a determination on a one-off basis, because I'm sure there are going to be a lot of issues that are not going to be that important.  However, I am concerned about these translator's notes, I don't know that there is any place for that in what goes to the jury.

MR. QUIGLEY:  Your Honor, we can revisit those.  I think our intention, again, in getting these done, was to get them to defense as fast as possible.  And the translator did put in the notes.  We can look back at those and see about taking those out in various places.

I would add that we're open to suggestions from the defense about specific translations.  When they sent over several pages of proposed revisions to the translations, we accepted most of those, and even if it wasn't really something that was substantive, we just in the interest of agreeing accepted most of those.

THE COURT:  Will your expert testify before the jury?

MR. QUIGLEY:  We anticipate he will, your Honor.  If only there may be certain words in largely English documents that we would ask him to take a look at and interpret.

THE COURT:  English words?

MR. QUIGLEY:  No, Arabic words.

THE COURT:  Ms. Miron.

MS. MIRON:  First off, we would object to the insertion of anything that is not a verbatim translation.  It's not the translator's role to interpret the meaning of words.  I think the government can make arguments in closing statements about how the context plays out, whether someone was joking or being sarcastic, but it is not the interpreter's role to type in in parentheses "for what you did."  That's a conclusion he's drawing based on context and not on translation.  So we would object to the inclusion of all of those.

I've reviewed some of the interpretation notes and they are changes like he, instead of in English the original is the letter U, and he's written Y-O-U, so that is improper. That's not, again, that's not a translation, that's an edit, so we would object to those types of change.

This is a really time consuming task that we don't have time to do.  That's why we've asked the government to reconsider its translations that it thought was accurate and gave to us in a final version as of November 5.  We're not

asking the government not to put in its evidence.  It is the evidence that they proposed to us as final evidence, and we made judgment calls based on that.  We spent lots of time and money having our interpreter review them, and that's why we proposed to the government the changes we thought were necessary.  Now he's got to go back through every single change that the new interpreter made, and I think the remedy is appropriate.  It is a slightly unusual remedy, but it is appropriate.  It solves our problem of having to spend money and time, when we should be preparing for opening statement on Tuesday.

THE COURT:  Mr. Quigley, why not do that?

MR. QUIGLEY:  Your Honor, I think number one, we'll have to have a translator testify anyway.  Number two, this was only proposed this week really on the 31st.  They knew -- I think we had a conference here on the 9th when we raised the fact or maybe it was the conference on the 19th, but they've known for a number of weeks of this issue with our translator, with our interpreter.

If they had said they were willing to stipulate at that point to the November translations, we would have considered that, rather than wasting our own time and money.  Now these are the translations, these revised translations are the ones we've been preparing with, and it would be a not insignificant investment in our own time to go back and

unrevise everything.

MS. MIRON:  To make the record clear, when we provided our suggested changes, I wrote in an e-mail please call me about resolving, maybe we can agree about the translations over all.  That was November 12.  So we did open up the idea of stipulating, and we're asking the Court to order that the new interpreter is precluded.  We were open to it.  Nobody wants to waste anyone's time.

THE COURT:  I will review the materials that have been submitted.  But I'm wondering whether we put on the government the -- or maybe on both sides rather than just the government or just the defense just go through and figure out which of these translations are important and substantive and will actually be argued and which -- does it matter one way or the other whether we use the first expert or the second expert or the defense expert?

MR. QUIGLEY:  Your Honor, again, we're happy to do that and we solicited the defense's input on that because I think that could streamline this whole process.  We would be happy to get a stipulation.  We don't want to call unnecessary witnesses.  But without knowing what they agreed to, it's hard to do that.

THE COURT:  What is the universe of these changes, Ms. Miron, if you know?  I know I'm asking perhaps a tough question.

MS. MIRON:  The work involved, the Court is suggesting that we go through and see which ones are significant and I'm saying that's the work I'm worried about doing.  That's going to take multiple days to see whether a slight change that includes a "not" which is the opposite of the original, whether that's significant or not.  They're numerous.

So if the Court just peruses just through the 500-page document, virtually every page has redlines, and many pages has many redlines, so it takes time for us to read and compare the original and think about the meaning and how it has changed in the context of the conversation.

THE COURT:  Are those 500 pages going to be read to the jury?

