GctWgamC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA,

v.                                    15 Cr. 588 (ER)

AHMED MOHAMMED EL GAMMAL,

                                      Conference

              Defendant.

------------------------------------x

                                      New York, N.Y.
                                      December 29, 2016
                                      3:00 p.m.

Before:

              HON. EDGARDO RAMOS,

                                      District Judge

                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BRENDAN F. QUIGLEY
NEGAR TEKEEI
ANDREW J. DeFILIPPIS
     Assistant United States Attorneys

DAVID E. PATTON
     Federal Defenders of New York, Inc.
     Attorney for Defendant
SABRINA P. SHROFF
ANNALISA MIRON
DANIEL G. HABIB

GctWgamC

(Case called)

THE COURT:  Good afternoon.  This matter is on at the Court's request to issue certain pretrial rulings.  I will note for the record that I did receive, I think two days ago, a letter from the government concerning a notice of expert that they had received from the defense and certain *in limine* motions that the government made with respect to certain exhibit items that Mr. El Gammal's counsel indicated they wished to introduce at trial.  I have not received a response from the defense.  The government did want a ruling, at least on the expert, by today, so let me just ask the defense table.

What is the status with respect to a response; are you expecting to put in a written response?  We could also just argue it out this afternoon, depending on how things go.

MR. HABIB:  Your Honor, we've reviewed it, and I'm not prepared to argue orally today.

THE COURT:  OK.

MR. HABIB:  I would propose, if it's acceptable to the Court, to file a written response on Tuesday.

THE COURT:  I guess that's OK with me.  If possible, given how close we are to trial, can you get the expert part of it to us?

MR. HABIB:  Ms. Miron can speak to that.

THE COURT:  OK.

MS. MIRON:  Your Honor, there was a flurry of

GctWgamC

cross-motions about precluding experts.

THE COURT:  Yes.

MS. MIRON:  As it relates to the government's recent motion to preclude Ashkan Soltani from testifying, we actually did not serve expert notice of his testimony, and I told the government -- we'd been asking them for months what exactly they planned to elicit from their Facebook witness regarding the Facebook records, because if it has to do with the timing of deletions, we might want an expert to counter that testimony.  I've received a representation that they do not plan to elicit testimony from the Facebook witness about the timing of deletions.  I don't know what they're planning to elicit from the Facebook witness.  We haven't been asked to stipulate to the admissibility of those records, so I imagine it's something broader than just, These are the Facebook records.  So we're in a position where we're waiting for tomorrow to get some 3500 materials to understand exactly what they plan for this witness to say, and at that point, if necessary, we will consult with Mr. Soltani and serve notice, but we're always about a three-day lag behind the government. They're giving us certain new materials, we're consulting with experts, and then at that point telling the government yes, we need to call an expert on this issue, and this relates to the forensic reports, which I'm happy to address, but you might want to address at a later point.

4

GctWgamC

THE COURT:  I'm sorry.  Is it your position that the information concerning the possible expert was just a placeholder from your perspective?

MS. MIRON:  I gave them the CV, which they gave to us. They gave us forensic experts' résumés back in October, and they didn't tell us what those forensic experts were going to say.  Until last night I didn't know what Mary Horvath, for example, was going to say on the stand.

THE COURT:  Did the government provide additional materials in addition to the CV?

MS. MIRON:  As it relates to Mary Horvath?

THE COURT:  Or as it relates to the other gentleman, the cell site gentleman.

MS. MIRON:  The cell site is a separate issue.  We haven't renewed that motion to preclude the cell site expert. We understand the Court's ruling that the proposed presentation is sufficient notice.  We have other qualms with the presentation, but if the Court has ruled that this is sufficient notice as it relates to that expert's testimony, we're respecting that ruling.

THE COURT:  OK.

MS. MIRON:  But last night we received a presentation from Mary Horvath, who I imagine will testify about her findings on an iPad; to this day I don't know exactly what conclusions she's drawn.  For example, last night, we received,

GctWgamC

I think, a 12-page presentation. Page 12 is a highlight of the Telegram application. I don't know if Ms. Horvath is going to say that application was used, downloaded at a certain point, accessed ever. I have no idea, and this is the type of expert notice that we need in order to rebut it, if necessary, with our own expert. But Rule 16 requires a written summary of the conclusions and opinions drawn from the materials reviewed by the expert, and we are not getting sufficient notice.

THE COURT: In other words, your notice was specifically tailored to meet, you believe, their notice.

MS. MIRON: In other words, as it relates to our potential expert about the Facebook records, I have nothing to notice at this point because I don't think our expert would say anything different from their expert, but I don't know what their expert's going to say, so we gave them the CV in case they want to do background research on him because at some point we might say, Yes, he came to a different conclusion than your expert.

THE COURT: Let me hear from Ms. Tekeei.

MS. TEKEEI: Thank you, your Honor. I can speak a little bit as to the Facebook witness, and my colleague, DeFilippis, will speak as to Ms. Horvath and Mr. Roth. Your Honor, we have conveyed to defense counsel now multiple times that we are not calling an expert with respect to the Facebook records. We have noticed, we have subpoenaed, and expect to

GctWgamC

call a Facebook custodial witness who will describe what Facebook is and authenticate the Facebook records, and we do not expect that she will provide testimony regarding the precise timing of any of the deletions that are at issue. We have conveyed that to defense counsel, and again, we are not calling an expert witness to discuss the timing of any deletions with respect to communications of the defendant or others on the Facebook records.

THE COURT:  So not an expert witness as such.

MS. TEKEEI:  That's exactly right, your Honor.

THE COURT:  OK.

Mr. DeFilippis.

MR. DeFILIPPIS:  Yes, your Honor.  As defense counsel acknowledged, we did last night produce additional information from Ms. Horvath.  She actually just finished the first draft of her trial presentation yesterday.  We immediately provided it to defense counsel, and I think the bottom line with all three of our technical experts, the cell site and the two forensic examiners who looked at the devices in this case is that we have complied exactly with your Honor's ruling with regard to the cell site expert.  They are now in possession of three separate presentations which we expect to be the same or almost the same as what will be testified to at trial.  They have been in possession for many months now of several productions containing the underlying data from these devices,

GctWgamC

not only the underlying data from the devices but forensic extraction reports that categorize and summarize and present that data.

THE COURT:  Why don't you give me an example of what that is so I can understand it, because my rudimentary understanding of what Ms. Horvath, for example, would do is --

What did she work on, the iPad?

MR. DeFILIPPIS:  It was an Apple iPad Mini.

THE COURT:  -- is that she would take an iPad and she would extract, using whatever extracting tool may exist, and if there's more than one, she has her particular favorite, and she extracts from that iPad everything that's on there.

MR. DeFILIPPIS:  That's correct, your Honor.

THE COURT:  And that's it, correct?

MR. DeFILIPPIS:  That is her first function.  That's what she does in the first instance.  She extracts the data, then uses a commercial software to essentially make that data readable to the layperson.  It has categories and graphics that display the data in sort of chart format.  It produces time lines and analytic reports that are all contained within what's called the extraction report.  So that's one level synthesized from the data.  It's actually something that makes the data more readable.

