UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X
                                              :
UNITED STATES OF AMERICA,                     :
                                              :
                                              :  Case No. 16-cr-00398  (PAE)
  - against –                                 :
                                              :
                                              :
SAJMIR ALIMEHMETI,                            :
                                              :
                    Defendant.                :
                                              :
———————————————————————— X


**MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. §
3582(c)(1)(A)(i)**


LAW OFFICES OF
SUSAN G. KELLMAN

Susan G. Kellman
Sarah Kunstler
sgk@kellmanesq.com
sarah@kunstlerlaw.net
25 Eighth Avenue
Brooklyn, NY 11217
(718) 783-8200

*Attorneys for Sajmir Alimehmeti*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

*FACTUAL BACKGROUND*.................................................................................................*3*

*ARGUMENT*.........................................................................................................................*4*

**A. The Court Has the Authority to Decide Sajmir Alimehmeti's Motion** ....4

**B The Relief Requested Here Is Authorized by Statute** .................................7

    *1.     Mr. Alimehmeti's Conditions of Confinement* ......................................11

    *2.     Mr. Alimehmeti's Extraordinary Rehabilitation*.................................26

    *3.     Mr. Alimehmeti's Age*...........................................................................34

*CONCLUSION* ...................................................................................................................*37*

Counsel submits this motion pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), for an order reducing Sajmir Alimehmeti's sentence from 264 months to 132 months, based on the "extraordinary and compelling reasons" discussed below. We respectfully request oral argument on this motion.

## INTRODUCTION

Sajmir Alimehmeti was arrested on May 24, 2016, by federal agents at his family's apartment in the Bronx and charged with attempting to provide material support to ISIS.

At the time of his arrest, Sajmir was 22 years old, and a deeply troubled young man. An Albanian immigrant from a secular Muslim family, Sajmir grew up in poverty the Bronx, where he was exposed to violence and criminality at a young age. After several juvenile contacts with the criminal justice system, he was released from prison in 2013, at age 19, when he committed himself to the teachings of Islam, but with little understanding of the tenets of his religion. A young person looking for belonging and identity, Sajmir was unfortunately drawn to radical voices and videos online, setting him on a path that led to his arrest in this case.

On December 19, 2019, your Honor sentenced Sajmir Alimehmeti to 264 months, or 22 years, in prison – one year for every year of his life prior to his arrest. At the time of his sentence, we argued that as a vulnerable young person, Sajmir had been radicalized by online propaganda through a process known as "identity fusion," through which an individual's personal identity is gradually overshadowed by a radicalized group entity, leading to a total endorsement of the narrative

1

proposed by the extremist group. At sentencing, much to his lawyers'

disappointment, Sajmir was not ready to disavow these beliefs. He had spent three

and a half years incarcerated at the Metropolitan Correctional Center ("MCC"),

with the last two of those years spent in solitary confinement. In a reply sentencing

memorandum, we wrote:

> As the government highlights at several points in their submission, the defense submission does not include a fulsome disavowal, by our client, of his extremist beliefs. This is because, in all candor, Mr. Alimehmeti is not there yet. Our client cannot perform a transformation that he has not yet made – and it is not in anyone's interest that he feign beliefs that he does not espouse.
>
> The fact that our client has not yet been fully deradicalized – while caged in isolation at the MCC – should not be a surprise to anyone. This, however, does not mean that he is irredeemable or not worthy of meaningful interventions. Over the past two years, we have come to know an alienated, confused, damaged young man. But Sajmir is much more than that. He is also inquisitive, sensitive, compassionate, and humorous. He is a young man yearning to make connections; to understand, and to be understood.

(Reply Sentencing Letter, December 4, 2019, at p. 4, available at ECF # 132.)

Since then, four more years have passed. Sajmir has now spent over 96

months, or approximately eight years, behind bars, under the harshest of conditions

– both at the MCC and at the government's super max facility, ADX Florence, in

Colorado. And over the past four years, Sajmir has undergone the transformation

that we, as his attorneys, had hoped for, and always knew was possible. After

working for years to disentangle his religious beliefs from his previously held

extremist views, Sajmir has declared himself to be deradicalized and remorseful, and has insight into his past conduct.

## FACTUAL BACKGROUND[1]

Sajmir Alimehmeti was born in Tirana, Albania, to a secular Muslim family that, fleeing the instability of a crumbling communist regime, immigrated to the United States when Sajmir was 7 years old. He grew up in poverty in a dangerous Bronx neighborhood, where shootings and physical violence were all too frequent, and where he began smoking marijuana at age 12, was held up by switch-blade wielding gang members at age 13 and had joined a gang, in order to survive, by age 15. At age 16, Sajmir pled guilty to his first felony; third-degree robbery, for which he was adjudged a youthful offender and received probation. That same year, he entered a mosque for the first time, and was overwhelmed by a feeling of peace and belonging. Soon after, he went to state prison where his faith deepened. When he was released from prison in 2013, at age 19, he was committed to Islam and its teachings. But as a young believer who had not grown up with religious instruction or a religious community, he had little understanding of his newfound religious commitments.

Sajmir, a deeply troubled young person desperate to belong and define his identity, went online looking for answers. He watched video after video and listened to talk after talk, becoming angrier and more radicalized. In 2015, Sajmir's parents and brother all moved back to Albania, leaving him alone in the Bronx at age 21.

---

[1] A more detailed factual background was included in Sajmir Alimehmeti's sentencing submissions, ECF No. 127 and 132.

Alone in the United States, without the support of his family, either financially or emotionally, Sajmir willingly befriended the federal agents who, posing as ISIS supporters, would begin building a relationship with this young man, as they simultaneous began to construct the case against him. These agents took Sajmir out for meals, bought him clothing and served as witnesses at his wedding. They became his de facto "family" and he cared deeply for them. The investigation culminated in May of 2016, when Sajmir was arrested at his family's apartment in the Bronx and charged with attempting to provide material support to ISIS. At the time of his arrest, he was 22 years old.

## ARGUMENT

This Court has the authority to reduce Sajmir Alimehmeti's sentence based on the extraordinary and compelling circumstances presented by his case.  The amendment to 18 U.S.C. § 3582(c)(1)(A)(i) made by the First Step Act permits inmates serving unusually long sentences to seek sentence reductions from their sentencing courts without the imprimatur of the Bureau of Prisons ("BOP") and indeed even if the BOP has refused to make such a motion itself.  The circumstances here warrant such relief, and the factors a court must consider in determining an appropriate sentence weigh in favor of a reduction in sentence.

### A.  The Court Has the Authority to Decide Sajmir Alimehmeti's Motion

What has become known as the compassionate release statute was first enacted as part of the Comprehensive Crime Control Act of 1984.  Pub. L. No. 98–473, 98 Stat. 1837.  It provided that a district court could reduce a term of

imprisonment in limited circumstances, one of which was the presence of "extraordinary and compelling reasons" warranting the reduction, as determined by the sentencing court. *See* 18 U.S.C. § 3582(c)(1)(A)(i) (2002), *amended by* First Step Act of 2018, Pub. L. No. 115-391, § 603, 132 Stat. 5194. Although the courts were given this authority nearly four decades ago, the statute imposed a gatekeeper—the authority could be invoked only upon a motion by the BOP. *Id.* Without such a motion, sentencing courts were powerless to reduce a sentence even if they agreed that extraordinary and compelling reasons warranted such relief.

This regime changed when Congress enacted the First Step Act of 2018 ("FSA")), which amended § 3582(c)(1)(A). *See* First Step Act § 603. Under the amended statute, a court can now reduce a sentence for "extraordinary and compelling reasons" upon motion of a defendant if he or she has exhausted administrative appeals of a BOP refusal to bring a motion or 30 days have elapsed from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Brooker (Zullo),* 976 F.3d 228, 237 (2d Cir. 2020) (noting Congress's "clear intention" in passing the FSA was to remove BOP from its gatekeeper role); *United States v. McCoy*, 981 F.3d 271, 283 (4th Cir. 2020) ("Congress, aware of the BOP's history of extensive delays, also provided a '30-day lapse' alternative, under which a defendant may proceed directly to district court if his request is not acted on within that time."); *U.S. v. Jones*, 980 F.3d 1098, 1111 n. 19 (6th Cir. 2020)(same).[2]

---

[2] *See also* Federal Bureau of Prisons' Program Statement Number 5050.50:

Sajmir Alimehmeti submitted his request to the warden on April 20, 2023.

(*See* Exhibit A) In his letter to the warden, he wrote:

> [I]t is imperative that you know I am no longer the lost
> misguided young man who I was at the time of my arrest.
> I have since greatly matured and have undergone
> expeditious growth while coming into my own person. I
> have since categorically and wholeheartedly disavowed all
> previous affiliations with any/all terrorist groups and
> radical violent extremist ideology. I have realized and
> now comprehend the devastating harm such folly has
> caused not only to myself but also to my family and
> society and as a whole. I fervently desire to remove myself
> entirely from anything or anyone tied to radical
> extremism.
> …
> It is my hope that when you contemplate granted my
> appeal. You consider me in light of who I have become
> and what I want to do with my life, and not according to
> the ways and ideas which I have since vehemently
> discarded and abandoned. I passionately desire and look
> forward to becoming a hard-working family man and a
> productive law-abiding citizen who morals and values
> conducive to a peaceful, healthy and thriving society.

The warden denied Sajmir's request on June 22, 2023. (*See* Exhibit B.) Following

this denial, Sajmir Alimehmeti fully exhausted his administrative remedies, filing a

"Request for an Administrative Remedy" appealing the denial of his compassionate

release request dated July 6, 2023, which was denied by Warden Ciolli on July 20,

---

*Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)* (2019) ("The following have been added to this version of the Program Statement: Requirements of section 603(b) of the First Step Act, codified at 18 U.S.C § 3582 . . . Specifying inmates may file directly to court after exhaustion of administrative remedies, *or 30 days from receipt of a request by the Warden's Office.*") (emphasis added).

2023. (*See* Exhibit C)

On July 25, 2023, Mr. Alimehmeti filed a "Regional Administrative Remedy Appeal," which was ultimately denied by Regional Director Andre Matevousian on September 1, 2023. (*See* Exhibit D.)  Mr. Alimehmeti appealed this denial in a "Central Office Administrative Remedy Appeal" which was denied on October 30, 2023, by Timothy Barnett, the Administrator of National Inmate Appeals. (*See* Exhibit E.)

The exhaustion of his administrative remedies, as well as the lapse of more than 30 days since Mr. Alimehmeti's request was received by Warden Ciolli entitles him, under the amended § 3582(c)(1)(A), to bring his motion directly to this Court, which now has the authority to grant such relief.[3]

## B.  The Relief Requested Here Is Authorized by Statute

Sentence reductions under § 3582(c)(1)(A) must be consistent with any applicable policy statement of the United States Sentencing Commission.  In *Brooker*, the Second Circuit became the first court of appeals to hold that the policy statement § 1B1.13 was "clearly outdated" following the FSA and applies "only to those motions that the BOP has made," meaning there is no applicable policy statement governing motions brought by defendants like Mr. Alimehmeti.  976 F.3d at 235–36.  Because of this, the *Brooker* Court held, district courts are free "to consider the full slate of extraordinary and compelling reasons that an imprisoned

---

[3] Any delay in filing this with this Court is the responsibility of counsel, who has worked on this motion as time allows.

person might bring before them in motions for compassionate release," and have broad authority to determine independently what reasons are sufficiently "extraordinary and compelling" to warrant a sentence reduction. *See id.* at 237 ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."); *see also United States v. Roney*, 833 F. App'x 850, 852 (2d Cir. 2020) (reaffirming that the "[t]he determination as to what constitutes extraordinary and compelling reasons warranting a reduction is committed to the sound discretion of the district court").

