

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, NY 10278*

July 2, 2024

**BY ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

> **Re:    *United States v. Sajmir Alimehmeti, a/k/a "Abdul Qawii,"* S1 16 Cr. 398 (PAE)**

Dear Judge Engelmayer:

The Government respectfully submits this letter in opposition to the motion for compassionate release filed by defendant Sajmir Alimehmeti, a/k/a "Abdul Qawii," pursuant to 18 U.S.C. § 3582(c)(1)(A). (ECF No. 143 ("Motion" or "Mot.")). There is no basis for releasing Alimehmeti early, and his Motion should be denied.

For years, Alimehmeti engaged in a determined effort to serve and support the Islamic State of Iraq and Syria ("ISIS"), a designated foreign terrorist organization, and its radical terrorist ideology. He twice attempted to travel to the United Kingdom with the intention of continuing on to Syria to join ISIS. When his travels were thwarted by U.K. authorities, Alimehmeti began stockpiling military-style weapons and tactical combat gear at his Bronx apartment and actively sought to radicalize and recruit others to join him in serving ISIS and terrorism. Now, after serving less than half of his sentence of 264 months (22 years), Alimehmeti moves for a sentence reduction based principally on his conditions of confinement while subject to Special Administrative Measures ("SAMs") designed to prevent his continued criminal activity in prison, on his purported rehabilitation, and on his age at the time of the offense conduct.

As detailed below, none of these constitutes an "extraordinary and compelling" reason for a sentence reduction, and the sentencing factors under 18 U.S.C. § 3553(a) support his original sentence as strongly today as they did at sentencing. The Motion should be denied.

## I.    Factual Background

### A.  Alimehmeti's Criminal History

Alimehmeti is an Albanian-born U.S. citizen. (May 14, 2018 Presentence Investigation Report ("PSR") ¶¶ 88, 97). In 2010, at the age of 16, he was convicted of committing a violent robbery in the Bronx (*Id.* ¶¶ 76-79). The same year, while serving a five-year term of probation for the robbery conviction, and as a member of a violent Albanian street gang, Alimehmeti pleaded guilty to an assault and other crimes under New York law and was sentenced to concurrent sentences of one year, one year, and 90 days. (*Id.* ¶ 81).

### B.  Alimehmeti's Offense Conduct

*Alimehmeti's Thwarted Attempts to Travel to Join ISIS.* Shortly after his release from prison in August 2013, starting in at least 2014, Alimehmeti spent years attempting to travel, radicalize others, and stockpile weapons in support of ISIS and radical jihadist ideology. (PSR ¶¶ 10-49).[1] In October 2014 and again in December 2014, Alimehmeti attempted to enter the United Kingdom on his way to ISIS-controlled territory in the Middle East but was denied entry both times. The first time, border authorities denied him entry after they found camouflage clothing and nunchucks in his luggage; the second time, they denied him entry after an inspection of his devices at the airport recovered a vast collection of images of ISIS flags and terrorist attacks conducted with improvised explosive devices. (*Id.* ¶¶ 14-15).

*Alimehmeti's Devices.* The FBI's examination of the devices seized by UK authorities recovered, among other things, photographs of Alimehmeti with the black and white flag of ISIS (which the FBI later seized from his Bronx apartment) and making a finger-pointing gesture commonly used by ISIS supporters to symbolize their allegiance to ISIS. (*Id.* ¶ 16). The devices also contained terrorist propaganda, including graphic videos that depicted ISIS fighters carrying out attacks with assault rifles and IEDs and executing prisoners and civilians by shooting them in the head or beheading them, and audio files of lectures promoting radical jihadist ideology by Anwar Al-Awlaki, the now-deceased former leader of al Qaeda in the Arabian Peninsula ("AQAP"). (*Id.* ¶ 17).