MR. QUIGLEY:  No, your Honor.  I think another point is since we produced these 500 pages on December 23, we've gone back, and as the defense is aware, and narrowed the scope of the translated materials we're planning on using.  I can't provide a precise page number but it's fewer than what we produced on December 23.  For some of the longer translations, between the defendant and CC-2, for example, we cut that down significantly.  So, they're not all going to be read to the jury, and they're not even going to be introduced into evidence at this point.

MS. MIRON:  Oh.  Is the Court inquiring whether they're all going to be introduced into evidence or whether --

H133gam1

THE COURT:  Again, I haven't looked at those 500 pages but I can't imagine that those 500 pages are going to be read to the jury in addition to whatever other evidence the government has.  There are other areas of evidence or other sections of evidence that they'll have.

MS. MIRON:  I don't think they will read those communications, but they will close on them.  And we'd like to close on them, the ones that are important.

So, for example, there was a change from -- this is a communication between Attia and Mr. Gammal on November 18, 2014.  Mr. Gammal writes "But in general, he did not show up." And the change is "Anyways, the matter canceled."  That's a subtle change, and it takes us thinking through how that might change the government's theory and our theory if the meaning of the communication is slightly different.  The matter canceled versus he didn't show up.  So, it's one line, but it takes some time to think through whether it is going to matter.

I appreciate the Court's suggestion that the parties attempt to work it out, but I think that would take us as much time as us reviewing them on our own and having our own interpreter check them.

THE COURT:  I understand that there is a lot of work to be done.  I just don't know that the answer to avoiding all that work is for me to say, okay, let's go to status quo ante November 9.  I will think about that and I'll take a look at

H133gam1

that submission.

Can I get that in hard copy, by the way, so as to save some trees.

MS. MIRON:  Sure.  In redline, sure.  We'll color print it.

THE COURT:  Great.  Mr. Quigley.

MR. QUIGLEY:  Nothing, your Honor.

THE COURT:  Okay.  Is everything else fully briefed at this point?

MR. QUIGLEY:  We had a motion to preclude a couple of defense experts, your Honor.  I don't think there has been an answer on that.

MR. DeFILIPPIS:  And your Honor, we will be submitting a motion to preclude cross-examination on several topics with regard to two witnesses.

THE COURT:  What witnesses?

MR. DeFILIPPIS:  Mohammed El-Goarany and one of the special agents, Timothy McNulty.

THE COURT:  And Mohammed is the --

MR. DeFILIPPIS:  The father of Samy El-Goarany.

THE COURT:  And Special Agent McNulty.

MR. DeFILIPPIS:  Yes.

MS. SHROFF:  Could we find out what it is they're going to move on because --

THE COURT:  It's Tuesday.

H133gam1

MS. SHROFF:  Thank you.

MR. DeFILIPPIS:  Your Honor, we'll be filing it under seal but we're happy to -- it will be done, if not tonight, then first thing tomorrow, and we will also share with defense counsel immediately after the conference what it is we intend to move on.

THE COURT:  Okay.

MS. MIRON:  Can we confer one moment, your Honor?

THE COURT:  Sure.

(Pause)

MS. SHROFF:  Your Honor, I think there are a couple of outstanding issues.  Should I raise them now?

THE COURT:  Yes.

MS. SHROFF:  Okay.  I think one is the matter of the defense experts and Drew Marsh and Mr. al-Tamimi the government moved to preclude.  We sent them a supplemental disclosure much like they had sent us for Mr. Zelin.  We're unclear if the government is still objecting to our experts testifying.  If they're not, we won't further brief it.  But other than that, that's one issue that I think the Court may need to rule on at some point.

THE COURT:  I think we have four defense experts that are currently in play.  Mr. Marsh, Mr. al-Tamimi is it?

MS. SHROFF:  Tamimi.

THE COURT:  Jason Roloff.

H133gam1

MS. SHROFF:  Yes, please.

THE COURT:  And your translation expert, who is that?

MS. SHROFF:  Mr. Marwan Abdel Rahman.  He is a court certified interpreter.

MR. QUIGLEY:  We also moved on the social media expert.  I don't think there was a response to that also.

MS. MIRON:  We have not provided notice of him so I think the motion is moot.

THE COURT:  So you're not going to put Sultan on?

MS. MIRON:  That's right.

THE COURT:  With respect to Mr. Roloff, and I think the government is still objecting to Mr. Marsh and Mr. Tamimi?