THE COURT:  OK, but time lines and the other thing that you mentioned, what does that do?  Does that say, Oh, not

GctWgamC

only is there this picture on the iPad, but this is when the picture came in, this is how many times the picture was looked at?

MR. DeFILIPPIS:  Exactly, your Honor, and when I referenced the time-line-function, for example, the extraction report sometimes aggregates different types of data on the phone in chronological order, so it has a section where you can look at a call was made on this date and time, two minutes later a picture was downloaded.  It sort of aggregates to give the reader a sense of what was going on the phone in chronological fashion.  That's just one example of the ways in which these reports, and these reports, which were produced months ago, that's what they show.

THE COURT:  You said that the reports were produced months ago?

MR. DeFILIPPIS:  Yes.  And so, your Honor, there are three categories of data here:  There's the raw data from the phone; there's the extraction report, which is a comprehensive display of all the data on the phone, including time lines and things like that; and then there's what we produced more recently, which is the trial slide presentation of Ms. Horvath, which is only the limited set of data on the phone that she intends to highlight in her testimony.  For example, and it's approximately, it's under 20 pages long, 20 slides long.  This is the presentation that Ms. Horvath intends to put up at trial

GctWgamC

where she will, for example, highlight that on a particular date there was a search for Syria conducted on the phone. Another example is that there's IP address that the agents have identified as of interest to this investigation; she will highlight that in fact that IP address was present and used to connect the iPad.

THE COURT:  I take it that Ms. Horvath is not going to speak about the significance of Syria, to use your example.

MR. DeFILIPPIS:  Correct.  She will only testify forensically as to what happened on the phone.  She'll offer no opinions, substantive judgments on obviously the case or its implications for the case.

THE COURT:  And I take it that she is highlighting those items on the 20-report because she was directed to do so by the prosecution team.

MR. DeFILIPPIS:  That's correct.  And, your Honor, this presentation, we think, effectively gives defense counsel not only the subject matter of her testimony but her conclusions insofar as it displays for defense counsel the precise data that she's going to testify about on the phone.

THE COURT:  I guess what I'm wondering is when you say conclusions, again I see Ms. Horvath simply as a technician.

MR. DeFILIPPIS:  I mean forensic conclusions.  For example, your Honor, and this is actually more relevant to our other expert, Mr. Roth, who analyzed other devices, there are

GctWgamC

videos that were recovered from a laptop and the PowerPoint presentation shows the date on which those videos were created, accessed, modified. Mr. Roth will testify as to that data and highlight for the jury the meaning of those dates and that data.

THE COURT: And the defense has that information.

MR. DeFILIPPIS: They do.

THE COURT: From Mr. Roth.

MR. DeFILIPPIS: They do. They have had it since discovery was produced in the actual data. They have had it since they received an extraction report several months ago, and they've now had it highlighted for them in the PowerPoint presentation.

THE COURT: OK. Thank you.

MS. MIRON: I disagree on several points. The first is as it relates to the iPad, Mr. DeFilippis referenced raw data. I don't know if he misspoke, but we never received raw data from the iPad. We received one extraction report and then last night a revised one. I have had some hours to try to figure out the differences. It looks like the second one is 800 pages longer. I don't know if that means it includes additional data that we've never seen or it's just reformatted. Maybe the government can clarify, but we never received the raw data from the iPad.

THE COURT: I'm sorry. Did you receive the slide

GctWgamC

presentation?

MS. MIRON:  The slide presentation we received last night.

THE COURT:  Yes.

MS. MIRON:  Which is 12 pages, yes.

THE COURT:  OK.  And he indicated before that you received two other reports.

MS. MIRON:  He mentioned raw data as the first type of information.

THE COURT:  Did you receive some other reports prior?

MS. MIRON:  We received two extraction reports.

THE COURT:  Maybe we're just talking about terminology here.

MS. MIRON:  I don't think we're just talking about terminology.  An extraction report, as your Honor mentioned, is something that an agent extracts, thinks is relevant either from the direction of the prosecutor or a different agent or her own self, and then culls it into a report.  We've received one extraction report.  We received that a long time ago, probably about eight months ago.  We, last night, received a second extraction report.  I'd like to know from the government what the difference is, because if it's additional data, that's a Rule 16 violation.

THE COURT:  OK.  Mr. DeFilippis.

MR. DeFILIPPIS:  Yes, your Honor.  I think the key

GctWgamC

here, and when I said raw data, I believe, and we'll check on this, I believe we may have provided to defense counsel essentially raw-image data that even the U.S. Attorney's Office didn't initially have access to, but again, what makes the data readable is the extraction reports, and the extraction reports, the forensic examiner does not exercise sort of editorial judgment in producing the extraction report.  They run a software that extracts the data and presents the data.  So that is essentially the raw data from the device.  It pulls all of the data from the device and puts it in a readable format, so at the very time they received those extraction reports, they had access to every bit of data that's possible to view and extract from these devices, and they have had that data for many months.

THE COURT:  OK.  Just to clear up a point that Ms. Miron made, I think, at the initial stage the technician is not making a determination, Oh, this is important, this is not important; they're just extracting everything.

MR. DeFILIPPIS:  Correct.

THE COURT:  They're sucking every bit of information out of that device, correct?

MR. DeFILIPPIS:  Correct, using a software which they don't design.  It's a commercial software that simply pumps out the data.

THE COURT:  Let me ask you this with respect to Ms.

GctWgamC

Horvath.    Is there anything else that she's going to be working on, any other reports?

MR. DeFILIPPIS:    There is not, your Honor.    The extraction report will be the basis for, like I said, the narrow set of data and topics that she'll highlight in her presentation, but there's nothing beyond what is in those extraction reports that she will opine on in terms of the forensic analysis of the devices.

THE COURT:    OK.

MS. MIRON:    Your Honor, I asked what the difference is between the original extraction report and last night's extraction report.    If it's just reformatting, we have no problem with that.    If it's additional data, that will require our time in going through it.    It appears to be 800 pages longer.

THE COURT:    800 pages longer?

MS. MIRON:    Yes.

THE COURT:    Mr. DeFilippis, do you know?

MR. DeFILIPPIS:    Yes, your Honor.    We've spoken to Ms. Horvath about that.    Apparently she ran a newer version of the software.    The FBI is continually receiving updated versions of the software, and it did produce a longer report. What we did, and it would be time-consuming for her to go line by line and determine exactly what was not included in the previous, but the bottom line is that as to the limited set of

GctWgamC

things that she expects to focus on in her testimony -- the data, the analysis, the conclusions -- it's all exactly the same. There is nothing she will testify about that has changed in the new version of the report.

THE COURT: OK.

MS. MIRON: Your Honor, that's a Rule 16 violation. It's a copy that's given to us too late in time. It's 800 pages of data that they're giving to us a week and a half before trial.