Policy Statement 1B1.13, however, has recently undergone a significant amendment. As of November 1, 2023, Policy Statement 1B1.13, consistent with the FSA, expressly states that courts may grant compassionate release "[u]pon motion of the Director of the [BOP] *or the defendant* pursuant to" Section 3582(c)(1)(A). Policy Statement 1B1.13(a) (emphasis added) (U.S. Sent'g Comm'n 2023) (amended Nov. 1, 2023). Moreover, the text of Policy Statement 1B1.13 itself now includes the discussion, previously contained below the text in Application Note 1, regarding "extraordinary and compelling reasons" that merit compassionate release. (Compare Policy Statement 1B1.13(b) (U.S. Sent'g Comm'n 2023) (amended Nov. 1, 2023), with Policy Statement 1B1.13 Application Note 1 (U.S. Sent'g Comm'n 2021) (amended Nov. 1, 2018).) Indeed, the permissible reasons previously found in Application Note 1(A), 1(B), and 1(C) — medical circumstances, age, and family circumstances — are now identified as extraordinary and compelling reasons for compassionate release in the text of Policy Statement 1B1.13(b)(1), (b)(2), and (b)(3).

8

And Policy Statement 1B1.13(b)(4) contains a new extraordinary and compelling reason, covering situations where the defendant was a victim of BOP abuse while in custody.

Notably, Policy Statement 1B1.13(b)(5) contains a new catch-all provision stating that a court may grant compassionate release if the defendant "presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." Policy Statement 1B1.13(b)(5) (U.S. Sent'g Comm'n 2023) (amended Nov. 1, 2023). Unlike the text of the antecedent catch-all provision previously found at Application Note 1(D), the new version of Policy Statement 1B1.13 does not make the existence of "any other [extraordinary and compelling] circumstance or combination of [extraordinary and compelling] circumstances" contingent on any determination by the BOP. *Id.*

Further, the newly amended provision contains one more specific "extraordinary and compelling reason" in Policy Statement 1B1.13(b)(6), which provides,

> Unusually Long Sentence—If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full

consideration of the defendant's individualized circumstances.

Policy Statement 1B1.13(b)(6).

Finally, while Policy Statement 1B1.13 provides that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement," Amended Policy Statement 1B1.13(d), the Policy Statement does say that "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.*

In short, the amendments to Policy Statement 1B1.13 have harmonized the Policy Statement with the FSA, and the Policy Statement's language is no longer "outdated." *Brooker*, 976 F.3d at 235. Accordingly, to grant a motion for compassionate release, a court must now, in addition to finding that the other elements of the compassionate release standard are satisfied, this Court must also find that granting such relief "is consistent with" Policy Statement 1B1.13, which sets forth the circumstances under which an extraordinary and compelling reason for compassionate release or sentence reduction would exist. 18 U.S.C. § 3582(c)(1)(A); see Policy Statement 1B1.13 (U.S. Sent'g Comm'n 2023) (amended Nov. 1, 2023) [hereinafter "Amended Policy Statement 1B1.13" in citations].

### C. Extraordinary and Compelling Circumstances Warrant a Reduction in Sajmir Alimehmeti's Sentence

Mr. Alimehmeti seeks compassionate release pursuant to Amended Policy Statement 1B1.13(b)(5), due to his conditions of confinement, his age at the time of

the offense, and the extraordinary rehabilitative work he has done, including his full disavowal of terrorist groups and extremist ideology.

> 1. *Mr. Alimehmeti's Conditions of Confinement*

More than a century ago, the Supreme Court recognized the adverse consequences to inmates' mental health posed by prolonged detention in conditions akin to solitary confinement. According to the court, "experience demonstrated" that, when placed in isolation, a "considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." *In re Medley*, 134 U.S. 160, 168 (1890).

As Judge Pooler wrote in a dissent in 2021,

> Prolonged solitary confinement is one of the true horrors of the modern-day penal system. Years on end of near-total isolation exact a terrible price. Studies have shown that prolonged solitary confinement can result in paranoia, hallucinations, suicidal ideation, feelings of impending doom, decline in mental functioning, insomnia, nightmares, and many other symptoms related to severe depression and anxiety. Other effects include post-traumatic stress disorder ("PTSD"), self-mutilation, obsessional thinking, dangerous weight loss, and aggravation of preexisting health issues. There is not a single study of solitary confinement wherein nonvoluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects. That these scars may not be visible makes them no less agonizing.

*Gallina v Wilkinson*, 988 F3d 137, 148 (2d Cir 2021) (internal citations omitted). *See*

11

*also Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting) (noting that the petitioner "developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Davis v. Ayala*, 576 U.S. 257, 135 S. Ct. 2187, 2208 (2015) (Kennedy, J., concurring) ("Of course, prison officials must have discretion to decide that in some instances temporary, solitary confinement is a useful or necessary means to impose discipline and to protect prison employees and other inmates. But research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price."); *Glossip v. Gross*, 576 U.S. 863, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting) ("[T]he United Nations Special Rapporteur on Torture has called for a global ban on solitary confinement longer than 15 days.").

The Eastern District of Pennsylvania recently recognized that extended solitary confinement goes beyond "the ordinary hardship of prison" and, together with rehabilitation, represents "extraordinary" and "compelling" circumstances under the First Step Act. *United States v. Marshall*, No. 00-385, 2022 U.S. Dist. LEXIS 44272, at *19-*22, 2022 WL 768558 (E.D. Pa. Mar. 14, 2022). *See also*, *e.g.*, United States v Williams, 09 CR 558 (CM), 2023 WL 4785286, at *13 (SDNY July 27, 2023) (McMahon, J.) (Holding that "the harsh conditions of confinement that defendants were forced to endure during the years of the pandemic must be part of the 'extraordinary and compelling circumstances' analysis.")

Sajmir Alimehmeti has been in solitary confinement for more than six years.

12

The first three years were spent at MCC New York,[4] and after spending 8 months in the SHU at Allenwood pending transfer, the remainder has been  at ADX Florence 'in the Special Security Unit  ("H-Unit") for prisoners under Special Administrative Measures (SAMS).[56] While he was first informally placed under SAMS restrictions in November of 2017, SAMs were officially imposed in March of 2018 and have been renewed by the Department of Justice ("DOJ") every year since.

During these years of solitary confinement, Sajmir Alimehmeti's only "approved" contact in the outside world, other than his attorneys, is his mother,

[4] In its 2014 report, "Entombed: Isolation in the Federal Prison System," hereinafter "Amnesty Report," Amnesty International wrote that it "considers that conditions under which detainees have been confined in the MCC SHU constitute cruel, inhuman or degrading treatment and are incompatible with the presumption of innocence in the case of untried prisoners whose detention should not be a form of punishment."  Amnesty Report at p. 7, available at https://www.amnesty.org/en/documents/AMR51/040/2014/en/ See also Prendergast, Alan, "At the Federal Supermax, When Does Isolation Become Torture?", July 3, 2018, available at https://www.westword.com/news/h-unit-at-colorados-federal-supermax-is-a-special-sort-of-hell-10496356
[5] It is worth noting that Sajmir Alimehmeti was incarcerated throughout the national state of emergency created by the COVID-19 epidemic. Many of the conditions he continues to endure – 24-hour lockdowns, insufficient access to programming, lack of family access – were successfully cited by inmates seeking compassionate release as a result of their incarceration on the grounds of their incarceration during this period, during which the BOP revealed itself to be woefully under equipped to keep inmates safe and imposed onerous conditions that drastically impacted their quality of life.
[6] Amnesty International has also condemned the conditions at ADX Florence. Prisoners assigned to H-Unit at ADX Florence are held in single cells with a narrow window to the outside and solid door with a window looking out onto the range. They are locked in their cells for 22-24 hours a day with 10 hours out of cell exercise a week, alone or in individual cages with up to five other prisoners. Correspondence to or from approved contacts, which is monitored along with the twice-monthly non-legal phone calls allowed, may be limited to only one letter a week.  Amnesty Report at p. 24.

Violljca. He is prohibited from contacting his brother, Erald Alimehmeti[7], and his wife, Eldina, whom he married in a religious ceremony, attended by the federal agents, acting as his family and friends, before his arrest.

**Life at MCC New York**

Sajmir Alimehmeti was arrested on May 24, 2016 and spent almost 18 months, until November 17, 2017, in general population at MCC New York until his contact with others inmates charged with terrorism-related offenses, and his participation in the dissemination of terrorist propaganda from discovery materials provided by the government with these inmates, landed him in MCC's Special Housing Unit ("SHU") in Unit 10 South, and ultimately, the imposition of SAMS on March 5, 2018.

On 10 South, Sajmir and other inmates "spent 23 hours of their day in their cells and the last hour of their day in solitary exercise in another cell, not much bigger. There was no outside air. The light remained on 24 hours a day. Most were prohibited from speaking with other prisoners. They got their food through a door slot and bathed in their cell. The windows were frosted, so they had no view of the outside world and little natural light."[8] Cameras in their cells recorded their every moment, even their use of the toilet.

The severe isolation of 10 South was described by the former UN Special Rapporteur on Torture Juan Mendez, as "no more than a punitive measure that is

---

[7] Erald was an approved contact up until the issuance of the 2023 SAMs.
[8] https://www.thenation.com/article/society/viktor-bout-mcc-jail-conditions/

unworthy of the United States as a civilized democracy"[9] Critically, in a 2011 letter to then-Attorney General Eric Holder, Amnesty International expressed concern that conditions on 10 South "fall short of international standards for humane treatment" and "appear incompatible with the presumption of innocence."[10] The brutal nature of life on the unit, including its extreme conditions of isolation, were also documented in a 2014 Human Rights Watch report about human rights abuses in US terrorism prosecutions.[11]

Even for inmates kept in general population at the MCC New York, the facility was a hellish nightmare. An exposé on MCC New York released in 2018 described "filthy conditions, vermin infestations, substandard medical care, and violence and abuse at the hands of guards" calling the facility a "rat-infested, high-rise hell."[12]

Sajmir was transferred out of MCC New York in August of 2020. One year later, in August of 2021,  MCC New York was "temporarily" closed in due to deteriorating conditions.[13] It has not reopened.

---

[9] https://committees.parliament.uk/writtenevidence/53116/html/

[10] https://www.amnesty.org/en/documents/amr51/029/2011/en/

[11] https://www.hrw.org/report/2014/07/21/illusion-justice/human-rights-abuses-us-terrorism-prosecutions

[12] Stahl, Aviva, Prisoners Endure A Nightmare 'Gulag' In Lower Manhattan, Hidden In Plain Sight, Gothamist, June 19, 2018, available at https://gothamist.com/news/prisoners-endure-a-nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight

[13] https://www.nytimes.com/2021/08/26/nyregion/MCC-epstein-jail-closed.html

**Life at ADX Florence**

For the past three years, Sajmir Alimehmeti has been housed in "H-Unit" at ADX Florence, the unit reserved for inmates subject to Special Administrative Measures (or "SAMS"). During much of this time, he has been confined to a series of cells that are roughly 10 feet by 7 feet, and include a bed, table, stool, sink, and toilet. There is one, four-inch-wide window to the outside world. There is enough space for Sajmir to walk two steps in one direction and three steps in the other. His toilet is roughly one arm span from the poured concrete bed where he lays his head to sleep and half an arm span from where he sits at the table to eat his meals.

The images of cells, below, at ADX Florence, taken from post on the website of Identiv, a security technology company, show the layout the slightly larger cells afforded to inmates in general population[14]:



---

[14] Full post available here: https://www.identiv.com/resources/blog/the-worlds-most-secure-buildings-adx-florence-prison

16



Unlike inmates in general population, Sajmir and other H-Unit inmates do not have showers in their cells, which are slightly smaller.

Sajmir is allowed out of his cell for two hours a day, which takes place in one of six individual cages – reminiscent of dog kennels – in an outdoor yard, like this one[15]:



---

[15] One day a week, his recreation takes place in an indoor recreation cell.

17

(Photograph from 2014 Amnesty Report, p. 10.)

The recycled and unfiltered air in Sajmir's cell is pumped in through a dust-filled vent. The vents have two settings; during his time at ADX Florence, Sajmir has been in cells where the vents pump on full blast all day and all night, roaring like a jet engine, and cells in which the vents barely function. He describes a plumbing system so eroded that it can take several flushes to fully eliminate waste. Stunningly, this situation is further exacerbated by a "one flush" limit within a five-minute period, meaning that the mechanism locks after a single flush, requiring him to wait an additional five minutes to flush again. If he miscalculates the five-minute waiting period and flushes twice within a five-minute period, the mechanism locks for an hour.