*Alimehmeti's Weaponry.* After U.K. authorities thwarted Alimehmeti's efforts to reach ISIS's purported caliphate in the Middle East, in 2015, Alimehmeti began amassing military-style combat knives and tactical gear at his Bronx apartment—weapons and gear that he could use in a lone-wolf terrorist attack against civilians in New York City. (*Id.* ¶ 18). The items Alimehmeti purchased for delivery to his apartment included a military-grade survival knife with a five-inch blade; three tactical knives with four-inch blades; two credit card-sized folding knives; a commando wire pocket saw; a 24-inch pocket chainsaw; a rucksack designed for tactical combat; and a tactical ski mask. (*Id.*).  Many of these items were later recovered by the FBI during a search of Alimehmeti's apartment following his arrest.  (*Id.* ¶ 43).

---

[1] The PSR is being submitted under seal as Exhibit ("Ex.") A.

Alimehmeti's Continuing Attempts to Join ISIS. Alimehmeti did not give up on traveling to join ISIS after his failed attempts to enter the United Kingdom. Instead, recognizing that the stamps in his passport showing he was denied entry would raise suspicions, Alimehmeti attempted to fraudulently obtain a new U.S. passport to travel by falsely claiming that his existing passport had been lost. (*See id.* ¶¶ 35-42).

Alimehmeti's Communications with ISIS Supporters. Alimehmeti did more than consume ISIS propaganda glorifying ISIS's mission of death, destruction, and brutal violence. From 2015 through 2016, Alimehmeti developed relationships with fellow ISIS supporters in the United States, expressed support for terrorist attacks carried out in the name of ISIS, and communicated his desire to make *hijra* to fight with ISIS abroad.[2] During a call on November 29, 2015, Alimehmeti referred to ISIS territory as an "amusement park" and on December 22, 2015, a female ISIS supporter told Alimehmeti during a call full of coded references that she was "going away soon . . . on holiday" and that she planned to join ISIS in Libya, stating "we're not going to 'S-town'" (referring to Syria) and "we're going to 'L-town'" (referring to Libya). (*Id.* ¶¶ 39-40). When the woman asked Alimehmeti if he wanted to join her, Alimehmeti replied: "I can't . . . You know why . . . I don't have a 'P'"—referring to a clean passport without rejection stamps—but "obviously I want to go." (*Id.* ¶ 41).

Alimehmeti's Conversations with the UCs and Attempt to Assist a UC to Travel to Syria to Join ISIS. In September 2015, as part of an effort to disrupt Alimehmeti's activities, law enforcement introduced undercover officers (the "UCs") to Alimehmeti, through certain members of Alimehmeti's network of radical associates. (*Id.* ¶ 19). Over the course of the ensuing months, Alimehmeti participated in numerous recorded meetings with the UCs, including in Alimehmeti's Bronx apartment, where he displayed an ISIS flag on the wall of the main room, described his desire to travel abroad to fight for ISIS and execute beheadings for the group, and used his laptop to play ISIS propaganda videos, including videos like "The Flames of War" celebrating terrorist attacks and the beheading of captives. (*See id.*).

But Alimehmeti recognized that the rejection stamps in his passport from his failed attempts to enter the United Kingdom would raise suspicions and likely prevent him from successfully making *hijra* and thus sought to obtain a new, clean U.S. passport. (*Id.* ¶ 36). On October 23, 2015, Alimehmeti submitted a passport application, falsely claiming that his existing passport had been lost when he "forgot [it] in [a] bag in a train." Alimehmeti signed the application, declaring under penalty of perjury that "the information furnished herein is correct and complete." (*Id.* ¶¶ 35-36). In ensuing recorded and intercepted communications with the UCs and associates, Alimehmeti described committing the passport fraud and made clear that he intended to use the fraudulent passport to travel to Syria to join ISIS. (*Id.* ¶¶ 37-42). For example, on November 23, 2015, during a meeting with a UC at Alimehmeti's apartment, Alimehmeti told the UC that he had falsely claimed his existing passport was "lost because I don't want . . . the rejection stamps." (*Id.* ¶ 37). Alimehmeti then showed the UC his purportedly lost passport, which Alimehmeti had

---

[2] ISIS supporters use the term "hijra" or "hijrah"—which traditionally refers to the flight of Muhammad from Mecca to Medina to escape persecution—to refer to an obligation to migrate to ISIS-controlled territory to join ISIS and wage jihad.

stashed at his apartment. (*Id.*). On December 3, 2015, during another recorded meeting with UCs, Alimehmeti again conveyed that he intended to use the new passport for making *hijra* to join ISIS, stating: "It's not about Albania and Europe. You know, it's about other places. I want to travel, you know what I mean." (*Id.* ¶ 40).