MR. QUIGLEY:  That's correct, your Honor.

THE COURT:  So did you want to put papers in on that?

MS. SHROFF:  Sure.  I also want to supplement even right now in court for Mr. Tamimi, I think the government should simply check Mr. Zelin's website.  I think Mr. Zelin has quite a bit to say about Mr. Tamimi, and that should also provide them with a very deep view of what Mr. Tamimi would have to say.

THE COURT:  Zelin being the government's expert?

MS. SHROFF:  Yes.  He has a website.  Jihadology.

THE COURT:  Jihadology.

MS. SHROFF:  Jihadology.  Like biology, your Honor.  Anthropology, your Honor.  Any of the other -ologies.

H133gam1

THE COURT:  I don't think that is going to address the government's concern about there is some stuff on the website. But what is Mr. Tamimi going to say?

MS. SHROFF:  We provided -- it's clear what Mr. Tamimi is going to say.  Mr. Tamimi is going to talk about the different ways and different means from which people go from Turkey to other countries.  What ISIL is all about, what ISIS is all about.  How somebody gets radicalized or does not get radicalized.  Much of what our expert will say depends on what their expert says.

We've argued to them that their expert notice continues to remain insufficient.  They've referenced to us major terms that Mr. Zelin will testify to.  He's going to opine on what jihad means, and I don't know what the other phrases they want him to testify to.  But frankly, I don't see what relevance that has in this case.  They're having Zelin testify as to videos of beheadings, I really don't see the relevance.  So honestly, after Zelin is done, only then will I know the true scope of what the expert in our case will say. It really depends on what Mr. Zelin has to say.  I don't know what Mr. Zelin has to say.  Mr. Zelin's notice was very broad.

THE COURT:  Didn't you receive a copies of Mr. Zelin's testimony in other cases?

MS. SHROFF:  I did in *United States v. Pugh*, one case.

THE COURT:  And --

H133gam1

MS. SHROFF:  Very different case.

THE COURT:  Mr. Quigley, will he be testifying consistently with respect to general topics as he did in the *Pugh* case?

MR. QUIGLEY:  Yes, your Honor.  And we've supplemented that notice with some additional things he'll be talking about. We did that back in October so we think the notice with respect to Mr. Zelin is clearly sufficient.  And Rule 16(b)(1)(C) applies to the defense, obviously.  That requires pretrial disclosure of the witnesses' opinions and the bases for their opinions.  They don't get to wait until the witness testifies.

MS. SHROFF:  We have provided that notice.  We've provided -- in fact, I think if you put the two notices side by side, you will see that they're almost identical.

THE COURT:  I'm sorry, what two notices?

MS. SHROFF:  If you put the government's notice and our notice side by side, I'm pretty sure we say the same thing. So if their notice is sufficient, our notice is sufficient.

And *Pugh* involved a very different case.  *Pugh* involved Mr. Pugh actually being part of the United States military and traveling, physically traveling.  It is a totally different case.  Okay, the topics that Mr. Zelin is supposed to cover in this case are quite different than the topics he covered in *Pugh*.  Not every terrorism case is the same case. So just because notice was sufficient --

THE COURT:  I understand not every terrorism case is the same case, but the history of ISIS and ISIL is the same, presumably, and Mr. Zelin will not testify to a different history.

MS. SHROFF:  The question isn't whether he testifies to a different history.  The question is the relevance of the history.  Pugh was in a different position.  Pugh's advocacy was different.  Pugh was a different defendant.  What was relevant in Pugh may not necessarily be relevant in Gammal.  That's all I'm saying.

THE COURT:  I understand.

MS. SHROFF:  Right.  So I think our notice is sufficient.  I've supplemented it.  I think I supplemented it last night or I supplemented it on the 31st.  I remember because it was the 31st.  I supplemented by e-mail on the 31st.  And I'm not entirely clear what the government's complaint is.  It really dovetails their notice to me.  There is nothing -- there's no more or less notice between the four people involved.

I do think that the difference between Mr. Zelin and Mr. Tamimi might be an issue of primary source, but I think they can figure that out.

THE COURT:  Mr. Quigley.

MR. QUIGLEY:  We continue to believe the notice is insufficient, your Honor.  And that to the extent very limited

additional notice has provided, that is still insufficient and on topics that are aren't necessarily relevant to the trial.

THE COURT:  What about with respect to Mr. Marwan? That's his first name, correct?