THE COURT: But if what Mr. DeFilippis just said is accurate, which is to say let's say she never ran this second report with extraction software 2.0, the testimony she will be giving at trial will be exactly the same. Unless I misheard him, you're getting a different look at the same data that was produced to you before.

MS. MIRON: Then they should rely on the first report if it's so similar. I mean, they're drawing the conclusion that it's the same. If her testimony is never going to change, they should just introduce the report that we have had for months and have been able to read. Instead, if the Court allows them to introduce this 800 different pages of data that we don't have time to read right now, because we've got other things to do, that would be a Rule 16 violation because we never received the information before. We have never had our hands on the iPad or the raw data, so it is additional

GctWgamC

information that's being disclosed in an untimely fashion. We never had access to those 800 pages of additional information. We demanded it but never received it until last night. That is a Rule 16 violation. The government's argument that there is no substantive difference as it relates to their expert's testimony should work in favor of them relying on the original report.

THE COURT: Let me just ask this generally. Was it the government's intention to submit this 800-page report to the jury?

MR. DeFILIPPIS: No, your Honor. The government does not actually intend to offer, we intend to mark it and present it to the witness for authentication purposes. We only intend to offer as evidence the data that Ms. Horvath testifies about, and that goes for Mr. Roth as well; in other words, excerpts of the reports, which again are the same for both reports. Again, I don't know whether we call it data from one report or the other, it's the same data that's going to be testified about.

THE COURT: I guess we're not going to be able to figure this out right now, because as far as I, and both sides are under a distinct disadvantage because I barely understand what's going on with respect to this stuff, but as I understand it, the universe of information that Ms. Horvath had has been the same throughout and she more recently, and it will be interesting to know when exactly, perhaps, she ran this new and

GctWgamC

advanced software that configured the data in a slightly different way, perhaps in a more clear way, and that may have some effect on the jury's ability to discern what was on there. I don't know, but it apparently, based on the representation that's been made, has had no effect on the conclusions to be drawn from the data that everyone has had for some months now, I suppose. Did I get all that right?

MR. DeFILIPPIS: I think that's right, your Honor.

THE COURT: Let's see.

Ms. Miron.

MS. MIRON: Yes, your Honor. I believe it's a Rule 16 violation because the government's saying they ran a new version of this software that permitted them to access information that they did not disclose earlier, so I would ask that a pretrial hearing be held to determine when this was run and why it wasn't disclosed to the defense until last night. In addition, our motion to preclude her testimony, we have renewed that because this report, her presentation, let me be specific, her 12-page presentation, references an installed application called Messenger. This is the first we've heard of the government seeking to elicit any testimony about this application. I asked on October 28 for a very specific proffer from the government because I knew there was a universe of data out there on the iPad.

I'm sorry. Telegram. Not Messenger, Telegram.

GctWgamC

Messenger is Facebook. We've known about that. Telegram. Telegram is another application, and if Ms. Horvath is going to testify about anything related to Telegram, we would like notice of that. Mr. DeFilippis says she's going to testify about the meaning of this presentation, that's exactly the type of notice we're seeking. What are her conclusions about this line of data that she put in her presentation? What is her conclusion, that he downloaded it, that he accessed it, that he used it, that he deleted it? I have no idea, and we need to know in order to consult with an expert and potentially call someone to rebut her testimony.

THE COURT: I guess I'm happy to have a hearing, and by the way, I'm yours for the next week and a half.

MS. MIRON: Right, we'll come back.

THE COURT: Including Monday, by the way, this Monday. But I guess as I sit here, I don't know whether even if you're right that it's a Rule 16 violation that your remedy will be any different from she gets to give the same testimony before that she proposes to give now. See what I'm saying?

MS. MIRON: I do understand; the remedy is separate from the question of the violation, but they're two separate issues. We're asking for a pretrial hearing about when they ran this separate, new version of software that allowed the agent to have additional information we have never had until last night, why that wasn't disclosed to us earlier. In

GctWgamC

addition, I'm just asking for expert notice about a written summary of her proposed testimony so that I may then seek a defense expert on the same topics. Their giving us a printout of her highlighted data extractions does not give me a summary, any notice of her conclusions.

I can't understand what application ID 5979D51A means; I don't know what she's going to explain to the jury that it means. If they give me notice that she's going to testify in her expert opinion, this was downloaded on this date, this was accessed on this date, this was used to communicate with this person, then I may seek my own expert to rebut that. This is improper notice. It's inadequate, and that's why we've renewed our motion to preclude.

THE COURT: Let's take a look at it. I haven't seen this, obviously, so let's take a look at it. Maybe the parties can discuss it some more and maybe we can obviate a hearing, or maybe not and we have a hearing. In any event, it does not appear to be ripe for resolution this afternoon. I guess we'll get the defense response to the government's letter Tuesday?

MR. HABIB: I had said Tuesday. If the Court is working Monday, it seems reasonable for me to work Monday also, so Monday.

THE COURT: With that, let me get to some of the outstanding motions, and the first motion that I want to discuss is the defense motion to suppress and for disclosure of

GctWgamC

the FISA order application and related materials.

On July 13, 2016, the government provided the defendant with notice that it intended to rely in its case in chief on information obtained and derived from physical searches conducted pursuant to the Foreign Intelligence Surveillance Act of 1978, which I will refer to as FISA. By notice of motion publicly filed on September 19, 2016, but dated August 2016, the defendant moved to suppress the FISA materials the government intends to offer at trial or, in the alternative, to compel disclosure of the FISA application, order, and related materials. On September 23, the government responded by submitting a memorandum of law *in camera, ex parte*, and under seal to the Court and by filing an unclassified version of that same memorandum, which had been redacted to remove the classified information that was provided to the Court. The Court has carefully reviewed the parties' submissions, including the FISA materials sought to be disclosed, and I hereby deny the defendant's motion in its entirety.

At the outset, the Court notes that, despite obviously the very serious natures of the case, including the potential risk to Mr. El Gammal, the facts of this case are actually very straightforward. Mr. El Gammal is alleged to have conspired with at least two other people to facilitate the travel of coconspirator No. 1 to Syria so that he could join and fight

GctWgamC

with ISIS, a foreign terrorist organization. That is all that there is to this case. In doing so, Mr. El Gammal is alleged to have violated four distinct criminal statutes.

El Gammal challenges the legality of the FISA-obtained information on a number of bases: specifically that the government could not have asserted that Mr. El Gammal was an "agent of a foreign power," as required by the statute; that a "significant purpose of the FISA application was to obtain foreign intelligence"; that the FISA application must have contained intentional or reckless material falsehoods or omissions, thus requiring a hearing under Franks; and that required certifications were or may have been insufficient, and finally that the government be required to prove that it utilized effective minimization procedures. He also argues that that this Court cannot decide these questions without the involvement of his attorneys.