Sajmir's incarceration on H-Unit at ADX Florence greatly limits the range of programming available to him. As Amnesty International notes:

> Institutional programs are [] provided to each cell through close-circuit channels; these include educational, religious, and recreational programs as well as classes on psychology and issues such as anger management There is no congregate prayer and religious services are conducted through close-circuit TV.[16]

Occasionally, there are opportunities for H-Unit inmates to participate in group therapy classes. In August of 2023, Sajmir successfully completed Basic Cognitive Skills, a 10-12 week psychology class with four other inmates on his tier. The class met in the outdoor recreation area in H-Unit where all five inmates are placed in separate cages, with the psychologist standing outside the cages and

---

[16] 2014 Amnesty Report at p. 13.

communicating with the group. (*See* Exhibit F, Certificate for Basic Cognitive Skills.) There has not been another group class on Mr. Alimehmeti's range since this class ended. He is on the waiting list for a number of additional courses, including Anger Management, Criminal Thinking, and Emotional Self-Regulation, but has been given no indication as to when these courses will next be offered. (*See* Exhibit F, Letter from Dr. Shields listing the courses for which Sajmir Alimehmeti is waitlisted.)

Despite these restrictions, Sajmir has done his best to participate in the limited programming available to him, which at ADX Florence, consist mostly of pre-recorded self-study classes that Sajmir completes alone in his cell. As of April 2, 2024, Sajmir had participated in 39 courses, 30 of which were self-study courses that he has completed since June 28, 2021, in which he invested more than 370 hours of time. These courses include history, English classes, health and wellness and music, arts, and crafts. (*See* Educational Transcript dated April 2, 2024, attached as Exhibit G.)

In January of 2024, due to his consistent good conduct while on H-Unit, Sajmir was given a job as an unit  orderly.[17] (*See* Inmate Work History Detail, attached as Exhibit I.) The job is a distinct honor; it is the only job in ADX's high security units in which the inmate is permitted to interact unrestrained with prison staff. Sajmir is the second-ever inmate to hold this position on H-Unit, and the first

---

[17] Sajmir's work transcript lists this job as starting on March 18, 2024; this date is incorrect. Sajmir began working the position in January of 2024, but it was not correctly entered into the system until March. As indicated in the transcript, he had a prior position as a recreation orderly from January of 2023 until April of 2023.

person with a terrorism conviction. As a testament to the progress he has made, Samir was offered the position after spending two and a half years at ADX Florence, bypassing several other inmates who have been at the facility significantly longer and have been incident free for decades.  As an orderly, Sajmir is permitted out of his cell on Mondays, Wednesdays, and Saturdays to clean for approximately two hours, and is permitted to speak and interact with correctional officers, which provides him with much-appreciated human contact and militates against any argument that he is a security threat or requires incapacitation at a maximum security prison.

Prisoners assigned to H-Unit have no opportunity to enter the traditional Step Down Program ("SDP") – the only clear way out of ADX for most prisoners – other than the lifting of the SAMS, which is a decision made by the DOJ rather than the BOP.[18] However, since 2008, H-Unit has had its own internal step-down program consisting of three "phases", each lasting a minimum of one year. According to Sajmir[19], in Phase I, inmates get two 15-miunute telephone calls per month and are permitted one 15-minute shower on Mondays, Wednesdays, and Fridays. In Phase II, they are permitted three 15-minute telephone calls per month and are permitted one 15-minute shower every day. In both Phase I and Phase II, H-Unit inmates remaining confined to solitary cells for 22-24 hours a day. As there is no shower in the cells, the inmates are escorted in chains to the shower area.

---

[18] Amnesty Report at p. 25.

[19] According to Sajmir, the information in the Amnesty Report on the H-Unit "Step-Down" program is outdated. Sajmir has provided counsel with updated information on the program, which is included here.

In Phase III, assuming the inmate is granted a SAMS modification, the inmate is normally moved to J-Unit, where they are housed on "B-side" of the unit, an area reserved for SAMS inmates. There, inmates are assigned into groups of four and are permitted some group association for one and a half hours a day with other members of this four-person group. They are also issued tablets that they are permitted to use to watch movies, listen to music and play video games. There is, of course, no internet connectivity.

If an inmate is not granted a SAMS modification, the inmate may still graduate to Phase III. These inmates must stay in H-Unit but are permitted a fourth 15-minute telephone call each month. Even with SAMS modifications, there are some Phase III inmates who remain on H-Unit due to space constraints. Decisions on whether a prisoner is eligible for progression through the phases are made by an H-Unit Review Committee; decisions are based on criteria relating to safety concerns, the inmate's conduct, and participation in programs.[20]

After an earlier approval to "step down from Phase I to Phase II, on February 22, 2023, Sajmir was approved for placement in Phase III. (*See* Phase II and Phase III approvals, attached as Exhibit J.) After being approved for Phase III, he was moved, at least provisionally, to a range of four cells on H-Unit that are slightly larger than the other H-Unit cells. In essence, the are the size of the general population cells pictured above (7 foot by 12 foot). Since they do not have an internal shower, there is a bit more internal square footage. Despite being granted a

---

[20] Amnesty Report at p. 25.

SAMS modification, it does not look like he will be moving to J-Unit any time soon, due to space constraints. On the positive side, this will enable him to keep his H-Unit job, at least for now.

**Renewal of the SAMS**

Samir Alimehmeti's SAMS are renewed, each year, in February. In February of 2023, the government, as it has done every year since the imposition of SAMS in March of 2018, the United States Attorneys' Office for the Southern District of New York issued a memorandum (the "2023 SAMS Memorandum") requesting that these measures be renewed for another year, based on the office's belief that ████████ ███████████████████████████████████████████████████████████ ████████████████████████████ (*See* February 2023 SAMS, attached as Exhibit K, and submitted under seal, at 6.) The office based this conclusion ██████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ (*Id.*)

The government's conclusion in the 2023 SAMS Memorandum that Sajmir Alimehmeti's ████████████████████████████ appears to be based on its accounting of his ██████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████



█████████ ██████████████████████████████████████

████████████████████████████████████████ (*See* February 2024 SAMS,

attached as Exhibit L, submitted under seal, at 3-6.)

With the exception of █████████████████████████████████

███████████████████████████████████████

████████████ Sajmir does not dispute the government's accounting of his actions,

other than to note that the government's list includes ████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████████████

███████████

In addition, context for some of the conduct demonstrates its questionable

utility as continuing justification for the yearly renewal of the SAMS: ████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████



As a whole, the government's list provides an incomplete window into Sajmir's conduct and ignores the many positive steps he has taken during his incarceration that are recounted in this submission – not the least of which is his sincere rejection of previous mindset regarding his terrorism ideations.  Indeed, in moving Sajmir from Phase I to Phase III, and in awarding him an orderly position making him the only person in his unit permitted to interact unrestrained with prison staff, the BOP has recognized that Sajmir can – and has – changed.

This recognition is further reflected in the BOP's determination that Sajmir Alimehmeti is at "low risk" of recidivism, which it did following a March 2023 PATTERN risk assessment. (See March 2023 Individualized Needs Plan, attached as Ex. M, at 2.) A 2021 review of PATTERN by the DOJ determined that PATTERN risk scores "display a high level of accuracy in their ability to predict recidivism."

Further, [f]indings also indicate that the risk level categories — the probability that an individual has a minimum, low, medium, or high likelihood of recidivating — provide meaningful distinctions of risk."[23] In other words, individuals like Sajmir Alimehmeti in lower risk level categories really do have lower than average recidivism rates.

Sajmir cannot change his past. But he can – and is actively working to – change his present and his future. Irrespective of the conclusion that the government has reached concerning the continuing need to impose SAMS restrictions on him, it is not the case that his "desire to promote radical islamist ideology" has "not waned." Quite the opposite; as explained in further detail below, Sajmir Alimehmeti no longer subscribes to this ideology, and has no desire to promote it.

### 2. Mr. Alimehmeti's Extraordinary Rehabilitation

While subsection (1), above, is nominally about Sajmir Alimehmeti's conditions of confinement, it also speaks to some of the changes he has undergone over the past four years, despite the isolating, circumscribed world created by his conditions of confinement; his participation in the classes available to him, his movement through the phases of H-Unit's internal step-down program, his hiring has H-Unit's second-ever unit orderly, a position of great trust, which permits him

---

[23] Predicting Recidivism: Continuing To Improve the Bureau of Prisons' Risk Assessment Tool, PATTERN: Review of PATTERN 1.3 demonstrates its ability to accurately predict recidivism, April 19, 2022, National Institute of Justice, available at https://nij.ojp.gov/topics/articles/predicting-recidivism-continuing-improve-bureau-prisons-risk-assessment-tool

to leave his cell and interact with prison staff, and the BOP's determination that he is at "low risk" of recidivism.

These are outward indicia of the change Sajmir is undergoing; here, in subsection (2),  we hope to provide your Honor with a window into what has been going on inside Sajmir's head since he last appeared before this Court, and a basis for the Court's consideration of his request for a reduction of his sentence under the First Step Act.

Over the past year, counsel has reviewed drafts of a letter that Sajmir has written to your Honor. This letter, attached here in its final form as Exhibit N, is illustrative of the transformation that has taken place in Sajmir's thinking, how he views his past actions, the trajectory of his life, and his path forward.

As Sajmir writes,

> Almost four years ago, on December 6, 2019,[24] I stood before your Honor for sentencing after pleading guilty to providing material support to a foreign terrorist organization and for making false statements in a passport application. I did this of my own volition and without any plea agreement with the government. I also did it in spite of the fact that my family wanted me to go to trial to at least have some chance at a not guilty verdict. However, I knew that I had broken the law, and my conscience required me to accept responsibility for my conduct.
>
> While I understood and accepted that I had broken the law, at the time, I was not remorseful for my actions. This is why I did not write an apology letter, or make a statement before your Honor at sentencing, in spite of the emphatic pleas to do so from my attorneys and the possibility that doing so could result in a lighter sentence.

---

[24] As some time has passed since Sajmir finalized this letter, is now four and a half years ago.

> I did not have anything to say that would have been both true and helpful to my case and it would have weighed heavily upon my conscience to write speak empty apologetic words.
>
> I am writing to you today because things have changed for me. Over the span of the last several years following my sentencing, I have experienced gradual and profound personal growth which has especially accelerated over this last year alone. Specific events, experiences, and realizations have led me to a tremendous amount of self-reflection, and re-evaluation of my personal and religious beliefs. I have reprioritized my life goals and have attained renewed awareness of what is truly important to me and good for me, my family, and society.
>
> Simply put, I do not see myself, or my actions, the way I once did. I am now able to say, with utmost sincerity and honesty: I am truly sorry for my actions. My previous younger and much immature self was deluded to believe: "I did not hurt anyone…I did not kill anyone…what is there for me to apologize for or feel remorseful about?" – I was too blindly and deeply immersed in radical ideology and extremist propaganda to see the grim reality. That is that I did, in fact, cause great pain and distress, not only to myself, but also to my father, my mother, my brother, and my wife, as well as harm to this country, the United States, which welcomed me and my family as citizens.

(Ex. M, at 1.)  What Sajmir describes is nothing short of a paradigm shift; he recognizes that at the time of his sentencing, he persisted in an outlook and world view to which he no long subscribes. He understands that (1) the ideology he was drawn to distorted his thinking; and (2) his conduct was not only unlawful, but wrong and harmful to himself, his family and to the United States.

Sajmir's letter then speaks about the people in his life he has hurt, and considers the hurt he has caused; to his father, Zyber Alimehmeti, who died shortly after his arrest; to his mother, Viollja Alimehmeti, who must suffer through long-

28

distance telephone calls with him, and for whom he cannot be present or provide direct support or connection; and to his wife, Eldina, whom he has not been successful in adding as an approved contact. Sajmir also acknowledges the harm he has caused himself. ("Worth a mention here is also the extensive ruin which I have brought upon myself through my utter foolishness. I have stolen from myself and wasted many prime years of life. I have tarnished my name and reputation and added layers of difficulty to the success of my own future as well as that of my family's.") (Ex. M at 2-3.)