In May 2016, Alimehmeti agreed to assist a UC who intended to travel to Syria to fight for ISIS. (*Id.* ¶ 21). Alimehmeti then took the UC to several different stores, at which Alimehmeti helped UC-4 to select and purchase supplies for traveling to join ISIS, including boots, a cellphone, a compass, a bag, and a flashlight. (*Id.* ¶¶ 25-29). That day, Alimehmeti also advised UC-4 about the most secure encrypted messaging applications to use when communicating with other "brothers" (i.e., ISIS supporters). (*Id.* ¶ 30).

### C. Alimehmeti's Continuing Support of ISIS in Prison

Prior to Alimehmeti's federal arrest, Alimehmeti had a recorded meeting with a UC during which he stated that if he were ever incarcerated, he would seek to radicalize other inmates and correctional officers. (PSR ¶¶ 48, 49).

After Alimehmeti's arrest on May 14, 2016, he was housed at the Metropolitan Correctional Center ("MCC"), New York, where he assisted another inmate at the facility in an effort to radicalize others at the facility by disseminating terrorist propaganda materials that were provided to the two defendants in discovery. That other inmate was Ahmad Khan Rahimi, who had been convicted for his role in carrying out the September 2016 bombing in Manhattan's Chelsea neighborhood, and would subsequently be sentenced to multiple terms of life imprisonment followed by a consecutive term of 30 years' imprisonment. (*Id.* ¶ 44).

Specifically, in November 2017, a hard drive in Alimehmeti's locker was found to contain terrorist propaganda materials that had been produced in discovery to Rahimi, including multiple issues of Inspire, a propaganda publication of AQAP. (*Id.* ¶ 45). One of the Inspire issues described how to build pressure-cooker bombs, celebrated the September 2016 bombings carried out by Rahimi, and encouraged followers to kill civilians through lone-wolf attacks in the West. (*Id.*). An analysis of a laptop seized from Rahimi's possession at the MCC showed the laptop had been used to connect to and open files on Alimehmeti's hard drive. (*Id.* ¶ 46).

As detailed in the Government's 2024 application to renew Alimehmeti's SAMs, further described below, ██████████████████████████████████████████████████████████████████████████████████████████████

## II.    Procedural History

### A. Alimehmeti's Indictment and Plea

On June 7, 2016, a grand jury in the Southern District of New York returned an indictment charging Alimehmeti with attempting to provide material support to a designated foreign terrorist

organization, *i.e.*, ISIS, in violation of Title 18, United States Code, Section 2339B (Count One), and passport fraud, in violation of Title 18, United States Code, Section 1542 (Count Two). On November 28, 2017, a grand jury returned a superseding indictment (the "Indictment"), which modified Count Two to allege that Alimehmeti committed the charged passport fraud to facilitate an act of international terrorism, namely, his travel overseas to join and fight for ISIS, thereby increasing the statutory maximum penalty on Count Two to 25 years' imprisonment, *see* 18 U.S.C. § 1542. On February 21, 2018, Alimehmeti pleaded guilty to both counts without the benefit of a plea agreement.

### B. Alimehmeti's Sentencing

At sentencing, the defense stated in its written reply that the defendant had not disavowed his extremist beliefs. (Mot. 2; *see also* Dec. 14, 2019 Reply (ECF No. 132)).

On December 6, 2019, this Court sentenced Alimehmeti to 264 months' imprisonment, or 22 years, which was below the Guidelines range of 360 to 540 months' imprisonment. (ECF No. 133 ("Sentencing Tr."), at 23).[3] Before imposing sentence, the Court detailed the evidence of the defendant's actions in support of ISIS "because it underscores how alarming your actions were and how deep a potential threat they posed, both to our society and to people abroad." (*Id.* at 77).