MS. SHROFF:  Marwan Abdel Rahman is his full name.

THE COURT:  Do you object to him on notice basis or tardiness basis or both?

MR. QUIGLEY:  Just on tardiness, your Honor.  They have had him for -- Ms. Shroff said they've had him for months. And we just got notice of him on December 30.  Maybe it was not the 30th.  It was after Christmas though.

MS. SHROFF:  Of course.  Why would we provide notice beforehand?  We didn't know they were going to interject a brand new translator with brand new translations that are inaccurate.  Why would I call an expert if their translations were accurate?  They propelled my late notice.

THE COURT:  Did you want to put in any further papers on your experts on their motion to preclude your experts?

MS. SHROFF:  Sure.  We'll augment some more if you want.

THE COURT:  It hasn't been briefed.  They've objected and --

MS. SHROFF:  We'll brief it.

THE COURT:  When do you want to do that by?

Let me ask, do you guys want to come back on Thursday

H133gam1

or Friday?

MR. QUIGLEY:  Friday would be better for the government, your Honor.

THE COURT:  It gives Mr. Habib a little more time.

MR. HABIB:  It's always appreciated, your Honor.

MS. SHROFF:  Mr. Habib is engaged on Friday afternoon. So if you want, if we can do it like --

MR. HABIB:  Your Honor, I would say this, your Honor. I'm also happy with Friday.  I have a sentencing at 2:30 with Judge Gardephe.  If the Court was inclined to convene in the morning on Friday, that's fine.  Or really any time before 2:30 as long as we're done by 2:30.

MS. SHROFF:  11 o'clock is fine for us.

MS. MIRON:  I will be here for a different case at 10. After that would be great.

THE COURT:  I'm available at 11:30 on Friday.

MS. SHROFF:  Sounds good.

MR. HABIB:  If it's acceptable to the Court, I'll submit our response to the government's motion to preclude our experts on Thursday.

THE COURT:  That's fine.

MR. HABIB:  Thank you.

THE COURT:  So we've got the experts.  We've got, to the extent he's allowed to testify, Mr. Roloff by video, we've got the translations, anything else?

H133gam1

MR. QUIGLEY:  One moment, your Honor.

MS. SHROFF:  Your Honor, obviously they're going to give us notice sometime tonight about the Giglio, so we may have to brief that.  Maybe they should wait until next week and then give us the motion papers.

Just kidding.

THE COURT:  Was there some other CIPA you wanted to raise?

MS. SHROFF:  Yes, please, but I have one more issue to raise.

THE COURT:  Just so I'm clear, we have the experts, we have the translations.  Okay.

MS. SHROFF:  And Giglio, you'll have the briefing at some point.  Just want to make sure your list is complete.

THE COURT:  Giglio being the --

MS. SHROFF:  The father and their Agent McNulty.

THE COURT:  Okay.

MS. SHROFF:  So your Honor, just one thing about Government Exhibit 520.  I don't think -- may I hand this up?

THE COURT:  Sure.

MS. SHROFF:  I didn't bring a copy for them because it's their own exhibit.  So if the Court could just take a look at the front page and two pages that say "example" if you don't mind.

THE COURT:  I don't know which is the front page.

H133gam1

MS. SHROFF:  The front page is the one that says "violent crimes unit."

THE COURT:  Says what?

MS. SHROFF:  Violent crimes unit.

THE COURT:  Violent crimes unit.

MS. SHROFF:  Yup.  That's it.

MR. DeFILIPPIS:  Your Honor, perhaps I can short circuit the discussion of the front page.  As Ms. Shroff is well aware, we agreed over the phone to remove the reference to the violent crimes unit, so that will not be an issue.

MS. SHROFF:  No, no, Mr. DeFilippis informed me he retracted that compromise because I would not agree to the flag being removed.

MR. DeFILIPPIS:  I'm sorry, Ms. Shroff must have misunderstood me.  There is another dispute between the parties, but we're not retracting our offer to remove that language.  So the issue on the front page is settled.

THE COURT:  So what we're talking about is removing this front page of Government Exhibit 520.

MS. SHROFF:  We don't think that the violent crimes unit is relevant.

MR. DeFILIPPIS:  With the caveat that the substantive information about the date range of the data on the front page we will find a way to keep in the presentation.  Whether it is on a front page or elsewhere.  But we will remove the

violent -- the reference to a violent crimes unit, but keep the reference to the unit in which the agent -- the other unit, the cellular analysis survey team, that will remain.  The reference to violence will be taken out.