The Court first finds that it can appropriately deny disclosure without affording the defendant a hearing. In enacting FISA, Congress expressly provided that where, as here, the attorney general certifies that "disclosure of FISA materials or an adversary hearing would harm the national security of the United States," a district court must "review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was

GctWgamC

lawfully authorized and conducted." 50 U.S.C. Section 1806(f); see also U.S. v. Abu Jihaad, 630 F.3d 102, a Second Circuit case from 2010, which I will be referring to frequently. While the district court retains authority to order disclosure of FISA materials "under appropriate security procedures and protective orders," it may do so "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance." Where the court "determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure." Consistent with these statutory provisions, the Second Circuit has concluded that disclosure of the FISA materials is "the exception and ex parte, in camera determination is the rule." United States v. Stewart, 590 F.3d at 129.

Here, as I indicated previously, the FISA materials are relatively straightforward and not complex. Specifically, I find disclosure and an adversary hearing are unnecessary because my in camera, ex parte review permitted me to assess the legality of the challenged surveillance, and to do so consistently with the requirements of due process.

Secondly, I find that the government has fully complied with the FISA warrant requirements and that there is no basis in the record for a Franks hearing. Taking into consideration El Gammal's claims that the government must have

GctWgamC

failed to satisfy the agent of a foreign power, significant purpose, certification, and minimization requirements of FISA, and proffered false information warranting a Franks hearing, I conducted a careful *in camera* review of the FISA order, the government's application for that order, and the classified materials submitted in support of that application. I have also reviewed the government's classified memorandum in opposition to the defendant's motion, the attorney general's publicly filed certification, the classified declaration of a high-ranking executive official with national security responsibility and with supervisory responsibility over the investigation conducted herein. And the classified declaration by a member of the federal agency that conducted the investigation regarding the applicable minimization procedures and the agency's compliance with those procedures. Having conducted that review, I conclude that the government has fully complied with the FISA requirements in this case and that there is no basis for a Franks hearing. I further find that, as the Second Circuit noted in Abu Jihaad, and as has been found virtually uniformly by numerous courts around the country, conducting the review *in camera* and *ex parte* does not offend the Constitution. Abu Jihaad, 630 F.3d 129.

FISA warrant applications are subject to "minimal scrutiny by the courts," both upon initial presentation and subsequent challenge. United States v. Duggan, 743 F.2d at 77.

GctWgamC

Moreover, "the representations and certifications submitted in support of an application for FISA surveillance should be presumed valid" by reviewing court absent a showing sufficient to trigger a Franks hearing. Duggan, 743 F.2d 77 n. 6. As case law in this circuit and elsewhere makes clear, however, this deferential standard of review does not mean that in the FISA context, district courts serve no role other than as a rubber stamp. Wilson v. C.I.A., 586 F.3d 171, 185 (observing in non-FISA context that "[d]eferential review" of classification challenge "does not equate to no review"). In reviewing a warrant application, the FISA court properly considers whether (1) the application makes the probable cause showing required by FISA, that is, that the target of the warrant is a foreign power or agent thereof and that the facilities or places to be searched or surveilled are being used or about to be used by a foreign power or its agent; (2) the application is otherwise complete and in the proper form; and (3) when the target is a United States person, the application's certifications are not "clearly erroneous." Duggan, 743 F.2d at 77.

Here, the parties dispute what standard of review is appropriate for the determination of probable cause, and while I find that the government has the better of the argument, I nonetheless note that the government easily establishes probable cause here even when measured against the standard

GctWgamC

urged by the defense, which is the standard in typical criminal cases.  The government's detailed submissions in this case clearly describe the facts supporting the government's assertion that there was probable cause to believe that the target of the FISA application was an "agent of a foreign power, that the facilities at which surveillance would occur [were] being used, or about to be used, by the target, and that a significant purpose of the surveillance was to gather for an intelligence information," citing Abu-Jihaad, the district court decision reported at 531 F.Supp. at 313.  In that regard I also note, to directly address the defendant's supposition, that the FISA application did not rely solely on protected First Amendment activity.

The classified record convincingly satisfies FISA's purpose and probable cause requirements, and further reveals no clear error in the certifications by high-ranking executive officials.  Further, because I discern no basis to think that the FISA application contained any false statement, much less one made "knowingly or intentionally, or with reckless disregard for the truth," I find no need to hold a Franks hearing.

Relatedly, I hereby grant that portion of the government's October 17 motion in limine, which I left open when we were last together, which sought an order precluding defendant from referencing that certain materials to be

GctWgamC

presented at trial were derived from FISA searches. I conclude, unless something happens during the course of the trial that would lead me or compel me to conclude otherwise, that the mere fact that some evidence was derived from a FISA-authorized search is irrelevant to any issue that the jury would have to find at trial. The fact that, as the defendant surmises, FISA-derived evidence did not yield certain inculpatory evidence is simply irrelevant to the issue of whether the defendant is guilty of the crimes charged. See, for example, United States v. Walker, 191 F.3d 326 at 336; and United States v. Williams, 205 F.3d 23 at 34.

Turning briefly to defendant's other motion, the motion for notice and discovery, I frankly found that to be a curious motion. I have not seen one quite like it. The premise of the motion, as the government notes, appears to be that there is something out there that the government is withholding. To the extent that that is true, it would appear to the Court that the government is abiding by its obligations by the notices it has provided in its FISA and CIPA motions, the latter of which is still pending. Unless there is something in particular that the defense wishes to bring to my attention, that motion is denied without prejudice to renew in the event the defense is able to bring something more concrete to the Court's attention.

Turning now to the government's December 9 motion in

26

GctWgamC

*limine*, actually, the more recent motion asking that the Court take judicial notice of ISIL, or ISIS, as a designated foreign terrorist organization, that motion is granted.  The defendant's opposition does not appear to oppose the government's motion *in limine* regarding judicial notice, and the Court finds that the government's request is appropriate, and I will take judicial notice of the designation of the Islamic State of Iraq and the Levant ("ISIL") as a foreign terrorist organization effective as of October 15, 2004, and the government shall submit its proposed statement regarding judicial notice.

Let me ask.  Are we referring to it as ISIL or ISIS, or are we referring to it interchangeably, and does it matter.

MR. QUIGLEY:  I don't think it matters, your Honor.  I think our intention was to refer to it as ISIS during trial since that's what most of the population knows it by.

THE COURT:  OK.  Next, concerning defendant's December 9 motions *in limine* concerning videos from a Toshiba laptop seized from defendant's home during the execution of a search warrant, the government's exhibit list contains five videos from a laptop seized during the execution of a search warrant at Mr. El Gammal's home, and Mr. El Gammal objects to their admission.  Among the computer files extracted from the laptop were videos which the government claims have been downloaded to the laptop.  They are as followed:

GctWgamC

Government Exhibit 1 generally is a New York Times report entitled "Surviving an ISIS Massacre," which contains videos of ISIS militants executing bound prisoners by shooting them in their heads, as well as interview with an Iraqi soldier who survived the massacre;

Government Exhibit 12, a video depicting an armed man in fatigues flanked by other armed men in fatigues with an ISIS flag behind him, addressing a group of people on a city street, in Arabic, and discussing God giving "victory" to "the mujahideen who worship him." A title card indicates that the video comes from the Information Office of the State of Aleppo";

Government Exhibit 15 is a video depicting armed men in fatigues guarding and striking prisoners in civilian clothes, accompanied by a voice-over audio track, in Arabic, that includes such statements as "God, grant us martyrdom," and "God be with our oppressed Muslim brothers in Syria";

Government Exhibit 14, a television news broadcast of a monologue by a masked man discussing in Arabic "Palestinian resistance";

And Government Exhibit 13, an Arabic-language monologue delivered over a still image of the ISIS flag, purporting to describe ISIS's political and military practices. The government states that the speaker is believed to be ISIL spokesman Mohammad al-Adnani.