The "hardest part" for Sajmir to wrap his mind around is the damage he has done to this country. (Ex. M, at 4.) While he acknowledges that "I spent a long time thinking I had committed a victimless crime" he "understand[s] understand now that this is not the case." As he writes:

> My actions were steps on an escalating path. Reviewing and collecting ISIS propaganda. Buying weapons and tactical gear. Helping someone I thought was traveling to Syria to join ISIS buy gear and travel to JFK airport. Lying about losing my passport and trying to get a new one. And I could have taken further steps towards causing harm. At every step of the way I rationalized my thoughts and actions, and every step I took still brought me closer and closer. I would like to think it was all talk, that I would have never gotten on a plane and taken up arms and put innocent people in harm's way, but given the path I was on, I know that I cannot honestly do that. At my sentencing, your Honor said that that there was "every indication" that I "on course to wreak havoc". You even called me a "ticking time bomb." I know in my heart that you were right. I cannot begin to calculate the damage I could have caused.

(Ex. M, at 4-5.)

How did he arrive at this dangerous place? Sajmir has spent a long time thinking about this and speaking with counsel about it. And he accepts that he may never fully know the answer. He writes:

> I often find myself reflecting into the mind of my younger self in an attempt to derive some sense from the folly which led me into my current predicament. I am now able to look back at these events with a new understanding of how I became so blinded from reality by an extremist group like ISIS. I have recognized my faults and shortcomings. I have also recognized the preventability of going down such a dark path. I do not want to remove any blame from myself for the decisions I made, rather I only desire to shed light upon my downfall in life so it can be an example and a tool for my dedication to save others from making similar decisions and life choices.

(Ex. M, at 3.) Sajmir recognizes that after his release from state prison at age 19, he was immature, lonely, and in search of a community – a place where he feels he belongs, a place where he feels welcome. He found refuge online, in a community of people who voiced support for ISIS, invoking the savagery of the Asad regime in Syria as justification for their beliefs. And then he found community in person, with the "Islamic Thinkers Society," a group of older men – including the two undercover agents who took him under their proverbial wing – two men whom he trusted and revered – federal agents who, from Day 1, were  building the case against him. These two agents  "showered [him] with respect and reverence" and made him feel "valued" and "important." The agents  gave him money. They treated him to meals. The bought him clothing. They became his "closest and most trusted friends." They took him home from the hospital after surgery. They witnessed his religious marriage to his wife. And they showed approval, acceptance and encouragement

when he expressed extremist views. (Ex. M, at 4.) They were solid role models and

Sajmir had nothing for admiration for them because they treated him as a person

who mattered to them. As Sajmir writes:

> It was my naïvety and foolhardy cravings to belong, to be
> accepted by a community, and a brotherhood, during a
> vulnerable time in my life which led to my downfall,
> luring me into the dark clutches of an extremist group
> like ISIS and led me to make such terrible errors in
> judgment. What began as a "super radical" façade became
> indistinguishable from my own belief system. It replaced
> whatever belief system I thought I had.

(Ex. M. at 4.)

To be clear: Sajmir Alimehmeti blames no one for the choices he made. But

understanding what led him to make these choices is instrumental to his

rehabilitation. During his time in the H-Unit, he has come to understand that the

love and acceptance he thought he found in extremist communities was not real –

though he believed that the agents' interest in him and support for him was, indeed,

very real. He has also learned that acceptance by others is not as important as he

once believed it to be.  About this he writes:

> I have learned that acceptance by others is not the most
> important thing, particularly when it is not based on real
> shared values and beliefs and that there are more
> important things than acceptance by others. I have had
> space to think about and to develop the ideals that really
> matter to me, and the principles that I want to be
> accepted for. I have learned that it is important to my
> sense of self and identity to treat everyone equally,
> regardless of their faith and to afford them the courtesy
> and respect that they deserve as human beings. I
> wholeheartedly regret that I ever showed hatred and
> hostility towards others because of their different beliefs,
> and that I ever aligned with people who nurtured this

hostility.

> Separating myself from these toxic associations has had the most positive and liberating results. It has opened doors for me to pursue genuine and healthy relationships with people who accept me for who I truly am; relationships where we encourage one another in a productive and positive way of life; not one of hate and manipulation. This realization has broadened my horizons to befriend peoples of various faiths and beliefs, learning from our differences and similarities in mutual respect. It has also helped me untangle my religious beliefs from the allegedly Islamic nature of Islamist terrorism. I am a devout Muslim, but I do not see people who support or engage in acts of terrorisms as consistent with my beliefs. The connection between the two has been broken for me.

(Ex. M at 5.)

Critically, he is now able to do what he was not able to do at the time of his sentence – disavow his previously held beliefs. He writes: "Your Honor, I categorically disavow ISIS and other similar terrorist organizations along with their violent extremist ideologies and philosophies. This belief is foundational to the person I have become." (Ex. M at 5.)

Given that Sajmir lives surrounded by extremist believers at ADX Florence, voicing this disavowal is extremely dangerous. If he were to share his new-found beliefs and awareness, he would mark himself for death, among a population of many who are serving life sentences with "little or nothing to lose." (Ex. M at 6.) Living among these inmates, he recognized the need to "live a life of pretend." (*Id.*) He writes "I live here on the edge of a knife – trying to maintain some semblance of association with them so I can live peacefully, while no longer believing in anything

32

that they stand for." (*Id.*)

One of the things that has helped Sajmir persevere is your Honor's recognition of the "good" in him – good that his family recognized in their letters of support. He writes:

> At my sentencing, you said that you hoped I would remember the good things that my family said about me in the letters they wrote, the good sides of me they saw. You told me to let that be a light, a destination and a guide. I have read those words over and over again to myself over the past four years since I stood before you. I have felt the warmth of that light, which has become like a protective barrier on the surface of my skin, keeping me grounded and sane and hopeful and reminding me of who I am.

(Ex. M at 6.) On February 29, 2024, Sajmir wrote counsel a letter in which he acknowledged the impact counsel has had on his life, a portion of which he has permitted us to share with your Honor. He wrote:

> I want you to know that I very much appreciate you sticking by me even after the conclusion of my case, and being one of the few people who believe in me as a human being and in my potential to change my life around for the better. I really want you to know that the way you treated me and interacted with me, regardless of my charges and radical beliefs, played a very big role in my reassessment of my beliefs and outlook of life. You are an amazing person and I thank you for it.

Sajmir's letters to counsel and your Honor are emblematic of the person that he is working to be – a person who recognizes the good in himself and the good in others and takes the time to acknowledge the positive impact that counsel and your Honor have had on him.

### 3. Mr. Alimehmeti's Age

As of this writing, Sajmir Alimehmeti is 30 years old. He was 22 years old when he was arrested in this case on May 24, 2016. He has spent over 96 months in prison, which is over one third of the 22 years he lived on this planet prior to his arrest. If he serves a sentence of 22 years, he will have been incarcerated by your Honor for as long as he was alive before his arrest.

Section 1B1.13 of the United States Sentencing Guidelines, as amended on November 1, 2023, only explicitly lists "age" as an extraordinary and compelling reason if the defendant:

> (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

U.S.S.C. § 1B1.13 (b)(2)

While Sajmir clearly does not meet the criteria set forth in (A) and (B), we nonetheless ask this Court to consider his age at the time of his commission of the we nonetheless crime, together with his extraordinary rehabilitation, and the deprivations of his conditions of confinement under U.S.S.C. § 1B1.13(b)(5), the so-called "catch-all" provision, which permits this Court to consider "any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." §1B1.13(b)(5).

Sajmir was 22 when he was convicted. As we argued in our initial sentencing

submission, and as the Supreme Court has recognized in myriad cases, this is an age where the brain is still developing.

Sajmir has not had a disciplinary incident for over two years, since December of 2021, when he lost telephone privileges for 30 days for "refusing to obey an order". *See* 28 CFR § 541.3.  He has six disciplinary infractions in total. The next most recent infractions took place in December of 2019 and January of 2020, when he was sanctioned for disabling the camera in his cell at MCC and for interfering with security devices (discussed in further detail on pages  23-25, *supra*). In December of 2018, he was disciplined for possessing an unauthorized item; namely, a piece of soft cardboard from the back of a notepad that he had cut into a circle to block the security camera when he used the toilet. He has two infractions from 2016: one for threatening bodily harm and one for using another inmate's pin number.  With respect to the former, Sajmir got into a verbal altercation with another inmate; with respect to the latter, Sajmir used another inmate's pin shortly after his arrest to call his family while waiting to be assigned a pin of his own.

Over the past eight years, Sajmir's maturation is remarkable, given his circumstances. And during that time, he has undergone a transformation that is nothing short of profound. Everything about Sajmir Alimehmeti has changed. That is, except for the sentence he faces, which stretches out before him, regardless of whether or not the considerations that justified its imposition remain true.

The BOP website lists Sajmir's release date as April 23, 2035. On that date, Sajmir will be 41 years old. And if he is incarcerated until that date, after eleven

35

more years in the custody of the BOP he will be ill prepared to face life in free society. To be sure, one of the objectives of § 3553(a) is that incarceration "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." 18 U.S.C. §3553(a)(2)(D), Given current realities, this is not something that the BOP can provide. As noted in a September 6, 2022, letter from formerly incarcerated individuals and prison advocacy organizations to the Director of the Bureau of Prisons, staffing shortages have worsened facility conductions and reduced programming opportunities within the BOP.[25]  Specifically, persistent staffing shortages have led the BOP to reassign staff hired as teachers, technicians, nurses and cooks to act as correctional officers, compromising safety. The impact on programming has been significant. According to the Fiscal Year 2023 Federal Prison System Performance Budget by the DOJ, the waitlist for literacy education has grown to over 23,000 individuals and over 4,000 are awaiting placement in the Sex Offender Treatment Program.[26]

Sajmir is directly impacted by this shortage. As he sits in his 7 by 12 foot cell, where he is confined when he is not showering, spending an hour in a recreation cage, or working his orderly job, he is unable to access meaningful programming or educational resources. In his cell, he can watch limited educational videos and

---

[25] *See* September 6, 2022 Letter to BOP Director Colette Peters, available at https://www.sentencingproject.org/advocacy-letter/formerly-incarcerated-people-and-advocacy-organizations-urge-reform-of-us-bureau-of-prisons/

[26] *See* Department of Justice, Federal Prison System Fiscal Year 2023 Performance Budget Congressional Submission, available at https://www.justice.gov/file/1492946/download at 33-34 & 43.

answer questions on those videos to earn certificates. His dedication to bettering himself through participation in institutional programming his demonstrated by his educational transcript, attached as Exhibit H, which list the many of the programs in which he has participated, as well as the letter listing the programs for which he is waitlisted. (*See* Exhibit G.)  But the "education" available to him has the equivalent depth of watching an online video before taking the written test required for a Learner Permit with the New York State Department of Motor Vehicles.  It is not an opportunity to participate in meaningful dialogue or engage in an open exchange of ideas. It is not a chance to grow. In fact, the growth that Sajmir has undergone, given the limited opportunities provided to him, is a testament to the depth of his commitment.

## CONCLUSION

Sajmir Alimehmeti has served over 96 months in prison, which represents over 40% of his statutory sentence, assuming credit for good time.  Much of it has been under extreme isolation; first at the MCC in New York, and then, for 8 months—from August of 2020 until April of 2021—in the SHU at Allenwood, pending his transfer to ADX Florence, and now finally, at ADX Florence – the ultimate land of deprivation.

Sajmir's criminal conduct was extremely serious – though thankfully, in this instance, perhaps circumscribed by his immaturity, his inexperience and federal agents, it was all talk and no action. Today he is able to  honestly express remorse for his actions, disavow his previously held extremist beliefs, and do significant

37

work towards gaining insight into what led him down the wrong path. He has spent more than eight years in prison and has been subject to harsh punishment for his offense of conviction, under conditions that are uniquely unsuited for personal growth. And yet, he has been determined to grow. To be better. To do better. To analyze his past conduct with perspective, and insight, to learn the skills he can, and to plan for a better future.