The Court observed that Alimehmeti's conduct went "well beyond" the acts set forth in the defendant's plea allocution—providing material support to ISIS by trying to aid another (a UC) to travel to Syria to join ISIS, and lying in a passport application to obtain a new passport that he himself could use to join ISIS. (*Id.* at 78). The Court emphasized that, after twice being denied entry to the UK, Alimehmeti began stockpiling munitions in his home—munitions such as spike knives and a pocket chain saw with which he would not have been able to leave the country—suggesting that he was preparing for a potential attack against civilians in the United States. (*Id.* at 78-80). The Court also underscored the FBI's recovery of a will from Alimehmeti's apartment, which he had written in the event that he lost his life in an act of terrorism, along with social media posts in which he celebrated the November 2015 attacks in Paris and videos celebrating suicide bombing. (*Id.* at 82-83).

The Court further stated:

> Over a period of several years in a variety of ways and in a variety of contexts, both alone and in concert with others, both while in free society and while in prison, you took steps to support ISIS's evil, violent mission at home and abroad. Through a variety of actions, you backed up your statements that you were dedicated to joining and fighting for ISIS.

(*Id.* at 88).

---

[3] The sentencing transcript is being submitted as Exhibit B.

### C.  Alimehmeti's Incarceration at ADH Florence and SAMs Renewals

The Attorney General placed Alimehmeti under SAMs on March 5, 2018 based on the substantial risk that Alimehmeti's communications or contacts with persons could result in death or serious bodily injury to persons, pursuant to 28 C.F.R. § 501.3(c). In April 2021, Alimehmeti was transferred to the United States Penitentiary, Administrative Maximum, Florence, Colorado (ADX). He is housed in the H-Unit, which is reserved for inmates subject to SAMs. The SAMs have been renewed every year since their initial imposition and were most recently renewed on March 5, 2024. (2024 SAMs Renewal 1).

According to BOP records, Alimehmeti's projected release date is April 23, 2035.

### D.  Alimehmeti's Administrative Requests for a Sentence Reduction

Alimehmeti submitted an administrative request for a sentence reduction, dated April 20, 2023, to the warden of ADX Florence. In the request, he cited his rehabilitation efforts as demonstrated by his purported disavowal of ISIS. (Mot. 6). In a letter dated June 22, 2023, the warden declined to pursue a request for a sentence reduction on his behalf. (*Id.*). Alimehmeti appealed the denial in a letter dated July 6, 2023, and the appeal was rejected by the warden on July 20, 2023. Alimehmeti then filed a "Regional Administrative Remedy Appeal," which was denied by the BOP's regional director on September 1, 2023. Alimehmeti filed a "Central Office Administrative Remedy Appeal" which was denied on October 30, 2023, by the BOP's Administrator of National Inmate Appeals.

## III.    Applicable Law

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. Alimehmeti has applied for a reduction in sentence under the so-called "compassionate release" provision of 18 U.S.C. § 3582(c), which provides that a court "may reduce the term of imprisonment . . . after considering the factors set forth in Section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

As this Court has explained, "there are three prerequisites for granting a compassionate release motion": (1) "the defendant must have exhausted his administrative rights"; (2) "the court must find that 'extraordinary and compelling reasons warrant' a reduction of sentence"; and (3) "the court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a)." *United States v. Freeman*, No. 02 Cr. 150 (LAP), 2022 WL 1785578, at *2 (S.D.N.Y. June 1, 2022). As the movant, the defendant bears the burden of proving that he is entitled to relief under Section 3582. *Id.*; *see also United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease.").