MS. SHROFF:  So if you could just look at the page that's marked "example," please.

THE COURT:  Yes.

MS. SHROFF:  You see that American flag waving over there?

THE COURT:  Yes.

MS. SHROFF:  Yes.  We don't think the American flag has any relevance whatsoever to the cell tower.  First of all, let me just back up.  I'm not sure why the jury needs examples of what an expert does.

THE COURT:  Just so I know what I'm looking at.  Are these supposed to be examples of places where cell towers are placed?

MR. DeFILIPPIS:  Yes, your Honor.  These are examples, and this is a sheet which has been presented or substantially the same sheet which has been presented in probably dozens of trials.  These are examples of cell towers that are concealed so as to not appear as cell towers for aesthetic purposes and are often testified to by cell site experts in order to provide the jury with experts in the context of this business and this field, how cell towers work, how they appear, just as

background for the expert's testimony.

MS. SHROFF:  There is no issue here as to whether or not Samy El-Goarany or any other player in this trial was hiding from cell towers or was trying to evade cell towers or any such thing.  It doesn't matter what has happened in other cases.  The question for this Court is, really, what is the relevance of the two pages of examples for the jury.

Cell towers are not a foreign concept.  We live in a -- in a day and age where every single person has a cell phone.  Almost everybody knows what a cell tower is. Nevertheless, the government has this demonstrative they want to put in, which includes the flag of the United States as part of the government's presentation.  The flag has a very special place, first of all, in a courtroom.  There is a flag right behind you, your Honor.  It sends a message.  And there is no place for that message in a demonstrative.

THE COURT:  Just so the record is clear, I am looking at pages two of 24 and three of 24 of Government Exhibit 520.

MS. SHROFF:  Yes, please.

THE COURT:  And page three of 24 is a montage of photographs.  It is labeled "example."  And there are on this page, among others, two large or tall cacti, presumably fake cacti, a grain silo, a windmill, the facade of a building, various different structures upon which cell technology can be placed, including a fake tree that looks quite fake.

H133gam1

And so, tell me, Mr. DeFilippis, what is your witness going to say about this?

MR. DeFILIPPIS:  Your Honor, the witness in the context of explaining his work as an analyst of cellular location technology and data will explain to the jury what, first, what a cell tower is, which I think we can assume a jury will or will not know.  And in the context of doing so will provide examples, first, of how cell towers appear, where they're placed, how they function, and how they interact with the devices we all carry around every day.

So, again, it has been offered in many trials in this district and I assume others, is intended to give the jury a sense of that, and to illustrate for them how a cell tower appears in its various forms.

THE COURT:  That's fine.  I think I'll allow it, but take the picture of the flag out.  It doesn't hurt the government.  It addresses one of their issues.

MR. DeFILIPPIS:  Okay.  Your Honor, I'll look into whether that will require redacting the montage or creating a new montage.  The government's position is there -- I don't know that the defense has articulated any prejudice or harm here.  But we will look into --

THE COURT:  I think the defendant's position is simply it is the government wrapping itself in the flag in a way that it doesn't need to.

MR. DeFILIPPIS:  Understood, your Honor.

MS. SHROFF:  Thank you, your Honor.  It was a much better articulation than I have done.

THE COURT:  Okay.  Anything else?

And by the way, there are at least a dozen other pictures on the montage so I don't think the government is losing anything.

MR. QUIGLEY:  Just actually one other thing from the government.  We had submitted based on the Court's ruling a proposed judicial notice for the designation of ISIS as a foreign terrorist organization.

THE COURT:  Yes, I have that.  If there is no objection from the defense, perhaps even if there is, I intend to enter that.

MR. HABIB:  There is no objection.

THE COURT:  That will be entered.  I will also enter the protective order on the CIPA motion.

MS. MIRON:  Just want to raise one thing.  We e-mailed the government to inquire whether they are withholding 3500 for an agent who we believe to have been intricately involved from the beginning, Lee Nguyen.  We only received two documents.  If they're withholding it based on a relevance objection, we'd ask the Court to conduct an in camera review.

THE COURT:  This is the affiant on some of the search warrants we saw?