GctWgamC

First of all, with respect to Government Exhibit 14, which is the television broadcast of a monologue by a masked man, the government states in its opposition that it does not intend to introduce that video. Therefore, the Court need not rule on its admission.

With respect to Government Exhibits 11, 12, 13, and 15, the Court holds this evidence is admissible for the purpose of establishing the *mens rea* element of the charged offense and to provide the jury with an explanation of the understanding or intent with which the offense was carried out. Although Government Exhibit 15 shows militants whose affiliation is unclear, it's therefore unclear whether they are ISIL-related. It is nonetheless relevant to defendant's motive and intent as it has the ability and tendency to show the defendant's support for militant action and his knowledge of the conflict in Syria.

The Court finds that the probative value of these videos outweighs any risk of unfair prejudice. As the district court noted in Abu Jihaad, reported at 553 F.Supp.2d 121, the videos may be violent and gruesome in places, but "nightly news dispatches...are often far worse." While the defendant has not proposed an alternative limiting instruction, the government cites courts in this circuit that previously have admitted such evidence and minimized any unfair prejudice through limiting instructions. See, for example, Abu-Jihaad, 630 F.3d 102, 133 where the Second Circuit upheld the admission of video evidence

GctWgamC

where the district court entered a limiting instruction that stated that the videos were evidence only of intent and further that the evidence should be considered "dispassionately, and even if there's material that you find personally distasteful, you can't let your personal opinions, your fears, your biases, to enter into your consideration."  Should the defense here desire a similar limiting instruction, the Court will so instruct the jury.

As to defendant's argument that there is no evidence that defendant actually watched the videos (as opposed to simply downloading them and never viewing them), again whether he ever watched them goes to the weight of the evidence and not to its admissibility, and it is the role of the jury to decide which inference, which competing inference, to credit.

Moving now to the April 2014 Facebook messages regarding securing residency in the United States, in an April 24 Facebook exchange, Mr. El Gammal apparently discusses with another Facebook user the possibility that the latter could try to immigrate into the United States by obtaining a tourist visa and then claiming asylum.  The defense argues that this evidence suggests that the defendant encouraged the user to mislead U.S. immigration officials and argues that these statements should be excluded as irrelevant, unfairly prejudicial, uncharged prior bad acts under Rule 404, and barred by Rule 608.

GctWgamC

The government indicates that it does not intend to offer these statements in its case in chief, but should the defendant testify, it reserves the right to cross-examine the defendant about these statements. Based on this representation, the Court therefore defers ruling on this issue. Should defendant testify and the government seek to examine the defendant with these statements, the defendant may renew its objection at that time.

Turning now to the July 2014 Facebook messages regarding weapons and ammunition into Egypt, in a July 2014 Facebook exchange Mr. El Gammal and another Facebook user discussed smuggling weapons and ammunition into Egypt, how merchants within Egypt procured ammunition, and the process of assembling AK-47 rifles. Defendant argues this exchange should be excluded as irrelevant and unfairly prejudicial and confusing under Rule 403.

As to that conversation, the Court finds this evidence is admissible. This evidence is relevant to defendant's knowledge, intent, and motive, and the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice or confusing the issues.

Turning to the Facebook post reproducing the hadith about a caliphate, which is Government Exhibit 100 L-T, defendant argues that this exhibit, a July 2014 posting regarding an ancient hadith, which is a saying attributed to

GctWgamC

the prophet Muhammad) concerning a "caliphate" is irrelevant and hearsay.  The defendant states that this message was not created or posted by the defendant but instead was "tagged" with Mr. El Gammal's name, and therefore the evidence is not relevant to defendant's mental state at all, as the government has previously argued.  Moreover, it is hearsay because it is an out-of-court statement not offered for its truth.

As to this exhibit, reproducing a hadith about the "Islamic caliphate," the Court finds this evidence is inadmissible.  The defendant has objected on both the reasons of relevance and hearsay.  The Court finds that this Facebook post which was neither written nor posted by defendant, but instead only "tagged" to link his profile by another user, is irrelevant and also impermissible hearsay absent any argument from the government to the contrary.  Simply because another user "tags" a Facebook member in the post does not mean that the tagged individual agrees with, adopts, or approves the tagging.  So that exchange will not be admitted.

Turning now to the Facebook profile picture of a soldier, Government Exhibit 100-N, at page 12, apparently in July of 2014, according to the government's theory, Mr. El Gammal used as his Facebook profile picture an image of a masked soldier emerging from the water and pointing a rifle. The defendant argues that this evidence is not relevant and risks confusing the jury.  Defendant states that through a

GctWgamC

reverse-image search, they determined that the photo is a commonly reproduced photo of a Hamas fighter and that the defendant is not charged with providing material support to Hamas.

As to this exhibit, the Court finds that the picture is admissible. The fact that the defendant changed his own Facebook profile picture to a picture of a soldier with a rifle is relevant evidence of the defendant's state of mind in the summer of 2014. That the fighter may in actuality be a member of Hamas and not ISIL does not undercut or outweigh the probative value of the evidence.

Turning now to the Facebook communication from Attia Aboualala to Facebook user, on pages 8 to 9 of the second motions in limine, the defendant objects to the introduction of any Facebook communications between Mr. Aboualala and other Facebook user whose name is redacted from the public filings. The defendant indicates it objects to the entire 113-page exhibit, which is marked as Exhibit GX122-A-T on that ground.

The defendant additionally objects to communications from September 2015 after Mr. El Gammal's arrest, on page 51 of that exhibit, including messages by Mr. Aboualala to the Facebook user stating, "it is just when the guy knew that he was traveling to Turkey...he told me that if he needed help with lodging and transportation to help him." Defendant argues that this does not fall within the coconspirator exception

GctWgamC

because that Facebook user was not part of the conspiracy and the conspiracy had ended by that point, so any statement narrating past events did not advance the conspiracy in any way.

The government has indicated that it does not seek to offer the entirety of what is currently marked as Government Exhibit 122-A-T, but instead seeks to offer only certain excerpts.