"In considering a compassionate release motion, the court looks to the whole record. Even if any one asserted ground for relief, considered individually, does not rise to the level of "extraordinary and compelling grounds" for compassionate release, that same ground, when considered as part of the totality of the record, can support achievement of the statutory standard." *United States v Williams*, 09 CR 558 (CM), 2023 WL 4785286, at *4 (S.D.N.Y. July 27, 2023); *see also., United States v. Clark*, No. 97 CR. 817 (DC), 2021 WL 1066628, at *4 (S.D.N.Y. Mar. 18, 2021).

Here, Sajmir's conditions of confinement, his age at the time of his arrest, and his sincere efforts at rehabilitation, including total disavowal of terrorist groups and extremist ideology. combine to create grounds for compassionate release that are as extraordinary as they are compelling.

Twenty-two years of incarceration are not needed to protect the public from further crimes by Sajmir Alimehmeti, who no longer poses a danger to any other person or to the community at large – a fact confirmed by the BOP's PATTERN score. We pray that your Honor will use the power conferred by the First Step Act to consider a reduction of Sajmir's sentence to 132 months – half of the 264-month

sentence this Court imposed – as such a modification is sufficient to achieve the

goals of his sentencing set forth in 18 U.S.C. § 3553(a).  We also request oral

argument on this motion.


DATED:      Brooklyn, New York
            June 5, 2024

                        LAW OFFICE OF SUSAN G. KELLMAN

                        By:

                        *Susan G. Kellman*

                        Susan G. Kellman
                        Sarah Kunstler
                        sgk@kellmanesq.com
                        sarah@kunstlerlaw.net
                        25 Eighth Avenue
                        Brooklyn, NY 11217
                        (718) 783-3682
                        Attorneys for Sajmir Alimehmeti

# EXHIBIT A

pg.1 of 2

A. Ciolli, Complex
FCC Florence
Florence, CO 81226

Re: Sajmir Alimehmeti, Reg. No. 77704-054

Dear Warden Ciolli,

Enclosed please find my application seeking relief under the First Step Act. Please afford my appeal a thorough review and a earnest objective consideration.

My main personal letter of this appeal is worded to address the court, however, the words therein hold true to all readers, and I ask that you read them as likewise addressed to you. Nevertheless, I wish to emphasize some of that sentiment directly to you.

Mr. Ciolli, it is imperative that you know I am no longer the lost misguided young man who I was at the time of my arrest. I have since greatly matured and have undergone expeditious growth while coming into my own person. I have since categorically and wholeheartedly disavowed all previous affiliations with any/all terrorist groups and radical violent extremist ideology. I have realized and now comprehend the devestating harm such folly has caused to not only myself, but also to my family and to society as a whole. I fervently desire to remove myself entirely from anything or anyone tied to radical extremism. And as I have explained in my letter to the court, doing so in my current confinement environment is dangerous to my personal safety.

It is my hope that when you contemplate granting my appeal, you consider me in light of who I have become and what I want to do with my life, and not according to the ways and ideas which I have since vehemently discarded and abandoned. I passionately desire and look forward to becoming a hard-working family man and a productive law-abiding citizen upon morals and values conducive to a peaceful, healthy and thriving society. I desire to use my in-depth knowledge of, as well as experience in, radical extremism to help other vulnerable individuals from following in my footsteps, thus saving both their lives and the lives of those who could have otherwise fallen victim to their actions. I crave this truly, with great exuberance. I require only that someone provide me with a chance and opportunity to embark upon such a life-changing journey. Mr. Ciolli, this is a chance and opportunity well within your authority to facilitate.

I am immensely motivated and enthusiastic to act upon these profound changes. I strongly believe that this is the most optimal time for me to re-enter society, because it is that motivation and enthusiasm that will make me most successful in realizing my goals. That is why I implore you to grant me this appeal. Provide me with this much needed head-start in my life so that I may get ahead of the hurdles I will surely face due to my history and while on supervised release. Facilitate for me the opportunity to be with my mother during her last years. We desperately need one another, and she would be a cornerstone of support for me to a successful re-entry and I dreadfully fear that she may not be around for my current projected release date in 11½ years.

pg 2 of 2

While most Wardens systematically refer such appeals to the courts, it is my hope that you would facilitated this for me out of your own volition, distinguishing yourself from your peers as someone who is capable of seeing change in people, and who is willing to provide those who have made terrible and regretable life choices, a chance and opportunity to a new life and to prove their worth to society.

Mr. Cielli, please accept my appeal for I have sworn a solemn pledge from the depths of my heart and soul that I will ardently dedicate this opportunity to doing only good. Good for myself, my family, and for all of society. Your capacity for compassion will not be in vain, and your decision to accept my appeal will be one that you will look back upon with pride and accomplishment, and not with regret.

Thank you for affording my appeal your time and consideration.

Respectfully,

Sajmir Alimehmeti
Reg.No. 77704-051

# EXHIBIT B



**U.S. Department of Justice**
Federal Bureau of Prisons

Federal Correctional Complex
Florence, Colorado

*5880 State Highway 67 South*
*P.O. Box 8500*
*Florence, CO 81226*

June 22, 2023

Sajmir Alimehmeti
Register Number 77704-054

Dear Inmate Alimehmeti,

You requested a reduction in sentence (RIS) based on the conditions of confinement, your institutional programming and having disavowed all previous affiliations with all terrorist groups and radical and violent extremist ideology. After careful consideration, your request is denied.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or compelling reasons. BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances which present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner. Your request has been evaluated consistent with this general guidance.

Your noted concerns do not meet the criteria for extraordinary or compelling circumstances which would warrant consideration under Program Statement 5050.50. Additionally, medical staff have completed a Reduction in Sentence Eligibility Review and have determined you do not qualify for a RIS based upon on a medical condition. Accordingly, your RIS request is denied.

If you are not satisfied with this response to your request, you may commence an appeal of this decision via the administrative remedy process by submitting your concerns on the appropriate form (BP-9) within 20 days of the receipt of this response.

Sincerely,

A. Ciolli
Complex Warden

# EXHIBIT C

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: **Alimehmeti, Sajmir**          **77704-054**      **H**        **FLM ADX**
　　　LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**Part A— INMATE REQUEST** I request the Bureau of Prisons to bring a motion for Compassionate Release on my behalf. I ask that my initial request at the institutional level and its subsequent denial by the Warden be reconsidered. My GCT release is in less than 12 years. Over the last several years I have disavowed and abandoned my violent extremist ideology I once held and I have disavowed my affiliation to ISIS and any other terror organization. I have made a self resolution to help whoever I can from falling into extremism by using my own knowledge and experience. I have been programming with whatever is made available to me under my current conditions of confinement. I no longer pose any risk to the public and I am enthusiastically prepared and ready to serve this country and the public as a productive and law-abiding citizen. I currently have a support structure at home and also have 5 years of Supervised Release to keep me on track. My mother has been the cornerstone of stability and support for me throughout my incarceration and she will be crucial to my successful reentry into society. My father has already passed during my incarceration and my mother who is now 70+ years old has been showing signs of mental decline and has been residing all alone here in the U.S. I fear that if I am released in 11+ years as opposed to now I may lose my mother and a great stability and support for me upon release. I am greatly regretful and remorseful of the conduct that led me here, and I can say with utmost conviction and dedication that I will never be a recidivist. Imprisoning me to full term (11 years More) does not serve in the best interest of justice or the general public and makes little to no difference therein. Whereas my early release at a time most optimal for a successful reentry will serve both; I will use my freedom to strive for wholesome productivity and to counter extremist ideology and help those vulnerable to it from being deceived by it.

**06 July 2023**
DATE

SIGNATURE OF REQUESTER

**Part B— RESPONSE**

Received
JUL 07 2023
Admin Remedy Office

_____      _____
DATE                    WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**                    CASE NUMBER: **1167744-F1**

　　　　　　　　　　　　　　　　　　　　　　　　　CASE NUMBER: _____

**Part C— RECEIPT**

Return to: _____
　　　　　　LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

SUBJECT: _____

_____      _____          BP-229(13)
DATE                    RECIPIENT'S SIGNATURE (STAFF MEMBER)          APRIL 1982

USP LVN          PRINTED ON RECYCLED PAPER

BP-229 Part B - Response                                    Case Number: 1167744-FI

This is in response to your Request for Administrative Remedy received July 07, 2023, wherein you are appealing the denial of your Reduction in Sentence (RIS) request. As relief, you request your RIS request be approved.

A review of the issue raised in your Request for Administrative Remedy has been conducted. The results of the review revealed Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the Bureau of Prisons (BOP), to reduce a term of imprisonment for extraordinary or compelling reasons. BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner. Your RIS request has been re-evaluated with this general guidance, and your basis for a RIS based on disavowing your affiliation to ISIS, your institutional programming and your support structure at home do not meet the criteria for extraordinary or compelling circumstances under Program Statement 5050.50. Additionally, medical staff completed a Reduction in Sentence Eligibility Review and determined you do not qualify for a RIS based upon a medical condition. You have not provided any additional extraordinary or compelling circumstances for further review. Lastly, Program Statement 5050.50 states, factors such as the nature and circumstances of the inmate's offense and criminal history should be considered to determine if the inmate's release would pose a danger to the safety of any other person or the community. Your current convictions for Providing or Attempting to Provide Material Support or Resources to a Foreign Terrorist Organization and False Statements in an Application for a Passport in Order to Facilitate an Act of International Terrorism were considered in the denial decision.

Accordingly, your Request for Administrative Remedy is denied.

In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response by submitting a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas 66101-2492.

_____                    7-20-23
A. Ciolli, Complex Warden                           Date

# EXHIBIT D

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Alimehmeti, Sajmir | 77704-054 | H | FLM ADX
LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION

**Part A - REASON FOR APPEAL** I request the BOP to bring a motion for Compassionate Release on my behalf. I am currently on track to be released in about 11½ years, and an earlier release will greatly increase my chances at a successful re-entry. I have a strong support structure that will be crucial in helping me create a stable life for myself and becoming a productive law-abiding citizen. However I fear that this support structure may be lost by the time of my release date. This is because my mother is 70+ years old and her physical and mental health are deteriorating. My father has already passed during my incarceration. Also, the current conditions of my confinement make it impossible for me to maintain ties with my community, friends and even my wife. I fear that continued incarceration will result in my loss of all support and resource structures that are conducive to a successful re-entry into society and decreased recidivism. I have catagorically disavowed my affiliation to ISIS and all violent extremist ideology and I plan to use my personal experience and knowledge of such groups to help vulnerable peoples from falling prey. I no longer pose any risk to the public, I strongly believe that an early release is in the best interest of justice and the general public. I am enthusiastic about striving for wholesome productivity in life and becoming a model citizen.

25 July 2023
DATE

SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED
AUG 02 2023

_____
DATE

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE

REGIONAL DIRECTOR

CASE NUMBER: 1167744-R1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION

SUBJECT: _____

_____
DATE

SIGNATURE, RECIPIENT OF REGIONAL APPEAL

USP LVN    PRINTED ON RECYCLED PAPER

BP-230(13)
JUNE 2002

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**

**Regional Administrative Remedy Appeal**
**Part B - Response**

---

**Administrative Remedy Number:**  1167744-R1

---

This is in response to your Regional Administrative Remedy Appeal received August 2, 2023, in which you state you were inappropriately denied consideration for a reduction in sentence (RIS) under 18 U.S.C. § 3582 (c)(1)(A).   For relief, you seek a review of the institution's decision.

We have reviewed your appeal and Warden's response dated July 20, 2023.   A request for reduction in sentence under 18 U.S.C.§ 3582(c)(1)(A) will be considered when there are extraordinary and compelling reasons which warrant the reduction, there is no danger to the safety of any other person or to the community, and the reduction is consistent with policy.   As indicated in the Warden's response, your request was evaluated by staff at the Administrative Maximum Penitentiary (ADX) in Florence, Colorado, who determined you were not appropriate for a reduction in sentence. In making the decision, staff thoroughly reviewed your records and found your circumstances did not meet the policy requirements as outlined in Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C §§ 3582 and 4205 (g).
Accordingly, the institution's decision is supported.