The defendant is deemed to have satisfied the first prong, the exhaustion requirement, after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). As to

the second prong, as the movant, "the defendant bears the burden of proving 'extraordinary and compelling reasons' exist justifying early release." *United States v. Rodriguez*, No. 88 Cr. 642 (LAP), 2022 WL 2533468, at *3 (S.D.N.Y. July 7, 2022).[4] Lastly, the court's finding of such extraordinary and compelling reasons permits release but does not mandate it, for the court must still consider the Section 3553(a) factors. *United States v. Monsanto*, No. 87 Cr. 555 (LAP), 2021 WL 355049, at *2 (S.D.N.Y. Feb. 2, 2021). Where the court determines "that the Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances," the motion for compassionate release may be denied. *United States v. Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020) (finding compelling reasons warranting defendant's release but nevertheless denying motion for compassionate release because the Section 3553(a) factors "weigh[ed] heavily against [a] reduction of [the defendant's] sentence").

**IV.      Discussion**

Alimehmeti has not demonstrated extraordinary and compelling reasons that would justify reducing his sentence by half, from 264 to 132 months, as he requests. Even if he had, the Section 3553(a) factors weigh heavily against his early release.[5]

**A. Alimehmeti Has Failed to Meet His Burden to Show Extraordinary and Compelling Reasons Warrant His Early Release.**

Alimehmeti provides no extraordinary and compelling reasons for reducing his original sentence of 264 months. First, as to Alimehmeti's arguments regarding the severity of his conditions of confinement as an inmate subject to SAMs, these conditions were implemented specifically in light of the dangers Alimehmeti showed himself to pose while incarcerated and are not themselves a factor, much less an extraordinary and compelling reason, supporting his early release. Second, the recent events evidencing Alimehmeti's purported rehabilitation—his recent hiring as a unit orderly, his participation in classes, and his alleged disavowal of ISIS—are rehabilitative steps that are expected of inmates and do not rise to the level of an extraordinary and compelling reason for Alimehmeti's early release. Third, Alimehmeti's age is a fact that the Court considered before imposing sentence and is not a basis for reducing that sentence.

---

[4] The Second Circuit has held that the First Step Act of 2018 "allows [district] courts independently to determine what reasons, for purposes of compassionate release, are extraordinary and compelling" and that the BOP Director is no longer the sole arbiter in determining whether the threshold is met." *See United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

[5] The Government does not dispute that Alimehmeti has exhausted his administrative remedies as to his motion for compassionate release. *See United States v. Rivera*, No. 89 Cr. 346 (LAP), 2021 WL 5235093, at *4 (S.D.N.Y. Nov. 9, 2021) (exhaustion requirement satisfied where the warden denied defendant's request for compassionate release).

### 1. Alimehmeti's Conditions of Confinement

Much of Alimehmeti's submission is devoted to describing the challenges associated with conditions of confinement to which he is subjected as a prisoner under SAMs. (Mot. 11-26). But Alimehmeti cites no authority for the proposition that the SAMs could warrant early release. These special security conditions have been imposed on Alimehmeti because of the dangers he has proven to pose to others, including while incarcerated, and he has been housed in the H-Unit at ADX Florence specifically to mitigate those dangers. These conditions were designed to address Alimehmeti's own conduct and plainly serve "legitimate penological interests," *United States v. Hashmi*, 621 F. Supp. 2d 76, 86 (S.D.N.Y. 2008), which are not punitive in nature but rather have the "non-punitive objective of protecting national security" and "curtailing [the defendant's] dangerousness." *Basciano v. Lindsay*, 530 F. Supp. 2d 435, 446 (E.D.N.Y. 2008) (quoting *United States v. El-Hage*, 213 F.3d 74, 77 (2d Cir. 2000)). Alimehmeti does not cite—and the Government has not identified—any caselaw in which such administrative measures have been deemed extraordinary and compelling circumstances warranting a defendant's early release. *Cf. Cross v. McGinnis*, No. 05 CIV. 504 (PAC), 2006 WL 1788955, at *4 (S.D.N.Y. June 28, 2006) ("Solitary confinement and the restrictions associated with it are not an extraordinary circumstance" that warrants equitable tolling).

Specifically, as recounted above, while incarcerated at the MCC,



otably, Alimehmeti does not dispute the Government's statements regarding his actions, though he attempts to explain or justify them. (Mot. 24).