H133gam1

MR. QUIGLEY:  Yes, Agent Nguyen is no longer assigned to the New York office.  He left the New York office some time ago.  If he does testify at trial, his testimony would be limited to about the defendant's post-arrest statement.

We've provided the defense with all 3500 materials related to the post-arrest statement.  And obviously he was -- he was one of the case agents for a while.  He did sign search warrants, he did sign -- he has e-mails and things like that relevant to other things, but given his testimony at trial would be limited to the post-arrest statement, that's the subject matter of his testimony and that's our disclosure obligation.

THE COURT:  Okay.  So, the response to Ms. Miron's question the answer is no.  You are not withholding anything.

MR. QUIGLEY:  Not that we have an obligation to produce, no, your Honor.

MS. MIRON:  The question is whether they are withholding something.  If the answer to that is yes, then we're asking for a proceeding under 3500(c) which is the court conduct an in camera review as to whether the material's relevant to the direct testimony.  The government isn't entitled to make that judgment call on its own.

MR. QUIGLEY:  Your Honor, if I may, 3500(c) does envision that, but I think the defense needs to make at least some prima facie showing that we may be withholding something.

H133gam1

Here his testimony is going to be very narrow.  It's going to be about one event on a specific day that was an hour long.  I don't think that triggers the in camera review of every single e-mail he sent regarding this case.

MS. MIRON:  The statutory language is clear.  I can read it.  "If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the Court shall order the United States deliver such statement for the inspection of the Court in camera."  And then it goes on to describe what happens if it's related.  Then it gets disclosed.  If it is not related, it is not disclosed.  But it is a simple process.

I know it is not invoked very often, but we're asking for it because it was the main case agent.  I don't understand why they're withholding things.  Why are they even calling him?  I'm sure they could call someone else.

I have a fear he will testify as to additional opinions about his -- about Mr. Gammal's post-arrest statement, you know, whether he thought things were credible or incredible based on his knowledge, and that's why it is a little bit more complicated.  That's why these prior statements might become relevant to his direct testimony.

THE COURT:  So this agent was the main case agent as he's been described in this case?

H133gam1

MR. QUIGLEY:  He was one of the case agents prior --
there were a number of case agents.  I think it is fair to say
he was the main case agent for a time.  He is not testifying as
a case agent here.  He's testifying, if at all, about the
defendant's post-arrest statement.

THE COURT:  Presumably there is some body of other
documents he created over the course of his involvement in this
investigation that has not been turned over because of the view
of the government that it does not come under the definition of
material that should be turned over pursuant to Section 3500.

MR. QUIGLEY:  That's correct.  There are materials
that have been turned over, not as his 3500, but as other
people's 3500 that he wrote.  So the defense does have a
substantial corpus of material from Agent Nguyen.  But we did
not turn over everything he ever wrote on the case because the
subject matter of his testimony is going to be very limited.

THE COURT:  I have a representation from the
government they're not withholding anything.

MS. MIRON:  They're not withholding much.  What
they're withholding we'd ask for an in camera review.

THE COURT:  The way I think of "withholding," it is
discoverable or producible pursuant to this provision or
they're withholding it for one reason or another.  They are
saying it doesn't come under the definition because of what
he's going to be testifying about.

H133gam1

MS. MIRON:  But the procedure is clear.  If they do not turn over materials because they think they're not relevant, the Court shall conduct an in camera review.  That's the procedure.

MR. QUIGLEY:  Your Honor, I think the statute also, the procedure under the statute is also that we're supposed to turn over the witness's 3500 after he testifies, in which case the Court is going to be better informed about making such an in camera review.

Here we're proffering that the subject matter of his testimony is going to be extremely limited.  It is not going to be like he's going to testify about bank robberies two and three but not about bank robbery one.  It is going to be just about the defendant's post-arrest statement.  And if for some reason that changes, we will -- which I don't think it will -- but if it does, we'll reevaluate what we've produced.

THE COURT:  I don't think I'm required to do anything more, require the government to do anything more at this point. So, to the extent that you're asking me to direct them to turn over for in camera inspection the balance of Agent Nguyen's materials, that request is denied.

Okay.  What else do we need to do today?

MR. QUIGLEY:  We don't have anything else, your Honor.

MS. SHROFF:  Nothing more other than the short CIPA proceeding, your Honor.

H133gam1

THE COURT:  So then let's do that.  We'll do that in the robing room.

MS. SHROFF:  Sure.

(Pages 51-60 sealed)

oOo