As to the specific September 2015 communications, the defendant objects to, on page 52, CC-2 sent a message to Facebook user 1 with a link to the video of CC-1, (a video which the Court has already ruled admissible) with the message to "check this website and send it to Adhmed's mother." The Court finds this link and message to check the website and send it to the mother is admissible based on similar reasoning under which the Court previously held that CC-1's martyr letter and written communications about the creation of the YouTube video admissible under the coconspirator exception to the hearsay rule. The statements were made in furtherance of the conspiracy because CC-2's statements about the YouTube video advanced the objects of the conspiracy -- that is to say, advanced the carrying out of the plan to provide material support to ISIL, and also by exculpating or attempting to exculpate the defendant. More generally, as to the statements contained on pages 38 to 52 and 105 to 113, which are the

GctWgamC

excerpts that the government proposes to admit made by CC-2, including those regarding the defendant's arrest, the Court finds these statements also admissible as statements of a coconspirator made in furtherance of the conspiracy. Again, as long as the government is able to connect the existence of the conspiracy or to establish the existence of a conspiracy, then this evidence comes in at trial as a statement by the coconspirator.

However, for any statements made by the Facebook user, the government has not provided any hearsay exclusions or exceptions, and there's no basis to believe that this uncharged individual was operating as a coconspirator. Therefore, the Court's ruling regarding admissibility is limited to the proposed statements made by CC-2 to the Facebook user, and not by the Facebook user to CC-2. However, to the extent that any party believes that additional statements from a declarant other than CC-2 ought to be included under Rule 106 for completeness, the Court will consider the admissibility of those statements if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure a fair and impartial understanding of the admitted portion.

To the extent the government seeks to admit additional portions of pages other than the two excerpts, the defendant may raise objections at that time.

GctWgamC

Turning to the April 2015 Facebook communication from Aboualala to another Facebook user, marked as Government Exhibit 122-G-T, the defendant objects to the introduction of an April 2015 Facebook message or messages between Aboualala and another Facebook user.  The defendant objects to the entire exhibit on hearsay grounds, and makes an additional objection to an April 8, 2015, message in which Aboualala says, "Brother Ahmed is one of the good brothers, but he is of the Daesh Brotherhood; do not follow him."  In addition to hearsay, the defendant objects because it is not clear that Aboualala is actually referring to the defendant by his comment.  In the same page, for example, Aboualala refers to a different "Ahmed," and the defendant argues that Aboualala is not referring to the defendant, that if Aboualala is not referring to the defendant in connection with the quoted passage, then the statement has no relevance.

Again, the defendant has objected to the introduction of the entire exchange between Aboualala and the Facebook user on that transcript on the basis of hearsay.  The government has not provided an exception or exclusion for the statements made by the Facebook user contained within the conversation or indicated that it seeks to offer these statements for completeness purposes under Rule 106.  Therefore, any statements made by the Facebook user as opposed to Aboualala are inadmissible on the basis of hearsay.  As to the statements

GctWgamC

of Aboualala contained within the transcript, or within the exhibit, the Court deems admissible the statement "I swear I pray to God for success and repayment and that God gets you through each difficulty and amends what's on your hands and to accept me as a martyr." The Court finds this statement admissible as a statement of a coconspirator because the statement is relevant to Aboualala's knowledge and state of mind during the time period of the conspiracy, and the aims of the conspiracy related to the militant jihadism. As to the statement that "Brother Ahmed is one of the good brothers, but he is of the Daesh Brotherhood; do not follow him," the Court finds the statement admissible as a statement by a coconspirator.

But let me ask the government, as you sit here, do you have any information tending to establish that the Ahmed referred to in this passage is the defendant?

MS. TEKEEI: Nothing other than what is contained in this passage, your Honor.

THE COURT: I think on the law, you're probably --

Yes?

MS. TEKEEI: Yes, your Honor. And the fact that the defendant has historical alignment with the Muslim brotherhood, but to the Court's question as to whether there is direct evidence as to whether brother Ahmed is this defendant, it would be by inference and not direct evidence.

GctWgamC

THE COURT:  I think you guys are OK on the law because it would go to weight and not admissibility, but I question why the government would want to use a statement that appears to be so, arguably at least, ambiguous when there is so much other evidence.  The remainder of the statements made by Aboualala contained within this exhibit, again the government did not provide any exception or exclusion or explain how the statements were made in furtherance of the conspiracy, and accordingly the Court finds that the remainder of the statements are inadmissible.

Turning to the August 1, 2015, email from CC-1 with the subject line Abu Murad, which is CC-1's Twitter handle, Government Exhibit 202-D, the government intends to introduce an email from August 1, 2015, from CC-1, with the subject line Abu Murad.  The defendant argues that this email should be excluded on relevance and hearsay grounds.  It is irrelevant because it does not pertain to any of the charged offenses, and it is hearsay because it does not appear within any of the exceptions.  The government does not address this topic in its response.  Therefore, in connection with this, the Court grants the defendant's unopposed motion *in limine* to exclude that exhibit, which is to say Government Exhibit 202-D, in its entirety.

Turning now to another item which was left open from the last time we were together concerning my ruling, which I

GctWgamC

then deferred on, concerning the admission of evidence of El

Gammal, the defendant's discussion with CC-2 concerning an

AK-47, because of differences concerning the translation.

Let me ask the parties, where are you with respect to

that dispute?

MR. QUIGLEY:  Your Honor, I think we included in our

letter our revised translation.  And we don't have any issue

with the defense characterization of "too sissy to be Daesh."

I think our initial translator retranslated it as "he would be

Daesh."  I think that's two sides of the same coin.

MS. MIRON:  Your Honor, their original translation was

that he's calling him a Daesh gigolo.  We gave the government

our revised translation, which is, "You are too wimpy to be

Daesh."  It does change the nature of the statement.

MS. SHROFF:  And if it doesn't, then by all means the

government should get our translator here.

MR. QUIGLEY:  Your Honor, I think I was agreeing with

the defense.  I don't know that there's any -- upon re-review

we don't have an issue.  We don't think that Daesh, we're not

asking the Court to read that as Daesh gigolo.  We think it's

"too wimpy to be Daesh" or "too sissy to be Daesh."

MR. HABIB:  At the risk of all of us speaking, if the

Court wants to hear us on that now, we can.  I'm also prepared

to respond in writing to the government's most recent

submission, but the crux of our argument would be the premise

GctWgamC

of the Court's earlier ruling was that Mr. El Gammal was describing CC-2 as a Daesh member when he referred to him as what the government said was Daesh gigolo, we think now "you are too sissy" or "too wimpy for Daesh" pretty dramatically changes, alters the premise of the Court's initial ruling, so we think it's no longer appropriate.

THE COURT: I'm happy to await your further submission, so we will defer on that.

I skipped one. There was also the government's motion to preclude "self-serving statements of the defendant." The government seeks to exclude any self-serving or exculpatory statements by the defendant offered at trial. The government argues that it can offer defendant's statements under Rule 801(d)(2) as a statement by a party opponent, but when the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay and therefore not admissible.