Based on the above information, your Regional Administrative Remedy Appeal is denied.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534.   Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

_9\|1\|23_
Date

_for_____
Andre Matevousian, Regional Director

# EXHIBIT E

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: **Alimehmeti, Sajmir**      **77704-054**      **H**      **FLM-ADX**
LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

**Part A - REASON FOR APPEAL** I request the BOP to bring a motion for Compassionate Release on my behalf. I am currently on track to be released in about 11½ years, and an earlier release will greatly increase my chances at a successful re-entry. I have a strong support structure that will be crucial in helping me create a stable life for myself and becoming a productive law-abiding citizen. However I fear that this support structure may be lost by the time of my release date. This is because my mother is 70+ years old and her physical and mental health are deteriorating. My father has already passed during my incarceration. Also, the current conditions of my confinement make it impossible for me to maintain ties with my community, friends, and even my wife. I fear that continued incarceration will result in my loss of all support and resource structures that are conducive to a successful re-entry into society, and decreased recidivism. I have catagorically disavowed my affiliation with ISIS and all violent extremist ideologies, and I plan to use my personal experience and knowledge of such groups to help vulnerable peoples from falling prey. I no longer pose any risk to the public. I strongly believe that an early release will be in the best interest of justice and the general public. I am enthusiastic about striving for wholesome productivity in life and becoming a model citizen. I need only the opportunity that you can help facilitate.

**22 September 2023**
DATE                    SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

OCT 1 0 2023

Administrative Remedy Section
Federal Bureau of Prisons

_____      _____
DATE                GENERAL COUNSEL
ORIGINAL: RETURN TO INMATE      CASE NUMBER: **1167744**

**Part C - RECEIPT**
                            CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

_____                SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL
DATE                                                      BP-231(13)

**Administrative Remedy No. 1167744-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal wherein you challenge the denial of your request for a Reduction in Sentence (RIS) based on extraordinary and compelling reasons. You request compassionate release citing your need to return to your community, disavowal of your threat group, and desire to lead a productive life out of custody. For relief, you request a RIS.

In accordance with Program Statement 5050.50, <u>Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g)</u>, sets forth the criteria the Director considers for a RIS. Pursuant to P.S. 5050.50, the following criteria may be used to file for a RIS: Terminal Medical Condition, Debilitated Medical Condition, Elderly Inmates, Death or Incapacitation of Family Member Caregiver, and Incapacitation of a Spouse or Registered Partner. A request for reduction in sentence under 18 U.S.C. § 3582 (c)(1)(A) will be considered when there are extraordinary and compelling reasons meeting the criteria in Section 7 which warrant the reduction, there is no danger to the safety of any other person or to the community, and the reduction is consistent with policy.

A review of your record reveals the Warden and Regional Director appropriately addressed your request. You are designated medical Care Level I. Your condition is stable. You have not submitted information demonstrating the incapacitation or death of your spouse or that your children require a caregiver. You have not submitted any evidence of extraordinary and compelling reasons meeting criteria for compassionate release. Thus, staff appropriately determined your request does not meet criteria for compassionate release at this time.

Accordingly, your appeal is denied.


_____10-30-23_____                    _T. Barnett_____
Date                                    Timothy Barnett, Administrator
                                        National Inmate Appeals

# EXHIBIT F

# Certificate of Completion

May it be known that this Certificate has been presented to

## *Sajmir Alimehmeti*

*Reg.No.* *77704-054*

For attending and actively participating in Psychology Services Group Therapy program:

## Basic Cognitive Skills

*Presented on Wednesday, August 31, 2023*

*Dr. Shields*

**ADX Psychology Services**
**ADX Florence**

# EXHIBIT G

Attachment - C

Mr. Alimehmeti,

You are currently on the waitlist for the following groups:

- Anger Management
- Non-Resolve Cognitive Processing Therapy
- Criminal Thinking
- Emotional Self-Regulation
- Illness Management and Recovery
- CBT for Insomnia
- Mindfulness-Based CBT
- Wellness Recovery Action Plan
- Basic Cognitive Skills

Please let me know if you have any additional questions or concerns.

Dr. Shields

# EXHIBIT H

```
FLMK1            *        INMATE EDUCATION DATA        *        04-02-2024
PAGE 001         *             TRANSCRIPT              *        09:43:32


REGISTER NO: 77704-054      NAME..: ALIMEHMETI              FUNC: DIS
FORMAT.....: TRANSCRIPT      RSP OF: FLM-FLORENCE ADMAX USP


------------------------- EDUCATION INFORMATION -------------------------
FACL ASSIGNMENT DESCRIPTION              START DATE/TIME STOP DATE/TIME
FLM  ESL HAS    ENGLISH PROFICIENT       08-17-2020 1240 CURRENT
FLM  GED HAS    COMPLETED GED OR HS DIPLOMA  09-07-2017 0938 CURRENT


------------------------- EDUCATION COURSES -------------------------
SUB-FACL    DESCRIPTION                   START DATE  STOP DATE EVNT AC LV  HRS
FLM         ACE- UNDERSTAND IMPERIAL CHINA 04-01-2024 CURRENT
FLM         MUSIC THEORY ADX              04-01-2024 CURRENT
FLM         MILITARY LIFE - GENERAL PATTON 01-01-2024 03-30-2024  P  C  P   12
FLM         JAZZ SELF STUDY               11-20-2023 01-01-2024  P  C  P    6
FLM         ACE-WORLDS GREATEST STRUCTURES 10-02-2023 12-30-2023  P  C  P   12
FLM         BASKETBALL OFFICAL CLASS      10-09-2023 11-20-2023  P  C  P   12
FLM         SBALL OFFICAL CLASS           10-09-2023 11-20-2023  P  C  P   12
FLM         CHANGING BODY COMPOSITION     09-04-2023 11-27-2023  P  C  P   12
FLM         WELLNESS CLASS                07-10-2023 09-18-2023  P  C  P   20


G0002       MORE PAGES TO FOLLOW . . .
```

```
FLMK1          *       INMATE EDUCATION DATA      *     04-02-2024
PAGE 002       *          TRANSCRIPT             *     09:43:32


REGISTER NO: 77704-054    NAME..: ALIMEHMETI        FUNC: DIS
FORMAT.....: TRANSCRIPT   RSP OF: FLM-FLORENCE ADMAX USP
```

------------------------------ EDUCATION COURSES ------------------------------

| SUB-FACL | DESCRIPTION | START DATE | STOP DATE | EVNT | AC | LV | HRS |
|----------|-------------|------------|-----------|------|----|----|-----|
| FLM | ACE ANCIENT CIVIL ASIA MINOR | 07-03-2023 | 09-30-2023 | P | C | P | 12 |
| FLM | ORIGAMI LEISURE CLASS | 05-01-2023 | 07-10-2023 | P | C | P | 20 |
| FLM | THE AMERICAN WEST ACE CLASS | 04-03-2023 | 07-01-2023 | P | C | P | 12 |
| FLM | SELF STUDY FILM LITERATURE | 04-10-2023 | 05-22-2023 | P | C | P | 6 |
| FLM | BASKETBALL OFFICAL CLASS | 03-06-2023 | 03-27-2023 | P | C | P | 12 |
| FLM | SBALL OFFICAL CLASS | 03-06-2023 | 03-27-2023 | P | C | P | 12 |
| FLM | BEGINNER STRESS MANAGEMENT | 02-13-2023 | 04-24-2023 | P | C | P | 20 |
| FLM | ACE - ENGLISH GRAMMAR BOOTCAMP | 01-02-2023 | 04-01-2023 | P | C | P | 12 |
| FLM | PASTEL CLASS | 01-09-2023 | 03-13-2023 | P | C | P | 20 |
| FLM | BEGINNING CROCHET | 11-07-2022 | 02-23-2023 | P | C | P | 20 |
| FLM | ENJOYING SECOND HALF OF LIFE | 10-31-2022 | 11-21-2022 | P | C | P | 6 |
| FLM | FORENSIC HISTORY ACE | 10-03-2022 | 12-31-2022 | P | C | P | 12 |
| FLM | CHESS SELF STUDY | 08-08-2022 | 09-19-2022 | P | C | P | 6 |
| FLM | THE SIXTIES ACE CLASS | 07-04-2022 | 10-01-2022 | P | C | P | 12 |

```
G0002      MORE PAGES TO FOLLOW . . .
```

```
FLMK1          *      INMATE EDUCATION DATA      *    04-02-2024
PAGE 003       *          TRANSCRIPT            *    09:43:32


REGISTER NO: 77704-054    NAME..: ALIMEHMETI       FUNC: DIS
FORMAT.....: TRANSCRIPT   RSP OF: FLM-FLORENCE ADMAX USP
```

```
------------------------- EDUCATION COURSES -------------------------------
SUB-FACL   DESCRIPTION                      START DATE  STOP DATE EVNT AC LV   HRS
FLM        WELLNESS CLASS                   07-11-2022 09-12-2022  P   C  P    20
FLM        DIABETES SELF STUDY              04-25-2022 06-06-2022  P   C  P     6
FLM        ACE SCIENCE FICTION              04-04-2022 07-02-2022  P   C  P    12
FLM        BEGINNING DRAW                   03-07-2022 05-16-2022  P   C  P    20
FLM        EAT SMART WELLNESS CLASS         02-21-2022 04-04-2022  P   C  P     6
FLM        BEGINNING CROCHET                08-16-2021 10-18-2021  P   C  P    20
FLM        PASTEL CLASS                     06-28-2021 09-06-2021  P   C  P    20
NYM M      FDIC MONEY SMART SKILL 1         11-01-2018 11-28-2018  P   C  P     3
NYM M      TUTOR TRAINING                   10-04-2017 05-15-2018  P   C  P     8
NYM M      COMMERICAL DRIVING LIC PREP      08-17-2017 09-15-2017  P   C  P     8
NYM M      LEAD BY EXAMPLE REVERSE THE TR   08-08-2017 09-12-2017  P   C  P    20
NYM M      INSIDE OUT PARENTING - UNIT      07-01-2017 08-15-2017  P   C  P    20
NYM M      BUSINESS ACUMEN CORP TRAINING    03-06-2017 04-06-2017  P   C  P    12
NYM M      FOCUS FORWARD PUBLIC DEFENDERS   05-02-2017 08-08-2017  P   C  P    24


G0002      MORE PAGES TO FOLLOW . . .
```

Case 1:16-cr-00398-PAE    Document 143    Filed 06/05/24    Page 64 of 81

```
FLMK1           *        INMATE EDUCATION DATA      *      04-02-2024
PAGE 004 OF 004 *            TRANSCRIPT             *      09:43:32


REGISTER NO: 77704-054    NAME..: ALIMEHMETI          FUNC: DIS
FORMAT.....: TRANSCRIPT    RSP OF: FLM-FLORENCE ADMAX USP


-------------------------  EDUCATION COURSES  ------------------------------
SUB-FACL   DESCRIPTION               START DATE  STOP DATE EVNT AC LV   HRS
NYM M      BASIC BOOKKEEPING         05-29-2017 07-06-2017   P  C  P    12
NYM M      ENTREPRENEURSHIP          03-15-2017 04-27-2017   P  C  P    20




G0005      TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

# EXHIBIT I

```
FLMJL  531.01 *                 INMATE HISTORY          *     03-18-2024
PAGE 001 OF 001 *                WRK DETAIL             *     11:08:17

REG NO..: 77704-054 NAME....: ALIMEHMETI, SAJMIR
CATEGORY: WRK        FUNCTION: PRT          FORMAT:

FCL    ASSIGNMENT DESCRIPTION                    START DATE/TIME STOP  DATE/TIME
FLM    U ORD H1   UNIT ORDERLY RANGE A LOWER     03-18-2024 1107 CURRENT
FLM    UNASSGN    UNASSIGNED                     04-04-2023 1304 03-18-2024 1107
FLM    REC ORD HA UNIT ORDERLY H-A RECREATION    01-03-2023 0918 04-04-2023 1304
FLM    UNASSGN    UNASSIGNED                     04-06-2021 0558 01-03-2023 0918
OKL    UNASSG     UNASSIGNED HOLDOVER            04-05-2021 1620 04-05-2021 1825
ALP    UNASSG SHU UNASSIGNED SHU                 08-11-2020 1207 04-05-2021 0546
NYM    UNASSG     UNASSIGNED WORK DETAIL         12-06-2019 1431 08-11-2020 0839
NYM    UNASSG     UNASSIGNED WORK DETAIL         11-27-2018 1324 12-06-2019 0920
NYM    UNASSG     UNASSIGNED WORK DETAIL         02-21-2018 1023 11-27-2018 0826
NYM    UNASSG     UNASSIGNED WORK DETAIL         05-24-2016 1830 02-21-2018 1022




G0000        TRANSACTION SUCCESSFULLY COMPLETED
```

# EXHIBIT J

Attachment 5

# SPECIAL SECURITY UNIT PHASE CONSIDERATION

March 30, 2023
DATE

ALIMEHMETI, Sajmir
INMATE NAME

77704-054                          H
REGISTER NUMBER              UNIT

April 2023
MONTH REVIEWED

**X**     You have been approved for placement in the next, Phase II, within the Special Security Unit.   Your Unit Manager will provide you with more details regarding this placement.

☐     You have been deferred placement into Phase II because additional time is needed to determine whether you can function with additional privileges without: posing a risk to institutional security and good order; posing risk to the safety and security of staff, inmates, or others, including yourself; and/or posing a risk to public safety.   We encourage you to continue to participate in and complete all programs recommended by the unit team; demonstrate positive behavior, including respectful and appropriate conduct towards staff and other inmates; and demonstrate positive overall institution adjustment to include, but not limited to, personal hygiene, and cell sanitation.   You will be reviewed again for placement in the next Phase ordinarily six months from your current review, providing you continue to meet the eligibility requirements identified in Institution Supplement 5321.08(3)A, Special Security Unit.   You may appeal this decision by utilizing the Federal Bureau of Prisons' Administrative Remedy Program.

A. Ciolli, Complex Warden

# SPECIAL SECURITY UNIT PHASE CONSIDERATION

February 22, 2024
DATE

Alimehmeti, Sajmir
INMATE NAME

77704-054                                    H
REGISTER NUMBER                   UNIT

February 2024
MONTH REVIEWED

**X**    You have been approved for placement in Phase III within the Special Security Unit.    Your Unit Manager will provide you with more details regarding this placement.

☐    You have been deferred placement into Phase III because additional time is needed to determine whether you can function with additional privileges without: posing a risk to institutional security and good order; posing risk to the safety and security of staff, inmates, or others, including yourself; and/or posing a risk to public safety.    We encourage you to continue to participate in and complete all programs recommended by the unit team; demonstrate positive behavior, including respectful and appropriate conduct towards staff and other inmates; and demonstrate positive overall institution adjustment to include, but not limited to, personal hygiene, and cell sanitation.    You will be reviewed again for placement in the next Phase ordinarily six months from your current review, providing you continue to meet the eligibility requirements identified in Institution Supplement 5321.08(3)A, Special Security Unit.    You may appeal this decision by utilizing the Federal Bureau of Prisons' Administrative Remedy Program.

A. Ciolli, Complex Warden

# EXHIBIT K
# -Redacted-

# EXHIBIT L
# -Redacted-

# EXHIBIT M

Attachment - A



## Individualized Needs Plan - Program Review (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: ALIMEHMETI, SAJMIR  77704-054

SEQUENCE: 02007705
Team Date: 03-13-2023

| | |
|---|---|
| Facility: | FLM  FLORENCE ADMAX USP |
| Name: | ALIMEHMETI, SAJMIR |
| Register No.: | **77704-054** |
| Age: | 29 |
| Date of Birth: | 11-27-1993 |

| | |
|---|---|
| Proj. Rel. Date: | 04-23-2035 |
| Proj. Rel. Mthd: | GOOD CONDUCT TIME |
| DNA Status: | NYM04892 / 05-25-2016 |

### Detainers

| Detaining Agency | Remarks |
|---|---|

NO DETAINER

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| FLM | REC ORD HA | UNIT ORDERLY H-A RECREATION | 01-03-2023 |

*Fig 1.0* (margin note beside FLM row)

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| FLM | ESL HAS | ENGLISH PROFICIENT | 08-17-2020 |
| FLM | GED HAS | COMPLETED GED OR HS DIPLOMA | 09-07-2017 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| FLM | | ACE - ENGLISH GRAMMAR | 01-02-2023 | CURRENT |
| FLM | | PASTEL CLASS | 01-09-2023 | CURRENT |
| FLM | | BEGINNER STRESS MANAGEMENT | 02-13-2023 | CURRENT |
| FLM | C | BEGINNING CROCHET | 11-07-2022 | 02-23-2023 |
| FLM | C | ENJOYING SECOND HALF OF LIFE | 10-31-2022 | 11-21-2022 |
| FLM | C | FORENSIC HISTORY ACE | 10-03-2022 | 12-31-2022 |
| FLM | C | CHESS SELF STUDY | 08-08-2022 | 09-19-2022 |
| FLM | C | THE SIXTIES ACE CLASS | 07-04-2022 | 10-01-2022 |
| FLM | C | WELLNESS CLASS | 07-11-2022 | 09-12-2022 |
| FLM | C | DIABETES SELF STUDY | 04-25-2022 | 06-06-2022 |
| FLM | C | ACE SCIENCE FICTION | 04-04-2022 | 07-02-2022 |
| FLM | C | BEGINNING DRAW | 03-07-2022 | 05-16-2022 |
| FLM | C | EAT SMART WELLNESS CLASS | 02-21-2022 | 04-04-2022 |
| FLM | C | BEGINNING CROCHET | 08-16-2021 | 10-18-2021 |
| FLM | C | PASTEL CLASS | 06-28-2021 | 09-06-2021 |

*Fig 2.0* (margin note beside FLM rows)

### Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|

** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS **

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 04-06-2021 |
| CARE1-MH | CARE1-MENTAL HEALTH | 05-25-2016 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| C19-T NEG | COVID-19 TEST-RESULTS NEGATIVE | 04-27-2021 |
| NO PAPER | NO PAPER MEDICAL RECORD | 04-06-2021 |
| REG DUTY | NO MEDICAL RESTR–REGULAR DUTY | 04-06-2021 |

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| ED NONE | DRUG EDUCATION NONE | 08-21-2020 |

### FRP Payment Plan

| Most Recent Payment Plan |
|---|

Attachment B



| **Individualized Needs Plan - Program Review    (Inmate Copy)** | **SEQUENCE: 02007705** |
|---|---|
| Dept. of Justice / Federal Bureau of Prisons | **Team Date: 03-13-2023** |
| Plan is for inmate: ALIMEHMETI, SAJMIR  77704-054 | |

**Most Recent Payment Plan**

**FRP Assignment:**    **COMPLT**    **FINANC RESP-COMPLETED**    Start: 06-15-2021

**Inmate Decision:**    **AGREED**    **$100.00**    Frequency: **MONTHLY**

Payments past 6 months:    **$0.00**    Obligation Balance: **$0.00**

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $200.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

** NO ADJUSTMENTS MADE IN LAST 6 MONTHS **

**FRP Deposits**

Trust Fund Deposits - Past 6 months:    $315.00    Payments commensurate ?    Y

New Payment Plan:    ** No data **

**Current FSA Assignments**

| Assignment | Description | Start |
|---|---|---|
| FTC INELIG | FTC-INELIGIBLE-REVIEWED | 06-02-2020 |
| N-ANGER Y | NEED - ANGER/HOSTILITY YES | 03-07-2023 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 03-07-2023 |
| N-COGNTV Y | NEED - COGNITIONS YES | 03-07-2023 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-28-2021 |
| N-EDUC N | NEED - EDUCATION NO | 03-07-2023 |
| N-FIN PV N | NEED - FINANCE/POVERTY NO | 03-07-2023 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 03-07-2023 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 03-07-2023 |
| N-MEDICL N | NEED - MEDICAL NO | 03-07-2023 |
| N-RLF Y | NEED - REC/LEISURE/FITNESS YES | 03-07-2023 |
| N-SUB AB N | NEED - SUBSTANCE ABUSE NO | 03-07-2023 |
| N-TRAUMA Y | NEED - TRAUMA YES | 03-07-2023 |
| N-WORK Y | NEED - WORK YES | 03-07-2023 |
| R-LW | LOW RISK RECIDIVISM LEVEL | 03-07-2023 |

Fig 3.0

**Progress since last review**

Fig 4.0

Clear conduct
saved $2576.00
participates in Grammar Boot Camp, Pastel and Stress Mgmt
Completed Crochet, Enjoying Second Half of Life, Chess, Forensic History, and Sixties. No current participation in criminal thinking.

**Next Program Review Goals**

Continue saving $10-20 monthly
Continue Grammar Boot Camp
Continue pastel and stress mgmt

**Long Term Goals**

Save $2700.00 by 02-2024
Complete Grammar Boot Camp by 07-2023
Complete Pastel by 08-2023
Complete Stress mgmt by 10-2023

**RRC/HC Placement**

Fig 5.0

No.
Management decision - Will review at 17-19 months from release. .
Consideration has been given for Five Factor Review (Second Chance Act):
- Facility Resources
- Offense
- Prisoner
- Court Statement
- Sentencing Commission

Will review at 17-19 months from release.

**Comments**

# EXHIBIT N

Honorable Paul A. Engelmayer
Judge, United States District Court
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, NY 10007

Re: Sajmir Alimehmeti, Register # 77704-054 (16 Cr. 398 PAE)

Dear Honorable Judge Engelmayer:

Almost four years ago, on December 6, 2019, I stood before your Honor for sentencing after pleading guilty to providing material support to a foreign terrorist organization and for making false statements in a passport application. I did this of my own volition and without any plea agreement with the government. I also did it in spite of the fact that my family wanted me to go to trial to at least have some chance at a not guilty verdict. However, I knew that I had broken the law, and my conscience required me to accept responsibility for my conduct.

While I understood and accepted that I had broken the law, at the time, I was not remorseful for my actions. This is why I did not write an apology letter, or make a statement before your Honor at sentencing, in spite of the emphatic pleas to do so from my attorneys and the possibility that doing so could result in a lighter sentence. I did not have anything to say that would have been truthful and it would have weighed heavily on my conscience to write or speak empty apologetic words for the sole purpose of misleading your Honor.

I am writing to you today because things have changed for me. Over the span of the last several years following my sentencing, I have experienced gradual and profound personal growth which has especially accelerated over this last year. Specific events, experiences, and realizations have led me to a tremendous amount of self-reflection, and re-evaluation of my personal and religious beliefs. I have reprioritized my life goals and have attained renewed awareness of what is truly important to me and good for me, my family, and society.

Simply put, I do not see myself, or my actions, the way I once did. I am now able to say, with utmost sincerity and honesty: I am truly sorry for my actions. My previous younger and immature self was deluded to believe: "I did not hurt anyone... I did not kill anyone... what is there for me to apologize for or feel remorseful about?" — I was too blindly and deeply immersed in radical ideology and extremist propaganda to see the grim reality — that is that I did, in fact, cause great pain and distress, not only to myself, but also to my father, my mother, my brother, and my wife, as well as harm to this country, the United States, which welcomed me and my family as citizens.

page 1 of 6

I hurt my father, Zyber Alimehmeti, deeply through my life choices, and it pains me severely to think that my actions and behavior contributed to his already ailing health which led to his passing shortly after my arrest. Knowing this haunts me to this very day. I remember my father daily in my prayers and I dream of him often. I have a recurring dream, where I see my father standing in a doorway. On his face are written signs of disappointment, yet his eyes gleam at me with utmost love, warmth, and compassion. I run to his embrace and we just stand there clinging on to one another tightly. I begin to sob audibly and then wake from my dream to real tears already streaming down my face. On one occasion, the emotions of my dream felt so intense that I continued to cry for nearly half an hour after I woke up. My father was a remarkable and outstanding man. Among his many attributes, was the fact that he was honest, hard-working, and a well-mannered man, and especially respectable and honorable. He was extremely and fervently dedicated to his family. Until the end, my father worked tirelessly, even past his retirement, to provide for his family. I love my father devoutly and will spend and dedicate my life for good and in honoring his cherished memory by following in his footsteps and noble virtues throughout all aspects of my life. My actions dishonored my father and I will never dishonor him again. That is why you must know that I will never be a recidivist.

I have deeply hurt my mother with the tremendous heartache and stress which I have caused her by my absurd actions. She is now 70 years old and my brother recently informed me that she has begun to display signs of early dementia. My mother has always showered me with her tender love and has always been there for me through thick and thin, supporting me to this very day. I am torn with regret that I am not there for her now that she will need my help and support the most. During our phone calls, she often breaks into tears at the thought that she may never again be able to see me and hold me due to her age and my current sentence. Her sobs shred through my heart like daggers. There is nothing that I want more right now than to be there for my mother and to strive in making the remainder of her life as easy, stress-free and comfortable as possible. Most importantly, I want her to know that all of her work as a loving mother has, in fact, produced a son who was worthy of her love.

I have also hurt my wife Eldina whom I married in a religious ceremony in 2016. We were just beginning and planning our life together when I was arrested. My last contact with Eldina was in 2016, and since being placed under SAMS I have not been allowed to even attempt to reach out to her with any form of communication, and the letters she sends to me are rejected because she is not recognized as part of my immediate family. (Since my arrest occurred shortly after our religious marriage, we never had the opportunity to aslo get a NY marriage license.) I yearn for the opportunity to reunite with my dear wife, Eldina, so that we may finally begin a new life together and pursue a future of love and productivity, not one of seperation, loneliness and lawlessness.