Indeed, though Alimehmeti argues that (i) the SAMs are a basis for his early release and (ii) the position he has been given as an orderly in H-Unit shows he is not a security threat and does not require incarceration at a maximum-security prison, Alimehmeti does not specifically challenge the continuing imposition of any of the SAMs. Nor does he offer any caselaw to suggest that a motion under Section 3582(c)(1)(A) could serve as an appropriate avenue for such a challenge. To the contrary, the Second Circuit has made clear that a defendant "must exhaust his administrative remedies under the Bureau of Prisons Administrative Remedy Program with regard to whatever special administrative measures are imposed upon him." *United States v. Yousef*, 327 F.3d 56, 169 (2d Cir. 2003) (holding that the courts lack jurisdiction to consider challenges to court-recommended special administrative measures where the defendant fails to first exhaust his administrative remedies).

The central factual basis for Alimehmeti's purported rehabilitation is his stated disavowal of ISIS, through the defense's written submission and in his statements in a personal letter to the Court. The defense emphasizes the "paradigm shift" that this represents and notes that the change has been recognized by BOP staff, who have moved him to lower security within the H-Unit's internal step-down program and have granted him an orderly position that permits him to interact unrestrained with prison staff in the H-Unit. (Mot. 25, 28).

Given the seriousness of his offense conduct and his express refusal to repudiate ISIS at his sentencing in December 2019, the Government acknowledges the defense's arguments about the potential significance of Alimehmeti's newly stated (purported) disavowal of extremist ideology. But his say-so cannot by itself be deemed an "extraordinary and compelling" reason for his early release. Nor can recent apparent improvements in his conduct, however commendable, be deemed extraordinary and compelling circumstances justifying a reduced sentence just by virtue of their contrast with Alimehmeti's disturbing prior longstanding refusals to renounce his violent extremist ideology and desire to support ISIS. Further, his attempted enrollment in or completion of various educational courses does not rise to the level of extraordinary and compelling. (*See* Def. Exs. G, H). Put simply, as this Court has observed in other cases, some amount of rehabilitative effort is expected from inmates, and cannot serve as the basis for early release. *See e.g.*, *United States v. Corbett*, No. 10-CR-184, 2023 WL 8073638, at *7 (Engelmayer, J.) (holding that participation in rehabilitative programming is expected of inmates and does not constitute an extraordinary and compelling circumstance) (collecting cases); *United States v. Peterkin*, No. 05-CR-538-02 (JSR), 2021 WL 1948513, at *2 (S.D.N.Y. May 13, 2021) (denying a sentence reduction where the defendant submitted 60 certificates earned in prison, information about his work as a pastor and the business that he started in prison, and letters attesting to his rehabilitated character).

It also bears noting that although Alimehmeti contends that he has undergone "extraordinary rehabilitation" while incarcerated, (Mot. 26), his conduct as detailed in the 2024 SAMs Renewal and reflected in his disciplinary records "raise questions about the extent of [his] remediation," *United States v. Morrison*, No. 07 Cr. 003 (LAP), 2019 WL 6732877, at *2 (S.D.N.Y. Dec. 11, 2019), *aff'd sub nom. United States v. Lee*, 841 F. App'x 285 (2d Cir. 2021). Alimehmeti has incurred six infractions since his detention in 2016, for phone abuse (2016), threatening bodily harm (2016), possessing an unauthorized item (2018), interfering with security devices (2020), disabling a camera in his cell (2020), and refusing to obey an order (2021).[6]



Regardless of the significance of any individual infraction or event, this is a troubling record spanning almost the entire period of Alimehmeti's incarceration. At a minimum, it suggests that it is simply too early to tell whether Alimehmeti has renounced terrorism and is rehabilitated

---

[6] The defendant's disciplinary records are being submitted under seal as Exhibit C.

in any meaningful sense. It is not a sufficient or fulsome record of rehabilitation—let alone an "extraordinary and compelling" one—warranting early release.