The general rule, of course, is that self-serving or exculpatory statements made by the defendant offered by the defense for the truth of the matter asserted are inadmissible as evidence. However, the government has made a generalized objection and did not specify any particular statement that it seeks precluded, and because I denied a similar motion by the defense I will deny the motion here. In the absence of any specificity, the government's motion is denied. However, the

GctWgamC

defendant is admonished to the extent it seeks to introduce any statement that arguably falls within this category that it be prepared to defend that statement with legal authority as to why it should be admitted.

Now I think that takes us to the most recent submissions, including the government's letter of December 27, which will be responded to by early next week, and the defendant's letter also of December 27, which raises three different issues. One concerns the production of 3500 material for Mr. El Goarany. I don't know that there's anything for me to do. I think representations have been that they've given you 99.9 percent and information concerning the .1 percent that has not been turned over.

Ms. Shroff.

MS. SHROFF: Your Honor, after we wrote to the Court, we did get a supplemental production, which contained 302s that were dated as far back as February 2015. Included amongst that production was a 302 that reflected statements made by Tarek El Goarany memorializing a 302 interview of Mr. Ahmed El Goarany. Within that 302 is a notation by the FBI agent that when Ahmed El Goarany was asked who knew about Samy El Goarany's travel to Syria to join ISIS, he said, Only two people knew, myself and Tarek.

THE COURT: Myself and?

MS. SHROFF: Tarek. I keep putting a Q, but it's a K.

GctWgamC

We think that's Brady, that a person in February of 2015 informed the FBI that only two people knew that Samy was traveling to Syria to join ISIS, namely Ahmed, which is a cousin, and the brother Tarek, and that that Brady disclosure should have been made to us a long time ago, just as they had made a Brady disclosure from other witnesses on a similar theory. That was produced to us, I believe --

Was it the day before yesterday?

It was the day before yesterday, so we're going through those additional disclosures about statements made by Mr. Tarek El Goarany. I can write to the Court about this Brady violation and we can move forward on that, but I flag it because the Court raised it now.

THE COURT: Very well.

MS. SHROFF: I have two other issues to raise with the Court if I may. I could do them now or hold off.

THE COURT: Why don't I finish going through your letter of yesterday and then we can take those up. OK?

MS. SHROFF: Sure.

THE COURT: The other item that was raised, one of the other items that was raised concerned the notice of expert witnesses, and it appears as though we're going to get some additional briefings on those. And finally, as to the length of the trial day. The defense has requested that we sit, I typically sit from 9:30 to 5. They've requested that I sit

GctWgamC

from 9:30 to 4.  The government objects.  I'm happy to grant the request, but I'm also giving you a choice.  We can sit from 9:30 to 4 Monday through Friday or we can sit 9:30 to 5 Monday through Thursday.

MS. SHROFF:  Your Honor, may we confer and get back to you?

THE COURT:  Sure.  That takes care of what I need to take care of, and there is still outstanding the CIPA motion.

Yes, Ms. Shroff.

MS. SHROFF:  Your Honor, on the CIPA motion, yesterday evening, I don't really recall at what time, I got notice that the government was going to give me CIPA disclosures, CIPA 3500 disclosure as to Samy and other witnesses in this case.  I was unable to pick that up yesterday.  I picked it up this morning. I wanted to address the contents of the CIPA disclosure in a CIPA proceeding.  I asked the government.  I did ask and it was a request made especially because unlike the government, I do not have a CIPA room in my office.  I do not have a CIPA printer in my office, and the printer in the CIPA room, for some reason or another, did not work.

THE COURT:  I'm sorry.  When you say the CIPA room, are we talking about the SCIF?

MS. SHROFF:  The SCIF.

THE COURT:  OK.

MS. SHROFF:  So the government declined.  I asked the

GctWgamC

government to make sure and bring a hard copy, because we were not able to get a hard copy printed. Apparently the government does not work for me, so they didn't bring a hard copy to court today. It's fine. I will try and get -- I don't even know who to call, by the way, to get the printer in the SCIF working because there are no more notes there. There used to be notes from the prior SCIF users as to who to call, but I will undergo and waste my time trying to get the printer to print it so that the government does not do me any favors, and I ask the Court to schedule a CIPA proceeding tomorrow so that we can discuss the lateness of this production and of course whether or not I then have a motion to declassify.

THE COURT: Can I get a representation as to just how voluminous this is?

MS. SHROFF: I think it's better that Mr. DeFilippis answer that.

MR. DeFILIPPIS: Yes, your Honor. The discovery is not voluminous. It concerns two separate witnesses. With regard to one witness, the data's contained on a spreadsheet, which is about 16 lines, and then the underlying files for those 16 lines, which again are very brief. And the other witness, it's just several emails.

MS. SHROFF: May I just explain to the Court that the files and the Excel sheet don't match up.

THE COURT: I don't understand what that means. I'm

44

GctWgamC

sorry.

MS. SHROFF:  To the extent the Excel sheet purports to reflect the files, it doesn't do so, which is why I asked for a printout, so that I could actually sit down and go through this with the Court.  But I don't have a printout and so I ask you to schedule a CIPA proceeding tomorrow.  As you said, you're ours for a week and a half, so no harm, no foul.  I guess we can all put on a suit and come back.

MR. DeFILIPPIS:  Your Honor, perhaps you could allow the government to confer with Ms. Shroff.  Ms. Shroff called earlier today and commanded the government in what I would say was an abrupt tone to print these and bring them to court for her.  Again, within all reasonable time constraints, we're happy to confer on this and see if we can avoid the need for a hearing.

MS. SHROFF:  I think if I command, they should obey. That's just my thought, but who am I to say.

THE COURT:  The government works for all of us, after all.

MS. SHROFF:  That's what I said to him.

THE COURT:  Let's see if we can't work that out.  It appears to be something at least in the short term that's easily addressed.  On the subject of the equipment in the SCIF, I think you just call the new guy.

MS. SHROFF:  The new guy's not in New York.  I tried

45

GctWgamC

the new guy, and it's the holiday week so I didn't feel like really bothering the new guy, but that's OK. We can move forward from that because it is an issue. Six lines, short information or long information, you know, sometimes it's the one line that hangs it all up, so there is something to be talked about and I would ask the Court to please hold a CIPA conference.

THE COURT: I'm available all day tomorrow with the exception, I believe, of a brief status conference at 11:00, but certainly all afternoon.

MS. SHROFF: That is my issue, your Honor. I do also want to just briefly address the notice we were given yesterday that one of the witnesses being called is Muhammad El Goarany. We are going to serve 609 notice. Mr. El Goarany was convicted of a felony.

THE COURT: I'm sorry. Tell me who he is again.

MS. SHROFF: He's the father of Samy El Goarany. He was convicted of a felony, I believe he was convicted of grand larceny. We would seek to cross-examine him on that point if he were to take the stand. We can write a short letter request to the Court, but I just wanted to give notice. We just found out yesterday, and I don't want to miss the opportunity to put in notice.

THE COURT: Do you know how remote in time the conviction was?

GctWgamC

MR. QUIGLEY: About 16 years, your Honor.

THE COURT: OK.