Worth a mention here is also the extensive ruin which I have brought upon myself through my utter foolishness. I have stolen life and joy from myself and everyone else who loved me, and I have

Case 1:16-cr-00398-PAE    Document 143    Filed 06/05/24    Page 77 of 81

wasted many prime years of life. I have tarnished my name and reputation and added layers of difficulty to the success of my own future as well as that of my family's.

I often find myself reflecting into the mind of my younger self in an attempt to derive some sense from the folly which led me into my current predicament. I am now able to look back at these events with a new understanding of how I became so blinded from reality by an extremist group like ISIS. I have recognized my faults and shortcomings. I have also recognized the preventability of going down such a dark path. I do not want to remove any blame from myself for the decisions I made, rather I only desire to shed light upon my downfall in life so it can be an example and a tool for my dedication to help others make healthier decisions and life choices.

My wrong turn towards radical extremism was guided by several factors: (1) I was 19 years old and had just started to practice my faith which served as a solid foundation for me in making significant lifestyle changes to improve myself for the better. (2) I had just been released from prison and was fully determined to completely abandon all toxic habits, associations, and influences in my life which had led me there. I gave up smoking, drinking, and partying at clubs and houses. I also removed myself from all craziness in the streets of my neighborhood. (3) My parents and brother had moved back to Albania. At the time I was on parole and therefore unable to travel with them, so I was left alone, on this side of the Atlantic. So I was young, alone, trying to stay away from former bad influences, and also looking to make new connections.

I stopped hanging out in the street and began spending more time alone at home. All of my life I have inherently been very friendly and social, so this sudden loneliness was extremely difficult for me. I rushed to fill this void and eventually wandered into the realm of social media. It was there that I encountered other Muslims who were most welcoming. The most inviting and brotherly among them turned out to be those who voiced support for groups like ISIS. I craved to be accepted into such a tight-knit community and brotherhood, so I inquisitively sought to research what they were about. I started to take part in their discussions and began to adopt their speeches and doctrines, especially ones that pulled at my empathy for the innumerable innocent lives destroyed by the Syrian regime's Bashar Asad with his use of chemical weapons and indiscriminate bombings of civilians. To me at least, this was their greatest selling point because although I had adopted some of their philosophies, I did not agree with all. In fact, I disagreed with and rejected more than I accepted, however I was unable to bring myself to voice my objections out of fear of being shunned by this newly found community to which I was welcomed. I think that it was my secret underlying opposition to some of their fundamental doctrines that caused me to overcompensate in my outward radical appearance. As a result, I found myself more actively propagating what I initially thought to be bizarre. I also began to realize that the more extreme I sounded, the more love and respect I received and in a much higher regard I was held. All the while I did not see the harm in this because I told myself that I had no plan or desire to act upon any of it. For me, at the time, feeling a part of a close-knit group of people who accepted me, mattered more than anything.

It was during this time that I was directed by one online ISIS supporter to a preaching group based in NYC called the "Islamic Thinkers Society." I was introduced to this group which among its members were two undercover federal agents. At 21 years old, I was their youngest member whereas everyone else was at least twice my age. Because of my youth, energy, and my seeming extremist exterior and speech, they showered me with respect and reverence. They always appointed me to lead them in prayers and they valued my points of view at every discussion and made me feel important. When eating out, these guys always treated me. They made it clear that they cared about me and were always ready to help me financially, or in any other, if I needed help. I became captivated by this treatment from these older men — they were so kind; they were the family I felt I no longer had. Of course, I sought to secure and prolong their friendship and attention and would have done just about anything for them. The direction I followed with my speech and appearance was whatever elicited their encouragement and approval was my chosen path. I considered these older men to be my closest and most trusted friends, so much so that I asked the two agents to act as the two witnesses required for my religious marriage to my wife Eldina. They were even going to fund my wedding feast which was being planned at the time of my arrest. When I was scheduled to have surgery at Mt. Sinai hospital, I was required to have someone accompany me and, again, my only true brothers, these agents came through. One of them accompanied me two different times, taking a day off from "work" on both occasions. They were always like this, dependable and jumping at any opportunity to help me out or do me some favor. For me, a kid feeling abandoned by his family, who were now living thousands of miles away in Albania, living alone with no job, this was a great thing. Especially because they seemed to care about and encourage me to do the "right thing" — things that they approved of.

It was my naivety and foolhardy cravings to belong, to be accepted by a community, and a brotherhood during a vulnerable time in my life which led to my downfall, luring me into the dark clutches of an extremist group like ISIS and leading me to make such terrible errors in judgement. What began as a "super radical" façade became indistinguishable from my own belief system. It replaced whatever belief system I thought I had.

The hardest part for me to wrap my mind around is the damage I have done to this country. As I said above, I spent a long time thinking I had committed a victimless crime. But I understand now that this is not the case. My actions were steps on an escalating path. Reviewing and collecting ISIS propaganda. Helping someone I thought was traveling to Syria to join ISIS buy the right boots for the rugged terrain — which, of course, I knew nothing about — and find his way to JFK airport. Lying about losing my passport and trying to get a new "clean" one so I could travel freely. And I could have taken further steps towards causing harm. At every step of the way I rationalized my thoughts and actions, and every step I took still brought me closer and closer to danger. I would like to think it was all talk, that I would have never gotten on a plane and taken up arms and put innocent people in harm's way, but given the path I was on, I will never really know that answer. At my sentencing, your Honor said that there was "every indication" that I was "on course to wreak havoc." You

Case 1:16-cr-00398-PAE   Document 143   Filed 06/05/24   Page 79 of 81

even called me a "ticking time bomb". Today, I hear your words differently and I know in my heart that you were right. I cannot begin to calculate the damage I could have caused.

For the past several years I have been housed at the Special Security (H-) Unit of the ADX in Florence, Colorado where the majority of Muslims are convicted terrorists. Many of them were active and significant members of extremist groups like Al Qaeda, and they partook in henious attacks like the events on 9/11. They are also among those who would contribute to the type of online propaganda which once had such an impact on me and where they acted as if they were my "loving brothers." However, in here, I very quickly learned how deluded I had been by their "brotherhood." The moment they caught even the slightest hint that I might disagree with them on even some minor religious doctrines, they became hostile, cold, and belittling. I realized that the smiles, warm greetings, acceptance, and brotherhood that once meant so much to me were tools to keep me focused on their goals, which, in turn, helping to further their radical agendas. They became even harsher when they saw how freely I interacted with inmates of other faiths, saying that I talk too much and a too friendly with disbelievers and enemies of God, while not being so with the Muslims (i.e., them). They now refer to me as "the ignorant little boy," and "Jew lover" because I have befriended another inmate who is Jewish and have stood up for him and defended him against some of their slander.

I have learned that acceptance by others is not the most important thing, particularly when it is not based on real shared values and beliefs and that there are more important things than acceptance by others. I have had space to think about and develope the ideals that really matter to me, and the principles that I want to be accepted for. I have learned that it is important to my sense of self and identity to treat everyone equally, regardless of their faith and to afford them the courtesy and respect that they deserve as human beings. I wholeheartedly regret that I ever showed hatred and hostility towards others because of their different beliefs, and that I ever aligned with people who nurtured this hostility.

Seperating myself from these toxic associations has had the most positive and liberating results. It has freed my mind to pursue genuine and healthy relationships with people who accept m for who I truly am; relationships where we encourage one another in a productive and positive way of life; not one of hate and manipulation. This realization has broadened my horizons to befriend peoples of various faiths and beliefs, learning from our differences and similarities in mutual respect. It has also helped me untangle my religious beliefs from the allegedly Islamic natur of Islamic terrorism. I am a devout Muslim, but I do not see people who support or engage in acts of terrorism as consistent with my beliefs. The connection between the two has been broken for me.

Your Honor, I categorically disavow ISIS and other similar terrorist organizations along with their violent extremist ideologies and philosophies. This belief is foundational to the person I have become. But it is a very dangerous thing for me to say aloud and even more dangerous to commit to paper. One of the ironies of "correctional facilities" is that they are not great places for "correction" or "rehabilitation". Being surrounded by people with negative beliefs and patterns

creates a self-reinforcing echo chamber. And expressing a counter viewpoint that challenges the dominant beliefs puts you in danger. So even if you don't agree, you still have to live a life of pretend. There are ways in which I am comfortable standing up to them (seeking out friendships with inmates of other faiths/beliefs) and lines I am still afraid to cross.

If I were to say openly what I have shared in this letter, I would be putting my safety at risk. The extremist Muslim inmates would consider and label me a "Murtad" (Arabic, meaning apostate/turncoat/deserter) which according to them, would warrant my death. It is known from news media reports how groups like ISIS would kill their own members for wanting to leave their ranks. Most of these inmates with terror-related cases are serving life sentences as opposed to my remaining 11½ years, and so they have little or nothing to lose by harming one they label as a Murtad if given the opportunity. In their twisted view, they would gain status in religion. So I live here on the edge of a knife — trying to maintain some semblance of association with them so I can live peacefully, while no longer believing in anything that they stand for.

At my sentencing, you said that you hoped I would remember the good things that my family said about me in the letters they wrote, the good sides of me they saw. You told me to let that be a light, a destination and a guide. I have read those words over and over again to myself over the past four years since I stood before you. I have felt the warmth of that light, which has become like a protective barrier on the surface of my skin, keeping me grounded and sane and hopeful, and reminding me of who I am. Sometimes I wondered why someone like you, Judge Engelmayer, would even take the time to give me what turns out to be the best advice.

I love my mother, brother, and wife without measure. Likewise, I still love my father in memory. He died while I was unable to hug and kiss him goodbye or attend his funeral. And I love the United States of America, which took us in, and my homeland of Albania, both countries I dishonored through my choices and actions. I have no one to blame but myself for being in this predicament and that is a reality which I will carry upon my shoulders for my remaining life.

I want my family, this country, and this court to be proud of me and my growth as I become a productive member of society. I solemnly vow to work hard everyday for the rest of my life, to being a law-abiding citizen and a positive influence to others who are in danger of being misguided towards the dark path I myself once walked. I am eager and most enthusiastic to re-enter society and to reunite with my loved ones and to put my words into actions.

I know there are many factors your Honor must consider, but I appeal to your Honor, and ardently implore you to take a leap of faith with me and give me this last chance in life. I ask that you take this First Step and grant me relief under the First Step Act so that I myself may begin my walk to claim the friars of the law and righteousness for the rest of my existence.

Thank you for affording me your time to read my words and giving sincere and objective consideration to my appeal.

Respectfully,

Sajmir Alimehmeti

page 6 of 6