### 2. Alimehmeti's Age

In support of Alimehmeti's early release, the defense argues that the Court should consider Alimehmeti's age—he was 20 years old at the start of his radicalization in 2014, and 24 when he was convicted, in 2018.[7] But as the Government explained in its sentencing submission, the defendant's age is not a mitigating factor, as it "is squarely in line with the ages of other young, male ISIS followers who have joined the group and attacked and killed in its name." (ECF No. 131, at 45).

More crucially here, Alimehmeti's age amounts to a personal characteristic already carefully and expressly considered by the Court at the time of sentencing. The Court stated at sentencing that it "accept[ed] . . . the defense's observation about how [Alimehmeti's] age made [him] susceptible to making bad choices" and made him "more vulnerable to radicalization." (Sentencing Tr. 98, 102). After factoring in the defendant's age, and all the other relevant circumstances, the Court imposed the 22-year sentence that Alimehmeti now seeks to reduce. Under these circumstances, Alimehmeti's age should not be considered an extraordinary and compelling reason for a sentence reduction. He should serve the full sentence the Court imposed. *See United States v. Ebbers*, 432 F. Supp. 3d 421, 429 (S.D.N.Y. 2020) (explaining that a compassionate release motion is "not an opportunity to second guess or to reconsider whether the original sentence was just").

### B. The Section 3553(a) Factors Weigh Heavily Against Alimehmeti's Early Release.

Even if Alimehmeti had carried his burden of demonstrating extraordinary and compelling circumstances warranting release, which he decidedly has not, his Motion is easily denied for the independent reason that the Section 3553(a) factors counsel overwhelmingly against his release. This Court thoroughly reviewed those factors when sentencing Alimehmeti to a below-Guidelines sentence of 22 years, and the careful reasoning it employed then "still applies with full force today." *See United States v. Saleh*, No. 93 Cr. 181 (LAP), 2023 WL 158444, at *5 (S.D.N.Y. Jan. 10, 2023) (declining to grant early release where "[t]he 3553(a) analysis has not materially changed" since sentencing).

First, and most importantly, the nature and circumstances of Alimehmeti's offense conduct, standing alone, compel denying his Motion for a sentence reduction. As the Court explained at sentencing, at the time of his arrest, Alimehmeti was "a ticking time bomb." (Sentencing Tr. 89). Addressing Alimehmeti directly, the Court stated that "there [wa]s every reason to assume that grave harm would likely have come to somebody or perhaps many somebodies, whether at home or abroad, whether at your hand or the hand of somebody you abetted or encouraged." (*Id.*). And the Court emphasized that "[t]he fact that you were caught before someone got hurt of called does

---

[7] The defense's brief states that Alimehmeti was 22 at the time of the offense conduct. But Alimehmeti was born in November 1993 (PSR at 3), and pleaded guilty in February 2018, at the age of 24 (ECF No. 114).

not make your intentions in preparation more innocuous." (*Id.*). In short, the horrific nature of Alimehmeti's crimes "continue[s] to militate overwhelmingly in favor of denying the defendant's Motion." *United States v. Jaber*, No. S1 13 CR 485 (CM), 2022 WL 35434, at *3 (S.D.N.Y. Jan. 4, 2022), *appeal dismissed sub nom. United States v. El Merebi*, No. 22-149, 2023 WL 4636754 (2d Cir. Mar. 16, 2023) (holding that the Section 3553(a) factors weigh against compassionate release where the defendant was schemed to sell military-grade weapons to a terrorist group that he believed would be used to kill American soldiers); *see also United States v. Al Kassar*, No. 07-CR-354-01 (JSR), 2020 WL 4813199 (S.D.N.Y. Aug. 19, 2020), *aff'd*, 850 F. App'x 815 (2d Cir. 2021) (observing that, given the "monstrous nature" of the defendant's plan to sell weapons to what he believed was a terrorist organization, his 30-year sentence was lenient and a sentence reduction unwarranted under the Section 3553(a) factors).

This was the backdrop against which the Court assessed Alimehmeti as a "clear and present danger to society." (Sentencing Tr. 93). While acknowledging the defense's thoughtful and comprehensive sentencing submissions and argument, the Court recognized the lack of "reasonable assurance, other than blind hope" that if released from prison any time soon, Alimehmeti "would not be poised to resume these dangerous ways." (*Id.*). Five years on, Alimehmeti purports to have taken the important step of renouncing terrorism, but this cannot provide reasonable assurance that he will not return to the dangerous conduct that put him in prison.