MS. SHROFF: The issue of translation continues. I don't need to belabor it. I noted in my letter what the constraints are, and we don't have an interpreter right now, as he's out of the country. The court-certified interpreter that we've been using is out of pocket until next week.

THE COURT: Again, my understanding, and you can correct me if I'm wrong, is that both parties are working assiduously to get the translations done and to ensure that there is substantial agreement, at least, so what we may be coming up against are simply the laws of nature, time, and space.

MS. SHROFF: That's fine, but that was the sort of thing that I wanted to note because it was in my letter.

THE COURT: Yes, so unless you see someone dragging their feet, Ms. Shroff --

MS. SHROFF: No, we're not. We understand their witness fell apart. That's OK. I'm just saying our witness is unavailable, so if there's any dragging on our part, I just want to flag for the Court why.

THE COURT: Very well.

MS. SHROFF: Your Honor, may I just have one second.

THE COURT: Certainly.

MS. SHROFF: Your Honor, one final issue, and I think

GctWgamC

Ms. Miron has one more, we just wanted to be mindful of how the Court wants us to handle the objections in terms of, the Court has reserved in terms of the general hearsay objections of evidence coming in.  We wanted to know how you wanted us to be prepared to handle that, if you wanted us to simply object before the jury and then have a sidebar.

THE COURT:  Typically I don't allow speaking objections.  If you have an objection, stand up, object.  If it's plain or obvious what the objection is, I'm happy to rule on it, but if it's not, you say one word, "relevance," "prejudice," whatever it might be, but I do it at sidebar if it's going to be something more substantive.

MS. SHROFF:  And, your Honor, of course on the rulings you've already made, we would want to preserve our objections at trial.  It is understood.

THE COURT:  Absolutely, and by the way, these are motions in limine so the rulings are obviously subject to changes that take place at trial.  Anything can take place during the course of a trial, and these issues may open up and compel the Court to reach a different conclusion.

MS. SHROFF:  OK.  I think that was it for me.  Thank you.

MS. MIRON:  Just to follow up on one issue that I raised earlier, the government says that they do not seek to introduce expert testimony about the timing of Facebook deleted

GctWgamC

messages.  We would like to know if the government would like to introduce nonexpert testimony on that issue.  If so, we may have an expert to rebut.

THE COURT:  Let me ask, are these going to be documents that are sort of self-evident, there will be a notation "deleted" and a time stamp?

MS. MIRON:  There is no time stamp as it relates to the timing of deletions.  So if there is a deleted message, it just says deleted, and we don't know when.  And I would like to know if the government is going to elicit any testimony about that, whether they deem it to be expert or not, and whether they're going to make any arguments about that, because there were multiple Facebook productions.  There were preservation letters at certain points.  There were different ways in which the government obtained Facebook records, and they may have someone who can testify about the timing of deletions.  I don't know whether they do or don't.

THE COURT:  Let me ask.  Are you in a position to say so, and if so, if there is going to be someone from Facebook who is going to say not only was this document deleted, it was deleted at a certain day and time, would that be expert testimony?

MS. TEKEEI:  Your Honor, we do not expect a custodian of records at Facebook to provide any testimony, we do not intend to elicit testimony regarding the precise date and time

GctWgamC

of any of the deletions to which Ms. Miron is referring. However, there are inferences to be drawn regarding the potential time periods of those deletions and when they may or may not have happened based on the face of the records themselves, and so we do intend to argue that deletions were made and those arguments will be made based on the inferences that can be drawn from the records.

MS. MIRON:   We may supplement our expert notice at this point.

THE COURT:   Very well.

MS. TEKEEI:   Your Honor, we have two very quick points.

THE COURT:   Yes:

MS. TEKEEI:   First, your Honor, as the Court is aware, the defense also has discovery obligations.  We have requested discovery from the defense multiple times over the course of the last several months.  We recently, in the last two days, were just provided with expert notice or résumés of defense experts that the defense says they may intend to call.  We will be briefing that in the next day or two, and we intend to move to preclude any testimony from those individuals.  And we would also like to know when the defense, and would like the Court to set a deadline for the defense to present to us their 3500 material and also any exhibits they intend to introduce at trial and any discovery that they have not yet produced.

GctWgamC

THE COURT:  Are you folks in a position to respond?

MS. SHROFF:  Your Honor, I'm not sure on what basis they would move to preclude our expert, so I would like to see that.  I sent them two expert notices.  I sent them one noticing that the person was going to be called, Andrew March.  He's a Yale law professor.

THE COURT:  What is the subject of Mr. March or Professor March?

MS. SHROFF:  Professor March.

Exactly the same thing as their expert.  They know.  They want to call an ISIS expert because they think a person doesn't understand simple words, so we have our own expert.  I, frankly, don't even understand their consultant.  They're calling an expert.  It's logical that we would call an expert.

THE COURT:  An expert on what?

MS. SHROFF:  On ISIS.  They're calling Aaron Zelin, so we're calling an expert.  It just seems logical.  I'm kind of surprised that they're surprised.

THE COURT:  I think they're just concerned about the timing.

MS. SHROFF:  Your Honor, the moment we were able to retain an expert, we gave notice.

THE COURT:  OK.

MS. SHROFF:  The defense is very aware of its obligations under Rule 16 and under 3500 and are in full

GctWgamC

compliance with our obligations.

THE COURT:  Very well.

MS. SHROFF:  Thanks.

MS. TEKEEI:  Your Honor, may we know when the defense plans to produce to us their exhibits and their 3500 material? Ours will be produced tomorrow, as we've indicated previously, ten days before trial.

THE COURT:  Is the defense able to say as you sit here whether or not you will be putting on a case?

MS. SHROFF:  If we're going to put on a case?  I think we gave them expert notice so we're going to put on some case. I can't elaborate beyond that.

THE COURT:  OK.

MS. SHROFF:  The government says they're questioning how admissibility works.  Surely they know by now the defense is in a very different position with respect to whether we put on a case or not.

THE COURT:  Yes.  Obviously you should as soon as you're able, as soon as you determine whether and what the case will consist of, get the government the required materials pursuant to Rule 16 and 18 U.S.C. 3500.  OK?

MS. SHROFF:  Sure.

MS. TEKEEI:  One final issue, your Honor, since we are all here.  We would like to show in our opening statement maps of the region, of Syria and Turkey.  We've asked defense

GctWgamC

counsel if they have any objection to that. We intend to introduce and offer those maps as exhibits through our expert, and we've asked defense to weigh in on whether they have any objections. We don't see a basis for any objection, so what we would like to do is just ask the Court now and let the Court know that we do intend to use three maps that we have marked as exhibits already in our opening statement.

THE COURT: I would be inclined to let them use maps in their opening, assuming they're just maps.

MS. SHROFF: I don't think that's proper. I mean, they know it's not proper. It's not evidence. You're opening, open. We object.

THE COURT: OK, so brief it.

Unless there's anything more --

MS. TEKEEI: Not for the government, your Honor. Thank you.

MS. SHROFF: No. Thank you, your Honor.

THE COURT: -- we'll see you soon.

(Adjourned)