Second, a sentence reduction would be wholly at odds with the need for the sentence imposed to promote respect for the law and further the goal of general deterrence, which has special import here. *See* 18 U.S.C. § 3553(a)(1)(A), (B), (C). Highlighting the need "to send a clear message to other people that is sufficient to deter them from engaging in similar crimes," and recognizing the dangers posed by "copycat" terrorists, the Court concluded at sentencing that there was "a general deterrent interest served by imposition of a sentence sufficiently long to discourage any rational person from thinking that it is worth paying that price." (Sentencing Tr. 90). The same holds true today. Reducing the defendant's sentence to time served would undermine this clear and important message sent by the Court at sentencing, and the ongoing need for general deterrence provides a second basis to deny the Motion.

Third, the need for individual deterrence and to protect the community also militates in favor of maintaining the sentenced imposed. Alimehmeti was not a first-time offender at the time of his federal arrest. As this Court noted at sentencing, Alimehmeti was a gang member who was sentenced for two violent crimes in his youth, for an attack on a victim during a robbery and, while on probation, an assault involving forcible touching. (*Id.* at 92). His imprisonment for those crimes did not deter him from "far more destructive" and "anti-social" conduct intended to physically harm others. (*Id.*). Indeed, upon being imprisoned for the instant offense, Alimehmeti "partnered with an infamous lone-wolf terrorist attacker to promote ISIS among criminal defendants in the MCC." (*Id.* at 93). *See also United States v. Rosa*, No. 88 Cr. 111 (LAP), 2020 WL 5774909, at *2 (S.D.N.Y. Sept. 28, 2020) (denying compassionate release because defendant was a danger to the community, as demonstrated in part by defendant's disciplinary sanctions while incarcerated, including for disruptive conduct and possessing a hazardous tool). The defendant is a recidivist criminal, who did not stop his troubling conduct even after being charged and incarcerated for a

federal crime. He has not demonstrated that he would not again pose a significant danger to the public if he were to be released early.

Finally, Alimehmeti's history and personal characteristics continue to counsel in favor of the sentence imposed. At sentencing, the Court acknowledged the defense's arguments, including Alimehmeti's relatively young age and certain claimed mitigating factors relating to his upbringing and psychological development. (Sentencing Tr. at 94). But the Court also recognized that the defendant had made a series of choices: to embrace ISIS, to buy an array of weaponry, and to twice attempt to join the terrorist fight in Syria. (*Id.* at 101).

Finally, Alimehmeti's current claims of rehabilitation, and his recent BOP classification as a "low risk" recidivist under the First Step Act's PATTERN risk assessment, do not approach supplying a basis for revisiting the Court's carefully calibrated analysis of his history and personal characteristics. *See United States v. Castillo*, No. 03 Cr. 979 (KMW), 2023 WL 2262881, at *3 (S.D.N.Y. Feb. 28, 2023) (recognizing the defendant's "substantial rehabilitative efforts" and the BOP's "low risk" classification but concluding that the Section 3553(a) factors weighed against compassionate release given the violence of the defendant's crimes and the harms inflicted on his victims).

In sum, this is a case in which "[r]educing [the defendant's] sentence—when he has served less than half of it—would undermine the goals of sentencing." *See United States v. Gotti*, 433 F. Supp. 3d 613, 620 (S.D.N.Y. 2020). Alimehmeti committed extraordinary crimes warranting an appropriately severe sentence. Because the justifications for his 22-year sentence remain as compelling today as they were at the time the sentence was imposed, that sentence should not be disturbed.

## V. Conclusion

The Motion for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A) should be denied. Alimehmeti should be required to serve the remaining years of his sentence.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by: _____
Jane Chong
Assistant United States Attorney
(917) 763-3172

Cc (By Email): Susan Kellman, Esq., and Sarah Kunstler, Esq.