**Exhibit B**

JG6YA1MS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                            16 CR 398 (PAE)

SAJMIR ALIMEHMETI,

            Defendant.

                              Sentence
------------------------------x

                              New York, N.Y.
                              December 6, 2019
                              10:05 a.m.

Before:

                HON. PAUL A. ENGELMAYER,

                              District Judge

                    APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
BY:  EMIL J. BOVE III
    GEORGE TURNER
    Assistant United States Attorneys

SUSAN KELLMAN
SARAH KUNSTLER
    Attorneys for Defendant

Also Present:
Carlos Santiago

Case 1:16-cr-00398-PAE    Document 149-2    Filed 07/02/24    Page 3 of 116    2

JG6YA1M8

(Case called)

THE DEPUTY CLERK:  Counsel, please state your appearance for the record.

MR. BOVE:  Good morning, your Honor.  Emil Bove and George Turner for the government.

THE COURT:  Good morning, Mr. Bove.  Good morning, Mr. Turner.

MS. KELLMAN:  Good morning, your Honor.  Susan Kellman for Sajmir Almehmeti.  My client is on his way to the courtroom, your Honor.

THE COURT:  Very good.  Good morning, Mr. Almehmeti.  Good morning, Ms. Kellman.  I'll wait Mr. Almehmeti.

MS. KELLMAN:  And, your Honor, I'm joined at counsel table today by Sarah Kunstler and Carlos Santiago who is with the mentoring program of the Southern District.

THE COURT:  Very good.  Good morning, Ms. Kunstler.  Good morning to you, Mr. Santiago.

You may all be seated, and good morning as well to the members of the public who are here.

All right.  I'll note for the record that Mr. Almehmeti is here.

Good morning, Mr. Almehmeti.

THE DEFENDANT:  Good morning.

THE COURT:  When I took the bench, I simply took the role of the attorneys and welcomed the attorneys, and welcome

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

to you too.

THE DEFENDANT:  Thank you.

THE COURT:  We're here today to impose sentence in the case of the United States of America v. Sajmir Almehmeti.

On February 22, 2018, Mr. Almehmeti pled guilty to both counts of the superseding indictment.  Count One charges him with providing material support to ISIS which has been designated by the secretary of state as a foreign terrorist organization.

Count Two charges him with submitting a false passport application so as to enable him to obtain a new passport to facilitate the provision of personnel, including himself, to ISIS.

In preparation for today's proceeding, I have reviewed the government's Pimentel letter and the transcript of the plea proceedings.  I've also familiarized myself with the history of this long-running case.  I've also reviewed the presentence report dated May 14 of last year, including its recommendation and addendum.

I've also received the following additional submissions:

The defense sentencing submission dated November 21 and the accompanying letter setting out the defense objections to the presentence report; the government's submission dated December 1 which included, among other attachments, a disc with

videos and still photographs; and the defense reply submission dated December 4.

Have the parties received each of these submissions? And are there any others?

MR. BOVE:  We have, Judge.  And there are no others that I'm aware of.

MS. KELLMAN:  Yes, your Honor.  We have.  I don't believe there are any others.

THE COURT:  Thank you.

Ms. Kellman, have you read the presentence report?

MS. KELLMAN:  Yes, your Honor.

THE COURT:  Have you discussed it with your client?

MS. KELLMAN:  Yes, I have.

THE COURT:  Mr. Almehmeti, have you read the presentence report?

THE DEFENDANT:  Yes.

THE COURT:  Have you discussed it with your lawyers?

THE DEFENDANT:  Yes.

THE COURT:  Have you had the opportunity to go over with them any errors in the report or anything else that should be taken up with the Court?

THE DEFENDANT:  Yes.

THE COURT:  Government, have you reviewed the presentence report?

MR. BOVE:  We have, Judge.

THE COURT:  Let's put aside for the moment the calculation of the sentencing guidelines where I'm mindful there are a range of disputes.

Are there any objections to the report regarding its factual accuracy, other than what is in paragraph 81?

MS. KELLMAN:  No, your Honor.  Well, other than the imposition of the -- the enhancement.

THE COURT:  Sorry.  Other than the guidelines calculation, just focusing on facts.

MS. KELLMAN:  Paragraph 81, just what's in that.

THE COURT:  I think your letter just deals with paragraph 81.

Right?

MS. KELLMAN:  May I have just a minute.

(Pause)

MS. KELLMAN:  That's all, Judge.

THE COURT:  Given the parties' consent, I will agree to delete the details that are set out in paragraph 81.  You can confer with Mr. Smallman after this just to make sure that the mechanical execution of that command accords with your collective views.  But I understand what you're trying to accomplish, and I'm fine with that.  So we'll get rid of the descriptive detail in paragraph 81.

MS. KELLMAN:  Thank you, your Honor.

THE COURT:  Hearing no objections to the balance of

the report, I will adopt the factual recitations set forth in the presentence report as amended with respect to paragraph 81.

The presentence report will be made a part of the record in this matter. It will be placed under seal. In the event an appeal is taken, counsel on appeal may have access to the sealed report without further application to this Court.

Counsel, it appears to me that you've all filed publicly your sentencing submissions.

Let me just confirm that you've done so.

MR. BOVE: Yes, Judge.

MS. KELLMAN: Yes, your Honor.

THE COURT: Let's turn now to the sentencing guidelines. The Court of course is no longer required to follow the sentencing guidelines, but I am required to consider the applicable guidelines in imposing sentence. To do so, it's necessary that the Court accurately calculate the sentencing guidelines range.

Now, in this case, there was not a plea agreement, and the parties have not stipulated to any particular calculation of the guidelines, and the series of submissions I've received reflect a variety of different calculations as to how the guidelines apply.

The government's original Pimentel letter calculated an offense level of 37, a criminal history category of VI, and a guideline range of 360 months to 540 months' imprisonment.

The government's sentencing letter argues for an offense level of 42, a criminal history category of VI, yielding the same guideline range.

The probation department calculates an offense level of 38 and a criminal history category of VI, again, yielding the same guideline range. And finally, the defense argues for an offense level of 26 and a criminal history category of III, yielding a much lower guideline range of between 78 and 92 months' imprisonment.

I've given a lot of thought to the guidelines disputes, and I'm prepared to rule on them. I'm going to now read into the record, in at a little bit of length I'm afraid, a bench decision explaining my application of the guidelines.

As to the chapter 2 calculations, these are undisputed. On Count One, there is a base offense level of 26 under Section 2M5.3 and a two-level upward adjustment for an offense involving dangerous weapons making the offense level 28. On Count Two, the base offense level under Section 2L2.2 is 8.

The parties' main area of disagreement is whether the so-called "terrorism enhancement" of Section 3A1.4 applies here. That enhancement applies where "the offense is a felony that involved or was intended to promote a federal crime of terrorism."

The government and the probation department conclude

that it applies.  Al met I says that it does not.  I hold that the terrorism enhancement applies to both counts.

The key term in Section 3A1.4 is a federal crime of terrorism, and it is defined by Title 18, U.S. Code, Section 2332b(g)(5) as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct" and that violates at least one of many enumerated statutes, including the statute at issue in Count One, Title 18, U.S. Code, Section 2339B."

So as to Count One, Alimehmeti's conduct here clearly involved a federal crime of terrorism.  The Second Circuit has held that a defendant who violates one of the enumerated statutes satisfies the involved prong of Section 3A1.4 so long as the defendant had the specific intent to commit an act calculated to influence government through fraud or coercion.  Citing here *United States v. Awan*, 607 F.3d 306 at 317 (2d Cir. 2010).

Here, the government has shown by at least a preponderance of the evidence, if not way more, that Almehmeti had the specific intent of providing his material support in order to influence a government.

Almehmeti clearly intended to provide support to others whom he thought were going to travel to Syria to join ISIS.  See the presentence report, paragraphs 22 to 34.

For example, he took one undercover officer to

Case 1:16-cr-00398-PAE   Document 149-2   Filed 07/02/24   Page 10 of 116   9

purchase supplies such as hiking boots, a cell phone, a compass, a bag, and a flashlight and provided advice on such purchases.

Almehmeti also downloaded encrypted communication apps on the undercover's phone and instructed him how to use such apps. And finally, Almehmeti drove the undercover to obtain travel documents before taking him to the airport before purportedly taking a flight to Syria.

Almehmeti also expressed a desire to travel with the undercover to join ISIS, stating -- and I'm quoting the direct words used -- "I'm ready to fucking go with you, man. You know I would. I'm done with this place. There are kuffar everywhere." That's paragraph 28 of the PSR. "Kuffar" is a derogatory term that refers to nonbelievers. These facts demonstrate that Almehmeti was aware of the undercover's purported affiliation with ISIS and that his actions were aiding and that cause.

The terrorism enhancement also applies to Almehmeti's passport offense. For offenses that are not enumerated ones, the terrorism enhancement can apply provided that the defendant in committing that offense "intended to promote" a federal crime of terrorism. That is under Section 3.A14(a).

To show that, the government must show that Almehmeti intended to encourage the material support of ISIS. The government does not have to show that Almehmeti himself

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

committed an enumerated crime or that his offense was "calculated."  Citing again *Awan*, 607 F.3d at page 314.

Here, the fact that Almehmeti lied on his passport application in order to facilitate the material support of ISIS is clear from the facts set out in the presentence report.

The purpose of Almehmeti's lies on the passport application was to obtain a new passport, and the reason that that was needed was self-evident.  His old one had two sets of rejection stamps from the United Kingdom on it that would likely prevent him from successfully exiting the United States and traveling to join ISIS.  That's in paragraphs 35 to 38 of the presentence report.

Almehmeti stated in a recorded call that he wanted to reach ISIS territory which he called an "amusement park" via route from Albania to Turkey to Syria.  That's in paragraph 39.

And he told undercover officers that he wanted the passport so that he could join ISIS.  The passport, he said, is "not about Albania and Europe.  You know, it's about other places.  I want to travel, you know what I mean."  Paragraph 40.

When Almehmeti was contacted by a friend who said that she was "going away soon on holiday," which was code for joining ISIS, Almehmeti told her that he could not join because he didn't "have a P," referring to a passport, but that he "obviously wanted to go."  Paragraph 41.

This evidence makes clear that Almehmeti lied in an attempt to obtain a passport for the purposes of traveling to join and lend his support to ISIS with all that that meant.

The terrorism enhancement adds 12 levels to Count One, bringing the offense level on it to 40.  And it brings the offense level on Count Two to 32.  It also moves Almehmeti from criminal history category III to VI.

Now, I want to briefly explain why I'm not persuaded by the defenses' three arguments why the terrorism enhancement should not apply.

First, Almehmeti argues that Section 3A1.4 applies only to terrorism directed at the United States government, not foreign governments, and that his conduct was directed to Syria only.

That argument fails, in my judgment, for two independent reasons:  First, I find that Section 3A1.4 applies to acts of terrorism directed toward both the United States government and foreign governments.

That is evident from the text of 18 U.S. Code, Section 2332b(g)(5)(A) and its surrounding chapter, Chapter 113B, as various courts have recognized.  See, for example, *United States v. DeAmaris*, 406 F. Supp. 2d, 748 at 750 to 751, a case out of the Southern District of Texas 2005.

As this and other courts have recognized, in this chapter of Title 18, Congress used the term "government" in

several different ways and was very precise in its respective uses of the term.

In some settings, Congress used the term "government" without a modifier, as it does in the provision at issue, and there are a number of other examples in Title 18 of that.

In others Congress narrowed the meaning of "government" by adding to it general terms of limitation such as "facility" as in government facility.  In other situations, Congress distinguished between a "foreign government" or "the government of another state" or "the United States government."

The different uses and modifications of the word "government" within Chapter 113B and even within Section 2332b itself, show that Congress intended its use of the term "government" alone in the provision at issue here to refer to more than just the United States government.

The Second Circuit has implicitly so found.  On more than one occasion, the Circuit has affirmed terrorism enhancement applicability to defendants who sought to influence foreign governments.  See, for example, *Awan* 607 F.3d at 317 to 318 involving the Indian government and *United States v. Stewart*, 590 F.3d 93 at 144 and 150, (2d Cir. 2009), a case involving the Egyptian government.

Other circuits have explicitly held that the terrorism enhancement applies as well to conduct aimed at foreign government's.  See, for example, *United States v. Khan*, 938

F.3d 713 at 718 (5th Cir. 2019), and *United States v. Assi*, 428 F. App'x 570 at 574 to 75.  (6th Cir. 2011).  I don't adopt that analysis.

Almehmeti states that there is no evidence that the Sentencing Commission specifically focused on this question. Be that as it may, the text controls.  There is no indication of the commission's contrary intent.

In any event, even if Almehmeti's construction were correct, the terrorism enhancement would still apply to him here, and that's because I find that Almehmeti's conduct was also directed to the United States.

As reflected in the presentence report, in 2015, after Almehmeti twice failed to enter the United Kingdom in fall 2014 and following a late 2014 ISIS speech that promoted lone wolf attacks domestically on non-Muslims, he began to hoard knives and other weapons in his Bronx apartment.  PSR, paragraphs 14, 15, and 18.

He purchased, among other things, spike knives, a military-style survival knife, a folding knife, a pocket chain saw, a face mask, handcuffs, and steel-knuckle gloves.

In fall 2015, he told undercover officers that ISIS supporters should do "you know what I mean," which I read to refer to staging attacks at home as well as abroad.

And in February 2015, Almehmeti, whose self-proclaimed nickname was, "The Dentist," publicly stated that if there were

an ISIS compound in Texas, that he would "brush his teeth there," the most logical implication, in context, being that he would commit violence there.

Further, in 2016, Almehmeti offered to take an undercover officer whom he thought was an ISIS supporter poised to travel to Syria to his apartment for supplies, although ultimately that did not come about.  PSR paragraph 31.

Almehmeti's stockpile of weapons, coupled with his statements, suggests preparation for a potential attack in the United States.  The stockpiling of weapons served no other conceivable purpose, and the weapons could not conceivably have been taken out of the United States.

Almehmeti's second argument is that the Sentencing Commission failed to consider empirical data when drafting the terrorism enhancement, and so the Court should disregard it or give it little weight.

Almehmeti relies for this argument on the decision in *United States v. Kimbrough* by the Supreme Court, 552 U.S. 85 (2007) which involved the guidelines for crack cocaine.

And as the Court noted there, the Commission had failed to consider empirical data or national experience when developing the crack cocaine guidelines.

As Almehmeti fairly notes, at least one district court has found that the Commission did not similarly consider empirical data when it prepared the terrorism enhancement.

Citing *United States v. Alhaggagi*, 372 F.Supp.3d 1005 at 114. (N.D. Cal. 2019().

The problem for Almehmeti is that such an argument was made to the Second Circuit in the case of *United States v. Salim*, 690 F.3d 115 at 126 to 127 where the Second Circuit in 2012 rejected the argument and affirmed the district court's application of the terrorism enhancement.

*Kimbrough*, in other words, leaves a district court free to vary from the guidelines, if warranted under the Section 3553(a) factors, and that is really where Almehmeti's argument best fits.

But it doesn't require, as Almehmeti argues, a court to forego the terrorism enhancement in calculating the guideline range which is a first step before I turn to the 3553(a) factors.

Indeed, in *Salim*, the Second Circuit, in addressing this very argument, stated that "we have never held that a district court is required to reject an applicable guideline. At most, the judge may give a non-guidelines sentence where she agrees with the weight the guidelines assign to a factor." *Salim*, 690 F.3d 126.

Even if *Salim* left room for the court not to apply the adjustment where the facts support it, this would not be a persuasive case in which to do so, given the evidence that Almehmeti had in mind and took at least initial steps to

further terrorism at home and abroad.

Furthermore, the terrorism enhancement is not flawed in a way the crack guideline was obviously flawed insofar as it failed to assign rationally related weights to crack versus powder cocaine.

As the Second Circuit has noted, *Kimbrough*'s holding in that context is not license "to disregard its circuit court's interpretation of a particular guideline."  Citing *United States v. Carr*, 557 F.3d 93 at 106 (2d Cir. 2009).

Here, the Second Circuit has, time and again, in its words "expressly upheld the lawfulness of the terrorism enhancement."  Citing *United States v. El*-Hage, 589 F. App'x 29 at 31, note 2 (2d Cir. 2015).

And the Circuit has also specifically found that the Sentencing Commission had a rational basis in fashioning that guideline to increase both a defendant's offense level and his criminal history category.

It has reasoned as to the latter that "even terrorists with no criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."  Citing *United States v. Meskini*, 319 F.3d 88 at 92 (2d Cir. 2003.)

to be sure, the Circuit has recognized that a district court that feels that the terrorism enhancement overrepresents 3553(a) factors "always has the discretion to depart downward

at sentencing" by assigning a lower criminal history category. The same cite, to *Meskini*.

While I respect very much the arguments for a variance, including that Almehmeti did not complete any act of terror and including various background mitigating facts ably chronicled by the defense, I do not find this to be an exceptional case meriting a criminal history departure.

Almehmeti is already in criminal history category III. And his many acts and statements indicative of his intent to promote terrorism implicate the reasoning the Circuit used in *Meskini* as to why a bump up in a defendant's criminal history category is justifiable.

Almehmeti relatedly challenges the enhancement on the ground that it results in double-counting with respect to his offense level in that his starting offense level for material support to a terrorist organization is then "enhanced for terrorism itself."

But in fact, the enhancement, although applicable in many material support cases, does not apply to literally all. As the Second Circuit has noted, "a conviction for material support of a terrorist organization does not necessarily imply that the defendant committed an act of terrorism. Not all material support for terrorism is calculated to affect government conduct." Citing *United States v. Banol-Ramos*, 516 at F. App'x 43 at 47 (2d Cir. 2013).

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

The Fifth Circuit similarly recognized this in *Khan*, 938 F.3d at 716 to 18, disputing that material support is "an intrinsically terrorist crime."  Likewise, the Sixth Circuit in the *Assi* case, 428 F. App'x 572-73, noted that it is "possible to be guilty of providing material support to a foreign terrorist organization but not qualify for the terrorist enhancement."

As for the Second Circuit, without explicitly addressing the claim of improper double-counting, it has repeatedly affirmed the application of the enhancement to sentences involving violations of the material support statute. Citing *Banol-Ramos*, 566 F. App'x at 42, and *United States v. Kaziu*, 559 F. App'x 32 at 34 to 35 and 39 (2d Cir. 2014).

Finally, as to Almehmeti's third argument, it is that the terrorism enhancement prevents the Court from engaging in individual, particularized sentencing.  He argues that it is blind to important facts, such as that inchoate crimes like his that did not involve concrete plans for an attack are much less serious than terrorist plots that advanced further.

The short answer is that these facts of course are highly relevant to the just and reasonable sentence here.  I have taken and will take such factors and the other mitigating ones regarding Almehmeti personally that the defense has very ably mustered into account in my overall analysis under Section 3553(a).

But that is no reason to disregard the terrorism enhancement in calculating the threshold guideline range, which is no more than a starting point for the Court's sentencing analysis.

Of course, there are matters of degree and gradations among terrorist acts. There is, for example, quite a difference between blowing up a building or crashing an airplane or taking hostages on the one hand and purchasing supplies for potential future use in an as-yet unplanned attack on the other.

But that is true of almost all enhancements. Among the fact patterns they fit, they fit some especially squarely. The fact that the enhancement would apply more clearly in the case of a concretely planned or executed terror attack is not a reason to hold it inapplicable in others. A concrete plan of attack is not an element of this enhancement. The defense's arguments have a proper place, but it is under Section 3553(a), not in the calculation of the guidelines.

All right. That concludes my discussion of the terrorism enhancement. I'm now going to turn to the parties' second dispute regarding the guidelines calculation. This will be brief.

The parties disagree whether the two-level obstruction of justice enhancement of Section 3C1.1 of the guidelines apply. The government argues that it does and that it should

further result in denying Almehmeti the three-level reduction for credit for acceptance of responsibility on account of his guilty plea under Section 3E1.1.  As to this issue, I hold with the defense that the obstruction of justice enhancement does not apply.

Section 3C1.1 applies where "a defendant willfully obstructed or impeded or attempted to obstruct or impede the administration of justice with respect to the investigation, prosecution with respect to the investigation and prosecution or sentencing of the instant offense of conviction."

When the obstruction is destruction of evidence, the enhancement applies where the destroyed evidence "is material to an official investigation or judicial proceeding."  That's application note 4D.

The government also must show or thus must show that the obstruction was both willful and material.  Citing *United States v. Zagari*, 111 F.3d 307 at 328 (2d Cir. 1997).

The government argues that the obstruction enhancement applies because Almehmeti wrote in a letter to a fellow inmate, after pleading guilty and finding out that he was being investigated for disseminating ISIS propaganda within the MCC, stating that he had "got rid of" a "book."

The fellow inmate who appears to have given Almehmeti the book wrote that Almehmeti, if caught with the book, should say that it was "not his 100 percent" or "they will use against

him."  The government interprets this to mean that the book, if not destroyed, would have been used against Almehmeti at sentencing.

I understand the government's purpose in making the argument.  It's not an unreasonable argument to make.  But in my judgment, these spare facts are not sufficient to warrant the obstruction enhancement for several reasons.

First, it is really ultimately conjectural if the book was material to this case.  For evidence to be material, it must have believed "tend to influence or affect the issue under determination."  That's application note 6.

The government, for understandable reasons, has not been able to show what the book is, what it contained, or how it could have potentially impacted Almehmeti's sentence.  And the guideline range for that sentence is extremely high.  Indeed, it effectively is the max, with or without the enhancement.

Second, the government does not offer a coherent theory as to why Almehmeti had any duty to preserve it or produce it.  The book was not under subpoena.  The government doesn't allege that Almehmeti was subject to some form of preservation order such that he was required to keep and not destroy the written communications he received or generated in his cell.  The government has not pointed to any authority along these lines.

Put a little differently, the government's interest in such materials is understandable, but it does not mean that Almehmeti did anything legally wrong or engaged in conduct meriting the obstruction enhancement when he destroyed a book sent to him.

Accordingly, I find that the obstruction enhancement does not apply. And that, in turn, disposes of the government's argument that Almehmeti is disqualified from the three-level credit for acceptance of responsibility.

I find, with the probation department and Almehmeti, not to mention the government's earlier Pimentel letter which preceded the alleged act of obstruction, that he merits that credit on account of his guilty plea.

The final guidelines' calculation issue is whether Counts One and Two should be grouped together under Section 3D1.2 of the guidelines. I find that they should be grouped.

Section 3D1.2(b) calls for the grouping of counts where such counts "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."

The government agrees with this citing its memo at 38. And that is ultimately because Almehmeti's conduct underlying the two counts really does represent a common scheme or plan.

They each were intended to support ISIS abroad. Count One involved Almehmeti's provision of material support to ISIS

by helping get the undercover to get to Syria to fight for ISIS.  And Count Two involves his lying on a passport application to allow Almehmeti himself to travel to ISIS-controlled territory and there to support ISIS.

In the plea proceeding, in fact, the government specifically connected the two counts in this way.  Citing the transcript at 10 to 11.

Because the two offenses group, Almehmeti's offense level is set by the higher of the two counts, here, Count One. The group's resulting offense level was 37, 27 for the base level, plus 2 for the weapons enhancement, plus 12 for the terrorism enhancement, minus 3 for the acceptance of responsibility credit.

Viewed in combination with Almehmeti's criminal history category of VI, that yields a guideline range that would ordinarily be 360 months to life imprisonment.

But because the two offenses to which Almehmeti pled guilty have a combined maximum penalty of 45 years' imprisonment, the effective guideline range is 360 to 540 months' imprisonment.

That concludes my bench decision.  I want to put a few things on the record though which may be relevant in the event that either party seeks to appeal the rulings I've just made.

First, the sentence I impose would be the same even if I adopted the government's calculation of the guidelines.  The

guideline range would be the same, and so would any sentencing analysis.

The difference between an offense level of 37 and an offense level of 42 has no bearing whatsoever on my assessment of the just and reasonable sentence.  It is ultimately really the defendant's conduct, not the guidelines' take on things, that is dispositive to me here.

Second, the sentence I impose would be the same even if I adopted the defense's view that the terrorism enhancement does not apply.  To be sure, that enhancement makes a huge difference in the guidelines recommendation.

But in the context of this case, the factors that point towards a very long sentence are really primarily the defendant's conduct and, secondarily, his criminal history.

The high guideline range that the terrorism enhancement yields is one way of expressing and capturing the destructive and alarming conduct in which the defendant engaged.

But one does not need the guidelines here to see that. One does not need the guidelines here to see that Mr. Almehmeti's conduct was terrifying and, in any real world sense of the term, terroristic.

The facts overwhelmingly reflect the defendant's promotion and support of ISIS at home and abroad.  And these facts are indelible.  So, for the record, whether or not the

terrorism technically fits -- and I think it clearly does -- I would impose the very same sentence. This aspect of the guidelines calculation is of no moment here.

All right. Having taken care of the guidelines, the issue now involves departures, which is to say within the narrow framework of the sentencing guidelines.

No party appears to me to be seeking an upward or downward departure, again, within that framework, although the defense of course is seeking a substantial downward variance to a ten-year sentence.

Am I correct though, just to be careful about this, that no party is seeking formally a departure?

MR. BOVE: We are not, Judge. Thank you.

MS. KELLMAN: That's correct, Judge.

THE COURT: Then having reviewed the presentence report and the parties' submissions, I find that no departure is available as a matter of law.

Having taken care, at some length I'm afraid, of those peremptories, we now turn to the heart of the matter.

Mr. Bove, does the government wish to be heard with respect to sentencing?

MR. BOVE: Yes, Judge. Thank you.

I think that the Court has already touched on many of the most significant features relating to the imposition of an appropriate sentence here, a lengthy one and, from our

perspective, a guideline sentence that is necessary to reflect the seriousness of this crime, the gravity of it, the threat to the public that the defendant presents today that was confirmed by his counsel in writing in a letter yesterday, and to promote general deterrence in a calculated, measured way but to send an appropriate message to people who would plot this sort of violence, who would plan to go abroad to support this organization or people considering taking up their fight here in the city and here in the United States.

From our perspective, a balance of all the 3553(a) factors weigh in favor of implementing the guidelines recommendation I think, especially after the letter last night, Judge.

What I'm referring to here is the confirmation. I think that the quote from the letter is that Mr. Almehmeti is "not there yet" with respect to denouncing ISIS and putting aside the terrorist objectives that he pursued.

That, to me, looms so large in what needs to happen today and what must happen today in order to protect the public and achieve specific deterrence. This man's conduct over the past five/six years, so starting with the baseline of the violent crimes that led to the three criminal history points that you described, reflects an escalating trend of commitment to ISIS; commitment to violence -- violence against Americans, violence against basically residents, citizens, officials of

any government that has said anything contrary to the ISIS propaganda and the ISIS speeches that I think it's clear he believes very much in.

And just to talk about the chronology, I think it's clear from the record and from the photograph of that visit with the state inmate, Mamdouh, that the defendant was radicalized in state prison in 2011 and 2012. That's why he's going to visit this man in 2014 before each of his attempts to go to the United Kingdom. I think that's where the evidence of a commitment to terrorism really begins.

In 2014, there are the two trips to the United Kingdom where the defendant's entry was rejected that we've talked about, and we tried to contextualize that trip in our sentencing submission.

The first one is in October 2014. In September of that year, Judge, the defendant is talking to the woman that he was going to visit about how to travel into ISIS territory.

And I think tellingly and critically, at that point in September 2014, he is connected enough to members and supporters of ISIS that he puts the woman in touch with someone who is confirmed to have been a member of ISIS, and that's confirmed in the evidence in this case.

The Kik account that the defendant passed to that woman was posted publicly on a Twitter account with the same user name for the same man. I'll say Habashi (phonetic).

There's a search warrant on that account that reflects other communications by that man that are similar in nature, facilitating travel to go forward into ISIS territory and fight.

Your Honor has already talked about the guidance that was coming from ISIS leadership in that time frame.  That's critical context for what the defendant was planning in September and October of 2014.  I think as you think about his mindset, another important point is that August 2014 trip to Albania.

There are text messages following that trip where it's clear that the defendant, at least -- I don't want to overstate it but introduced himself to a man in Turkey who had advanced into Libya.  There are probably, I think, in fairness, competing inferences available from those text messages.  I'll acknowledge that.

But I think in the context of all the other evidence and the things that the defendant was saying to the woman that he later went to meet, the inference that's supported by the preponderance at this sentencing was that the defendant was communicating with that man who in those messages confirmed that he had made it to Libya about going to fight for ISIS in Libya at a time where ISIS was mounting a major offensive campaign in Libya.

So now we're in October 2014.  The defendant gets his

first rejection stamp in the United Kingdom.  He comes back, and he's not deterred.  He tries to pay for the record in a better way by getting this invitation letter from the woman's father.  We set out the evidence to the way that that letter was prepared, again, another thing that I want to be measured about, because this evidence escalates.

But I think as you look at that, it's clear that the defendant played a very central role in creating that document.  He was communicating with someone in the United States about how best to present it to British authorities to facilitate his entry into the United Kingdom.

The defendant sent that letter, not to the woman's father, but to her.  There are text messages sent out in our sentencing submission where he asks her to go get it notarized.

There is an inference here, Judge, we submit, that that signature is forged, forged by the woman who wanted the defendant to join her in the United Kingdom so they could travel onward.

But our recommendation and our position on a guideline sentence doesn't rise and fall with that inference, not at all.  The defendant goes to the United Kingdom.  I think there is back-and-forth in the submissions about both trips about what the defendant's intent was.

I think it's telling, and this is why we provided the report.  The British authorities concluded, based on what was

in his phone, based on their investigation, based on their investigation of a woman that he was communicating with and the evidence relating to her radicalization that the defendant's purpose in that second trip was also to meet with her and travel forward into ISIS.

That doesn't happen. The defendant comes back in 2015. Things get worse. We talked about in our submission -- and you have the document. In May 2015, the defendant wrote his own will in anticipation, hopeful anticipation, of dying on behalf of ISIS in a terrorist attack.

That concept of martyrdom is going to come up a little bit when I get to the letters between the defendant and Rahimi because he wanted to achieve that terrorist name in 2018.

But in 2015, May, the defendant writes that will. He also purchases a tactical combat rucksack. That's one of the early Amazon purchases that were uncovered through the search warrants in this case.

During that same year, he establishes his apartment as an ISIS outpost with the flag in his living room. As your Honor referenced during your written decision, he's talking to undercover officers about conducting beheadings.

I think the Court's inference at this point from the defendant's nickname of "The Dentist" and these toothbrushing references is that he was plotting acts of violence.

I submit, based on the things that were said and the

context in which they were said, that the inference is a little more specific. It's not just ISIS violence, Judge.

This defendant in this courtroom, who is still "not there yet" in 2015, was committed and excited to participate in a very specific, very graphic type of violence associated with this terrorist organization, decapitations, in Texas, as your Honor referenced, and also abroad.

His plan for joining ISIS -- and there are cases like this where a defendant wants to go support the organization by providing funds or medical expertise. The defendant wanted to go conduct beheadings for this organization.

In terms of whether or not the defendant was planning an attack or contemplating that in the United States, we think that the evidence of his problems, his inability to travel abroad, is part of the proof that supports that inference.

But another thing that I think looms very large in that analysis about whether this man planned and is still a risk of perpetrating violence here in this country is the talk in the meetings with the confidential sources -- excuse me. The undercovers -- about a covenant of security.

What does that mean. It's a concept, as I understand it, Judge, that conveys that when a Muslim feels that the country has aligned or offered him protection, that he has a covenant, an obligation, not to perpetrate violence in that country.

The defendant said, time and again to the undercovers, notwithstanding the fact that he had been permitted to emigrate here, that he had been permitted to naturalize, he said, time and again, "I have no covenant with this country."

That was a way for the defendant to convey to the undercovers -- let's be clear about this. These meetings with the undercovers -- it's not just one or two undercover officers and the defendant sitting in a room someplace.

There are other supporters, other people who are like-minded also under investigation being targeted by the FBI who are there as well that the defendant is talking to.

Some of them he knows better than others. So he's understandably I think being less explicit than he might otherwise be in close quarters in conversations with people with which he had absolute trust like his brother.

But the defendant is pretty clearly saying, I have no covenant with this country, America. He's saying that while purchasing knives, while purchasing a pocket chain saw.

I don't think that we said too much about the pocket chain saw in our submission, Judge. But when you're thinking about what the defendant had in mind when he referred to himself as "The Dentist" and he's talking about brushing teeth, Judge, the only purpose in the context of this evidence for having bought that weapon -- and on this evidence, it was a weapon -- was to use it.

It basically had two hooks or handgrips on each side. And I think in its design it was probably intended to cut trees down or cut wood in a camping trip. This was a weapon that the defendant intended to use to perpetrate decapitations. So that is the evidence that is developing in 2015.

THE COURT: Can I just pause you on that just before we leave the equipment that was found in his apartment.

Was anything found that offers an insight as to a concrete plan as to how, when, where these would be used? A map of a location, an email, anything like that?

MR. BOVE: No, Judge. I think it's a fair point to concede that point. I'm certainly not here to overstate any of the evidence. I appreciate, and I agree with the way that you described it in your written opinion as someone who is gathering weapons and other tools in anticipation of some kind of violence, whether that's going to be in the United States or abroad, without any specific plan as of the time that he gathered them. I think that's fair.

THE COURT: In other cases involving lone wolves, has evidence been found that indicated, for example, the location of an intended plan?

I'm trying to figure out what one makes of -- counsel, I'm sorry.

I'm trying to figure out what one makes of the absence of that.

Is it that that would actually be fairly typical and that lone-wolf attack would not involve communicating with somebody else or writing out information or doing recon on a location?

Or is it something one would ordinarily expect to see before a lone-wolf attack moved forward?

MR. BOVE:  In our experience, referring to Mr. Turner and I who were working these cases in 2014 and forward, the evidence here is consistent with what we've seen elsewhere.

And it's consistent with pretty basic concepts of operational security that you would not commit to writing, for example, or even speak in detail in these somewhat broad circles at the ITS gatherings or even with the men who came back to the apartment, speak in detail about your plan.

THE COURT:  No.  But you might find evidence of doing recon in a particular venue.

MR. BOVE:  I agree.  That's fair.  I do think that ISIS disseminates propaganda about appropriate venues for these attacks.  So they have basically created instruction manuals about the best targets to do this such as they've released materials about the subway system, Times Square, and things like that.

Especially in the context of a knife attack, in a lot of ways, the whole point here, Judge, is that you can pick up and go and carry out something like that without much advanced

planning and strike a soft target.

Again, I'm not --

THE COURT:  You've answered the question.  Thank you.

MR. BOVE:  In 2015, we've talked about the equipment, the passport, the ISIS flag, the beheading conversations, the discussion about a covenant of security.

I want to pause here to say a little bit about the investigation, what's going on at this point, because a lot has been said in the defense submission about what might have been in terms of the FBI's approach to this.

In this time frame -- and the agents are here, and they participated in this, Judge -- there was an extremely thorough review going on to try to determine -- and not just with respect to this defendant, several targets in this situation -- what level of threat did they pose, how best to approach that situation.

Yes.  Here, particularly because of the weapons that were being gathered -- and I think this record has helped in that you have a very good sense of the historical context of what things looked like from the perspective of counterterrorism efforts in 2014 and 2015 based on what ISIS was saying.  We're literally removed from that, although I think events last week in London bring it right back to the forefront.

This was a time when the FBI was actively carefully

looking at a variety of targets who were consuming ISIS propaganda and thinking about how out to address those threats.

To the extent there were situations where it seemed like people were inclined more towards staying on the internet with this than to perpetrating attacks, decisions were made about how to deploy investigative resources and what steps to take.

This is a situation where the man is stockpiling weapons in his apartment and talking about carrying out beheadings.  We fully stand by this.  This was not a situation where it was feasible, where it would have been consistent with our obligations to protect the public, to open up a dialogue with Mr. Almehmeti about whether he was willing to stand down from the things that he was saying.  That was just not an option here.  A lot of thought went into when and how the sting aspect of this would be deployed.

I know that your Honor has seen sting investigations in a lot of different contexts.  They can be used in different ways with different levels of sophistication.

In hindsight, as I look at this record, I think when you look at what was going on in 2014 and 2015, I don't think there was much question that there was probable cause for an arrest, and that would have been consistent with our obligations to protect the public.

But instead, the FBI continued to put resources on

this in terms of surveillance, trying to get a sense of what was actually going on, is this man actually a threat.

Towards the end of it when I think it seemed pretty clear to all of us that he was, that he was trying to go fight abroad, that if that was not available to him, that he was at severe risk of carrying out an attack here, we decided to insert the additional undercovers and give the defendant an opportunity, put an open question to him in May 2016, sir, there is a man coming to New York City.  He is going to travel to fight with ISIS.  Do you want to help him or not?

That was the defendant's decision to make.  And I think, from our perspective and the way that these investigations were being carried out at the time, that was important to us to put that to him as an open question, notwithstanding the evidence of predisposition, to make sure, not just could we prove this case at trial, but I submit on behalf of the FBI, this was done in a thoughtful way.

How is he going to react to this.  They could have went and arrested him by the end of 2015.  And I think that if the defendant had said in 2016, I'm not interested in that anymore.  That's not my aim, we would have looked at this differently.

It would have obviously been exculpatory as to his state of mind, and it would have absolutely borne on our thinking about the case, but that's not what happened.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

The defendant doubled down when that sting was deployed.  Not only did he fully embrace helping that undercover get to ISIS, he reiterated excitedly that he wanted to go himself.

One of the things that he was excited about was that as much trouble as he had had getting a passport through his own passport fraud as charged in Count Two, this concept of a new document facilitator was introduced.  He gives him his phone number, and he was excited about the idea that this man can get him forged documents that will help him travel.

There's a paragraph in the PSR that describes the defendant's conversation with his brother, Erald, after that happened.  And he's saying, look.  I think I have another way to get there.

The relationship between the defendant and his brother and who the defendant's brother is I think is another important thing for the Court to consider when you're thinking about specific deterrence and the need to protect the public.

The defendant's brother, Erald Almehmeti, is another radicalized supporter of ISIS.  Time and again to the UCs during this investigation and to others -- I think there's a recorded call where the defendant talks about waiting until his brother gets out of jail to travel.

She's talking about -- the other participant in the call is saying, I'm getting ready to go.

And he says, I can't go quite yet because the defendant's brother, Erald, is incarcerated in Albania on weapons charges.

The defendant's brother now is at liberty in Albania and, from our perspective, continues to pose a threat in his own right and will also pose a threat in tandem with the defendant here to travel abroad, whether it's ISIS or some other terrorist organization, to pursue jihad based on his terrorist principles.

So that's 2016. The arrest happens. I think from our perspective, in almost all of these cases, that arrest point is the beginning of the incapacitation, the beginning of the disruption. The targeting of this particular defendant ends with him being placed in prison, detained. And it should end the threat.

It's extraordinary that that did not happen here and truly superlative for almost any of the cases that we've dealt with. Your Honor's talked about some of that evidence already.

Looking back on it, perhaps we should have been more careful about the security measures in place based on what the defendant said in 2015 about how he -- this is in the PSR. He would radicalize people in the prison committing to that.

I think, as we looked at evidence in real time, that was bluster to us. Certainly we didn't think the defendant was anticipating being arrested. He did exactly what he promised

to do, Judge, with some of the most dangerous, convicted terrorists that have been around the city in years, including Ahmad Khan Rahimi, both pooling terrorist propaganda that was part of the discovery in that case and distributing it to others.  We flagged this in our submission for you.

Rahimi was a pretty sophisticated bomb maker, Judge. Rahimi constructed complicated pressure-cooker bombs.  He manufactured explosives in his house in New Jersey.  He put the chemicals together himself based, in part, on AQAP propaganda but also based in part on education in engineering and other training that he obtained that put him in a position to create these different kinds of devices.

To now see, as we do in letters, that they had as much connectivity as they did and were talking about, for example, a plan, what ended up happening here was that there's a period of time where Rahimi and this defendant had an opportunity to discuss attack planning.  And I think that's pretty explicit in the letters that we've submitted to you.  That, to us, escalates the dangerousness posed by Almehmeti to a high level.

I anticipate -- I wouldn't be surprised to hear the defense say that's our fault.  Whether or not a mistake was made, the defendant who sits here in this courtroom is the one to be sentenced.

This is a man who has communicated clearly very closely, even affectionately, with a defendant who detonated a

bomb in this city and tried to murder several police officers when they tried to arrest him.

The Court's already talked about the gravity of the mindset reflected in the defendant's writings about destroying evidence. I think perhaps even more -- not "perhaps."

Much more troubling is the defendant's referencing himself as the ISIS Balla, still remaining committed to the organization in one of those letters and, worst of all, sort of the aspiration that he and Rahimi would achieve jihad, martyrdom.

So looping back to that will in May 2015, notwithstanding everything that happened, Judge -- the arrests, everything in this letter -- the defendant is still committed to terrorism.

Then, again, just last night -- I think in every respect I appreciate the candor from defense counsel on this. I think we'll get a view perhaps about what this means, but defense counsel concedes the defendant is not deradicalized. He's "not quite there yet" with respect to abandoning these concepts, these objectives, and these beliefs.

And I think, even if general deterrence was not a factor here, if we just set that aside for a minute, just to protect the public, just to achieve specific deterrence based on what you've seen here, a guideline sentence is appropriate, and it's necessary.

But this is now a time in 2019 where ISIS' efforts here and abroad to promote lone-wolf attacks are escalating. We flagged for you one of the pieces of propaganda that purports to send a message to America of violence.

And I think it's critical that the Court respond in kind here today. This is one of the first public sentencings that's going to happen after the attack in London last week, an attack that ISIS has claimed of being of the kind and the type that they're promoting and suggested to people in public channels that this is exactly what we want done.

What's important here, Judge, in terms of general deterrence, is that the message be sent that the court system will not wait until someone gets a little bit closer to carrying out an attack here. And I promise you the FBI will not wait either.

When people are found to be planning these types of things, to be of a mindset where they're thinking about them, the London attack illustrates how important it is to disrupt that activity and incapacitate the people who are involved in it as quickly, as swiftly, and fairly as possible.

And I think that's a huge part of today's sentencing, is sending that message that that is an appropriate law enforcement objective and that courts recognize and that your Honor recognizes -- and you'll make the decision obviously -- that this is something that is appropriately

incapacitated and targeted in this way.

A lot has been said in the submissions about deradicalization programs.  I submit that is not a mitigating feature of this sentencing, the availability of the programs, whether the FBI may have chosen a different approach or not.

I'm trying to lay out for you why we took the approach that we did here.  I pointed to you the quotes from some of the research that's cited in the defense submission that indicates that this is still a very early field of study and a very early concept to think about whether this is even possible.

Your Honor cited the *Meskini* opinion where the Circuit talked about how difficult it is to get people to walk away from this kind of ideology, to deradicalize them, how this type of crime in that way is different than almost any other when you're thinking about how to achieve specific deterrence.

There are some anecdotes where this concept of deradicalization has perhaps worked to the benefit of the public or to the defendant.  The defense cites this *Doe* case, obviously very different, Judge.  The defendant in that case on the day he was arrested took a step towards deradicalization that the defendant still hasn't taken today.

And it has to be said -- and I want to say it in a careful way because it's anecdotal, but this is a, fact that Khan in London last week murdered the counselors in his deradicalization program.

This is something that's got to be looked at extremely carefully and thoroughly. And in the context of an individual sentencing, that's just not the place to do that.

We are here today for a sentence of Sajmir Almehmeti based on what he did dating back to 2013, based on the person he is today, someone who has admittedly not walked away from these terrorist objectives based on the threat that he still, as he sits here, poses to the public and based on the need to deter others from this kind of conduct, to do our part to try and protect the people of the city and to protect other targets of ISIS all over the world.

So for all of those reasons, based on everything that the defendant did before he was arrested and certainly what you have seen from him since then, we submit that a guideline sentence is appropriate.

THE COURT: All right. Thank you, Mr. Bove. A very helpful and thoughtful presentation.

Ms. Kellman, do you wish to be heard?

MS. KELLMAN: Thank you, Judge.

THE COURT: And then, just for counsel's and everyone's benefit, it's my anticipation, after hearing from the defense and the defendant, that we'll take a comfort break for everyone before I impose sentence.

Go ahead.

MS. KELLMAN: Thank you, Judge.

Your Honor, what I hear a little bit from the government is a little bit like you're damned if you do and you're damned if you don't.  The government comments that it was appropriate for counsel to put in our letter yesterday that we didn't think our client was quite there.

If we had said that he was there, then the government would say, it's unbelievable.  Given all his history, it's unbelievable.  But we tried to be candid with the Court, and I think we're always candid with your Honor.

But when you're caught in the damned if you do and you're damned if you don't, it's a little hard to know how you get to whatever the truth is or whatever truth there is.

One of the things that gives us confidence in our client is that he has grown over these last four years under the worst of circumstances.  He's not 19 anymore.  He's not 21.  He's not 22.  He's 26.

He's prepared now to think more critically about what he says and what he does, and that gives us hope.  We hope that we'll be able to, through this discussion and through our papers, that we'll be able to persuade your Honor that there's a lot more than the talk that went on here that leads to the whole person and the way in which the Court can deal with this.

Now, I understand obviously it's the government's job to represent the United States in this courtroom.  But Mr. Almehmeti's team here, his legal team -- we're not in such

a different position.  We live in this city.  We have families in this city.  We want to make sure that our city is safe.  We take our role very seriously.

Obviously we're advocates.  But at the same time, we're able to, I think -- I hope -- analyze the information that your Honor has before you in a different way.  I heard, in a very artful and articulate way, a presentation by the government that wasn't as over the top as their written submission.

But what it was was, in its own way, an apology.  Why?  Because it was talk, and it was talk, and it was talk.  And it was let's do this, and let's do that.  But nothing escalated.  And nothing escalated over more than a year's time.  And that matters.

And it matters for a number of reasons, because at the time these agents met Sajmir Alimehmeti in the beginning, he was young.  He was confused about his own identity.  He was alienated from his family, isolated from his family.  His family was overseas at the time.  He was young and on his own in a community where he didn't feel accepted.

He had begun to undertake the teachings of the Muslim faith in good faith in a legitimate mosque and felt comfortable about it and felt a connection that we all need.

He didn't have family around him all the time, and he felt the connection with this individual who took him to the

mosque who was a serious fellow, and he got more and more involved.

He explained -- and we put it in our papers. He explained to the extent in which he felt a place that he belonged in. He responded to the prayer. He felt comfortable in it, and he found a place. He began to grow a beard. He began to dress differently, and he began to get mocked. And this caused a real confusion in a young man who has no place to go for advice about this. He reacted.

When you have someone who is young and confused and alienated, isolated, and looking for a place to belong, and enter the FBI who really were everything he was looking for, somebody, adults, to connect to, adults who seemed to have an answer, adults who were able to sway him one way or another.

We included in our submission to your Honor Judge Weinstein's statement of reasons in the *John Doe* case. In that particular case, the agents similarly saw the beginnings of similar kind behaviors, and they were concerned about it.

And this individual, John Doe, lived in Brooklyn, I believe, with his family. The agents, rather than setting him up and trying to effectuate some terrorist kind of activity -- they went to visit his home. They went to visit his paints. They had a sitdown with him and his parents and said, this is the wrong path. Get your act together. Don't do this because

this will get you in trouble.

Now, did it help?  No, it didn't, at least not in the first instance because John Doe did travel to Syria.  He did join ISIS, and he did take training, military training.  He carried a weapon.  He fought in a particular battle.

So why do I raise this.  Well, for several reasons, first, when he got to Syria, one of the things he saw were suicide belts, and it freaked him out.  And he saw that the things he believed, the things he read on the internet that were all so attractive were not true.

He didn't know what to do.  He didn't know how to extricate himself, but he called the FBI.  And I wonder -- and we'll never know, but I wonder if the reason he called the FBI was because the FBI had reached out to him.  The FBI had said to him, don't go down this path.

And when he got down the path and he saw that it was everything they said it would be and he didn't belong there, he felt comfortable enough to call the government, to call the FBI, and say, I need help.

And they helped rescue him.  When he came here, he was a different person.  He had seen the truth of what was there, not what is on the internet, which is there for the purpose of fishing and attracting as many adherents as they can.

In a different case, Judge, I had the opportunity to look at some of the videos that were put out by ISIS adherence.

And one was a young man who was probably between 20 and 22/23, a very nice-looking man.  He was sitting on a rock in front of a lake.  The sun was setting, mountains in the background.  It was quite a beautiful scene.

It was Canada.  It said that it was Syria, but it was actually Canada, and it was a stock photo.  And he was talking about how beautiful it is here in Syria and how wonderful it is, and he goes to work every day and comes home to his beautiful family.  And all he does during the day is work which is fighting.  Then he comes home and has a lovely dinner and has a lovely evening with his children.

For somebody who wants to belong and look at this beautiful sunset and these beautiful mountains, if you want to go to Canada, knock yourself out.  That's what's available there.

That's what targets young people who don't have a mission, that don't have the support that they need to have somebody say, you know, you're out of your mind, or this is the wrong path, like the FBI tried to do in that other case.

Judge Weinstein spent some time talking and in fact called witnesses at this young man's, John Doe's, hearing.  And he asked the experts, what do you do with someone who has gone down this path, who has actually gone to Syria and joined up, pledged an oath?  What do you do to somebody who's gone down this path?  Who are these people that go there and get swept up

in this?

The experts all agreed that they were people who were insecure, immature, and easily manipulated. And there you have it, a young man who is on his own basically, who is easily manipulated, who is insecure, has feelings of alienation and wants more than anything and in fact is desperate to belong.

Then Judge Weinstein asked what the best path for deradicalization is. And the answer was not incapacitation because incapacitation turns people into monsters.

The answer was a strict regimen of programming, programming that includes deradicalization and training, programming that included limited access to the internet, programming that included creating a safety -- they called it a cocoon, a safety cocoon that had triggers so that if the individual moved in any of the wrong directions, there would be a stopgap that would let the probation department or whoever was supervising him know that he was moving in the wrong direction.

Because one person failed at deradicalization in the government's example doesn't mean that it doesn't work, and these experts are saying that in fact it does work and that with the proper restraints, with the proper limits, with the proper guidance, that it can work and that it's far better than turning people into monsters.

I wanted to spend a little bit of time, Judge, talking

about some of the other sentences that have been doled out around the country. I'd say one other thing with respect to the supervision, and that was that this one expert also said -- actually, I believe this was Judge Weinstein -- said that it was important to avoid needlessly destroying a human life but encouraging a person and teaching a person how to live within the law.

This is a young-enough man that he has all the potential of his life ahead of him. To put him in jail for, as the government suggests, 30 or 40 or 45 years, what comes out at the other end, if he's still alive, is not a human being who is capable of in any way, shape, or form adhering to the kinds of civility and law-abiding way of life that we would expect.

The government voices a concern about avoiding a sentencing disparity and therefore argues for a guideline sentence of 360 to 540 months.

But in the cases that they cite, the very cases that they cite -- if I remember, Judge, three of the four cases that they cite were individual defendants who actually traveled to Syria and actually joined ISIS.

Of those four, three of them received I believe 15-year sentences. Three of them received 15-year sentences. More importantly --

THE COURT: Was the statutory maximum above 15 years?

MS. KELLMAN: That's correct, Judge.

THE COURT:  Sorry.  The statutory maximum though was 15 years?

MS. KELLMAN:  Yes.  That's correct.

THE COURT:  So do we know if there had been statutory headroom whether the sentence had been longer?

MS. KELLMAN:  Well, I can say that there is guidance on this from the Second Circuit because very recently in the *Pugh* case, Judge Calabrese -- the sentence below was 15 years, because that was the maximum, plus 25 years for obstruction of justice.

So the district court stacked the sentences, and Judge Calabresi said, now, I think this is really not the way to go because all you're doing is extending, creating a statutory way to extend what is a 15-year sentence, and it's inappropriate.

He sent it back for resentencing.  And the defendant hasn't been resentenced yet.  So I can't tell you what the result will be.  Clearly, the Circuit had that in its mind and also the fact that Congress decided that 15 years is an appropriate sentence for this kind of behavior.

And to tack on additional matters -- when you consider the difference between a passport fraud and terrorism, the government has decided -- or Congress has decided -- 15 or 20 years now is an appropriate sentence but 25 for a false passport.

In fairness, think about the passport issue itself. How hard would it have been for these agents to just get a passport. If this kid wanted to really go to Syria, get him a ticket, drive him to the airport. And when he gets out of the car and he goes to the gate to board a plane, you arrest him. There are cases where that's exactly what the agents did.

A lot of what the government said here today was they went as far as they thought was safe. They went as far as they could, but that's just not the case.

The case is they did exactly what this young man needed. They wrapped themselves around him, they gave him something to hold on to, and they let him talk his heart out, and they helped him talk his heart out.

They gave him these topics, and he bought into the topics. And he went all over the place with them. One thing he didn't do was anything, anything but talk.

The government spends a considerable amount of time on this lone-wolf idea. And I saw that it piqued your Honor's interest. But I would say several things about it:

First, while there were conversations, as the government points out, around the time, ISIS conversations about lone-wolf attacks, here you have a young man who they say had an arsenal. But nobody ever said to him, let's plan something. Let's try to do something. And he never did anything with those weapons.

There is a case that's very recent --

THE COURT:  May I just ask you though:  Is there a benign explanation for what was found in his apartment?

MS. KELLMAN:  The benign explanation is maybe he's a nut.  Maybe he collects knives.  I have a client who is a white-collar tax evader.

THE COURT:  Ms. Kellman, I appreciate the valid point that there was no concrete plan.  I get that.  I'm trying to understand if there is any way of looking at anything that was found in his apartment as anything other than an early step towards a plan.

I'm giving you a chance if there is some other way of looking at a pocket chain saw, mask, and all those knives.  If there is some other way of looking at this as ISIS relevant, this is your chance.

MS. KELLMAN:  I don't know if it is ISIS relevant.  I know that he did a robbery years earlier when he was 16 years old I think, and he had a weapon then.  He had a knife.

THE COURT:  A chain saw?

MS. KELLMAN:  He didn't have a chain saw.

THE COURT:  Look.  I'm being direct with you.  The circumstantial evidence of the full set of what was collected sure looks like it was the first step, even if second and third steps weren't taken, towards an attack.  If there is some other way of looking at the purpose beyond collecting those, I want

to hear it from you.

MS. KELLMAN:  I would answer your Honor this way:  The government makes it clear -- and I think we all understand -- he was never getting those weapons out of the United States. So it must have been an attack that he was thinking about inside the United States.

Is there any conversation that supports that?  No.  Is there anything on the internet that he says, I'm about to do this or I hope to do this or I'm going to do this?

And in the *Lacrom*  (phonetic) case which we pointed out to your Honor, there we have an incident where the defendant there is 24 years old.  She is all over the internet about mass murder.  She wants to pay homage to the Columbine shooters.

She speaks of nothing but mass murders and how she wants to be a mass murderer, and she buys all the things that she needs to make a pipe bomb.  She has extensive firearms in her home.

So you say, well, that's just what he was doing, collecting all these things, but she was talking about it.  She was sharing it with people.  It wasn't a secret.

You had agents surrounding this individual who could have easily pulled him in that direction if he wanted to go in that direction.  There were times when he was in front of other people.  There were times when they were alone with him.

Let's be clear about this.  This young man trusted these agents, and we know he trusted them.  First of all, he would have adhered to almost anything.  He wanted that connection.  He wanted to belong.  But when he got married, he asked them to be the witnesses at his wedding.  He had nobody in his life except these guys.  These were his guys.

If he planned to do an attack, it's impossible to me to imagine a circumstance where he wouldn't have run it by his good buddies who were interested in ISIS and interested in supporting ISIS.  I can't see that scenario.

In the *Lacrom* case where this woman did publish all over the internet the name of the bar she was going to blow up, the people that she was going to kill.  And she amassed everything she needed to do it.

It wasn't just the amassing.  It was the planning, the communicating of the specific event.  We can talk about London to try to prejudice everybody, but I know you are way smarter than that.

The bottom line is there was no plan.  I can't tell you why he had the knives.  But I can tell you that if there was a plan, if he intended to do something with them, the agents would have known that and he would have put it on the internet.  He would have told people what he was about and what he was going to do, and you have none of that, Judge.

By the way, this woman who was planning an attack, a

target, with a bomb, with everyone that she needed, the government agreed that 15 years was an appropriate sentence. The government agreed to that.

They could have charged her with whatever they wanted. They had weapons. The government could have charged her with 20 different things. There was no indication that she cooperated, but the government agreed to a 15-year sentence. There you have the lone-wolf attack, and you have the planning. You have everything but it actually being carried out.

Here you had something more because you had the ability to have these agents find out if there was going to be a planned attack as opposed to imagining it or being afraid of it or being hypothetical about it.

Your Honor, since 911, there have been 862 terrorism-related convictions in this country. 435 of them were material support convictions. And the average sentence across the country -- this is important, Judge -- for returnees, not for people who sit at home talking nonsense but for returnees, people who have gone overseas to fight and come back -- the average sentence is 8 1/2 years to 10 years, not 360 to 540 months. And these people were returnees.

There is a Defendant Abood which we cited in our brief who claimed that he went to Syria to fight against Asaad, but the internet told a different story. All over the internet, he was pledging allegiance to ISIS and saying that he was going

there to fight for ISIS.  So his story in the courtroom was not accurate.

He was charged with making false statements, and he was sentenced to four years, even though he traveled to Syria with a false purpose.  The internet told what his real purpose was, and he was sentenced to four years.

Then there's Special Agent Greene, the federal agent who fell in love with an ISIS fighter and moved to Syria to be with him, to support him.  She returned to the United States when she saw the horror of what was happening there.  And she was sentenced to two years.

There's another individual who, as we cited in our brief, Kodaimati, who also traveled to Syria and lied about the reasons that he went, and he was sentenced to eight years.

May I have just a minute, Judge.

(Pause)

MS. KELLMAN:  Your Honor, at page 41 of our first submission, example number 10, there's a specific case in the district of California, Adam Dandach.  There is an individual who is very similar to our case.

The defendant was 22 years old.  He was initially charged with falsely claiming that he lost his passport and later indicted for attempting to travel to Syria in support of terrorism.  He communicated with two people in Syria about his proposed travel, and he made two attempts to join ISIS, to

travel there and to join ISIS.

Now, the government says now so did this young man. But the reality is if you read 1,600 pages' worth of texts, you see that the purpose of his travel to the UK at least was to meet his love, to meet Safa who he had been communicating with through thousands of text messages.

In fact, the government says oh, it's probably a forgery because her father wasn't asked to be involved. In fact, her father drove 4 1/2 hours from their home to the airport with Safa to meet this young man. So the father was involved, and the family was involved.

In this particular case, the defendant also engaged in post-arrest obstruction seeking his family's help for the posting on the internet. At the end of the day, Judge, he was charged with making a false statement and material support, and he was sentenced to 15 years. He faced a maximum of 25 years. So there's that.

Another thing that I wanted to talk about, Judge, is how other countries handle these cases, and I think it's important. In its own way, it's sort of depressing when we think about how we handle these cases in the United States.

We don't have a solution for this kind of situation. So by incapacitating someone and sending them to jail for the rest of his life, which effectively is what these sentences are, the proposed sentence is, makes it look like we don't have

a problem, or it makes it look like we handle it.

But in reality, all we're doing is destroying human life. In this case, they're asking you to destroy human life that hasn't doesn't done anything except -- we live in Manhattan -- talk trash and collect a lot of weapons. But what he was going to do with them is something we can't answer. It's a blank we can't fill.

In this particular case, Judge, I don't think that the Court could fairly assume a potential lone-shark attack or anything potential that this individual was going to do with it because there you had agents that he didn't hold back from. If there was anything he had a plan in, he could have discussed it with them, and he didn't.

By the way -- I don't know that this matters, but all of these knives were purchased on Amazon legitimately. So maybe that's another question. But another thing I wanted to say is returnees -- and that's so far what we're talking about here because these sentences that are not nearly as what the government suggests here have all been cases of returnees.

But returnees in other cases, the United Kingdom, France, Germany. Their statutes punish people up to ten years for material support kind of cases. In the Netherlands there was a whom who aided terrorists on a regular basis. That should be troubling in its own right.

Indonesia and Malaysia treat these kinds of cases less

severely than we do in the United States. And all of these countries have taken the position that incapacitation may not be the best approach.

To me, Judge, one of the most shocking things that I learned as I was preparing for this sentencing was that in Saudi Arabia, they have something called a jihad prison.

And their first step towards handling individuals like Mr. Almehmeti is deradicalization training. And they have a separate jail, this jihad prison where -- this is the way they describe it. They have lavish apartments where they house these individuals, and their families have free access to visit because part of the deradicalization process involves getting the family involved in the grassroots so that they live in these apartments, not with their family. But they are encouraged, in fact required, to have all kinds of interactions with their family. And the focus is on rehabilitation.

As I read this, I thought was it a primer in early childhood. One of the things that they said is the most successful is rewarding good behavior. They're young men. They're young men who really haven't gotten where they want to be as adults. And, duh, rewarding good behavior. That's what they do in Saudi Arabia. They don't look to incapacitate everybody.

Sometimes, Judge, just the assurity of what happens in our own prison system on a person-by-person level tells more

than generalizations.  I want to point out one case to your Honor that we cite in our brief.  It's Ali Ahmed.

He lived in Sweden.  He traveled from Sweden to Somalia where he joined al-Shabaab.  He received military training.  He fought in a battle, at least one battle, against Ethiopia.

Now, we say why would we care about Ethiopia.  We funded that war.  We funded Ethiopia.  We funded the government in exile of Somalia against whom al-Shabaab was fighting.

I got a photo the other day, a letter and a photo, from Mr. Ahmed who was sentenced to 11 years.  The government had agreed to a 15-year sentence, and Judge Gleeson gave him a 15-year sentence.

But I got a letter from him the other day and a photograph.  In the photograph, he's very proudly holding up his GED certificate.  Wow.  He's got his high school diploma now.

Why is that absurd?  Because he couldn't get good time unless he got his GED diploma.  He has a college degree in Sweden, and he's fluent in four languages.  And now he has his high school diploma too because nobody cares that he doesn't need his GED.  He can't get his good time without it.

But now they're saying that he was traveling overseas and he joined al-Shabaab; that he fought on behalf of al-Shabaab.  And the government agreed that a 15-year sentence

was appropriate for this young man.  He was sentenced to 11 years in prison.

The Tamil Tigers case that's we cited in our brief -- the vast majority of them were sentenced to time served which essentially was between three and five years.

I spoke just a little while ago, your Honor, about the *Pugh* case where it was a 15-year material support case and a 20-year obstruction count.  Judge Calabresi specifically said, can one really justify turning a 15-year sentence into a 35-year sentence.  It looks like the district court used the second count as a means of extending the statutory maximum.  He sent it back for resentencing.

Sometimes I get ahead of myself, and then when I look at my notes, I'm there already.

Your Honor, in the government's submission, they speak to several particular things that they suggest should drive your Honor's thought process here.  They say that there was the potential that Mr. Almehmeti would attempt to go to Syria.

I think I have addressed that earlier.  I think that if he was interested in going to Syria, that was certainly the kind of thing that the agents could have found out about and could have accomplished.

I don't mean send him there but gotten him up to the point where he's at the airport and he's ready to board a plane, and you arrest him then because you then you know what

he's doing.  There is nothing in the day-to-day everyday communications that he has with these agents that make it clear that that's what his interest was.

I want to be clear, Judge.  I don't mean to be harsh about the agents or what they did here.  They were doing their job, and I understand that.  But I think that the difference between what happened in the John Doe case and what could have happened in this case is worthy of repeating because the FBI doesn't have to make everybody a target.

This was a young man who they had to see very quickly needed them way more than they needed to convict him of a crime of terrorism.  You could have gotten this kid to do virtually anything because he didn't have a direction.  He didn't know where he wanted to be or who he wanted to be.

There are days when we talk to him where he sounds like he can conquer the world, and he's bright.  He's articulate.  He's sometimes funny.  He's also terrified.

He doesn't know where his life is going and what his life is going to be about.  He's terrified about the effect that this is going to have on his mother.  His mother is here today.  He didn't want her to come because he was afraid that it would be painful for her.

The government also speaks, your Honor, about the pattern of escalating violence and this young man's criminal history.  I'm not going to spend a lot of time on it, but he

has a YO and a misdemeanor conviction. And I think that saying that the YO and the misdemeanor leads to terrorism is as ridiculous as saying marijuana leads to heroin addiction.

He went down this road as a result of a number of different reasons. Maybe the simplest explanation at the very beginning is he sought out Islam. He felt comfortable in Islam.

He wasn't comfortable in his neighborhood, and then he was mocked for the beard and mocked for the hair and mocked for the clothing. He tried to find other people who were like-minded.

There's a retired brigadier army general who does a lot of private counseling in Muslim communities. He says that the question that he's asked most by Muslim parents is how do we protect our kids. How do we prevent them or protect them from getting on the internet and seeing this.

The answer he gives -- and I don't mean any offense, Judge. The answer he gives is masturbate. Let them masturbate. The answer, to me, was shocking. But he says that these are strict homes, and these are kids without direction. And they want to go on the internet, and they want to look at porn.

But they know they're not allowed to do that, and they know the punishment at home for that. So they wander. What they find are pictures of a guy in Canada who they think is in

Syria who is fishing for people who are looking for young kids who are looking for a place to belong.

And they found him.  They found him, and I'm not saying obviously the FBI didn't start this.  He started this. He started this by being on the internet and by fishing himself and by buying into the things that he heard.  The agents saw it, heard it, and grabbed onto it.

Your Honor, very briefly, I just want to add a couple of things.  I just did a bit of workup for the Court in terms of the cost.  I don't mean the cost of this young man's life but just the cost to the United States in terms of housing individuals.

The average inmate costs $32,000 a year.  With a 30-year sentence, which is the low end of the guidelines here and not the statutory maximum at all, we're talking about 30 years costing just a million dollars, $960,000.

But with a secure inmate, just as Mr. Alimehmeti would be, the cost is $70,000 which over a 30-year period, again, not the maximum, would be at a cost of over $2.3 million.

Now, if this individual or individuals generally in this situation were treated differently in terms of being able to be supervised strictly and be able to be deradicalized in a meaningful kind of way, supervision right now costs $4,000 a year.

Over ten years, we're talking about $40,000.  Over 20

years, we're talking about $80,000.  The amount of therapy that you could buy for $80,000 or the amount of therapy you could buy for $2.3 million would probably take care of every individual who is in this same situation.

But for $2.3 million, we'll house him away for the next 30 years.  And we'll create a monster, as opposed to having a human being who maybe can function much more effectively as he's older and given the guidance that he didn't have when he needed it.

I just want to spend a minute, Judge, on the living conditions at the MCC.

THE COURT:  I took that point.  You don't need to recapitulate that.

MS. KELLMAN:  One of the reasons that I raised it, Judge, is because Ms. Kunstler and I have spent the last several years just working with Adam Johnson who has been trying his best to help us to eliminate things like why doesn't he have glasses.

He now has glasses.  They're just glass.  There is nothing in them.  There is no prescription in them.  He wanted glasses.  It took us three years to get glasses.  They don't do anything.

I said, do you wear them to read or for distance?  He said it doesn't matter because they're just glass.  Mold and showers and the cold and hot water don't mix.  That's just kind

of torture.  There's never quiet because the guards outside his room all night are talking on their phones and socializing with each other because it's quiet.

Four years of living like that is a cost.  It's a cost emotionally.  Like I said, I don't want to belabor it, but I say it because you take those four years and you make it 10 years or 15 years or 30 years, and you've created a monster.  I don't mean you.

I think that Mr. Almehmeti, Judge, is a young man who is desperate to make connections.  He's desperate to make the right connections.  And with proper guidance, he can make the right connections.  He's a young man who seems to me is desperate to understand the world around him and desperate to be understood by the world around him.

I don't envy your Honor's position.  I know that this is probably the hardest thing that you do, making a difference in really a young man's life and obviously balancing all of the factors that the Court has to consider, including deterrence, protecting the public, protecting this individual from committing further crimes.  I don't have to recite them for your Honor.  We can all say them backwards and forwards.

But I really believe that Ms. Kunstler pointed out to me that there is a concept that psychologists use.  It's called anchoring, what anchoring is when you attach your idea to a particular fact, and everything works from that fact.

But that fact could be erroneous to begin with, and that fact here is 360 to 540 months.  So the government says 30/40 years.  And I say how about ten.  And now we're in a negotiation.

Then you say maybe 30 is too much.  Maybe 10 is too little.  So maybe 20 years.  But that is anchored -- that discussion is anchored to the guidelines.

When I wrote that, I wasn't thinking about it, but the reality is what is the best thing for our community, our community at large, and for this young man.  I submit to your Honor that the best thing here is not to make up a number that means nothing but to try to come up with a plan that helps this young man get his life back.

THE COURT:  Let me ask you one question about that.  The sentence here will clearly be a combination of a term of imprisonment followed by supervised release.

What is the condition of supervised release that responds to the deradicalization imperative?

MS. KELLMAN:  The first is the way that the experts have laid is out, your Honor -- I think we have it in our submission as well -- is that it has to be strict.  It has to be lengthy.  It can adjust as time goes on as appropriate.

But it starts with no internet access.  It moves into limited internet access.  It's never unmonitored internet access.  It's regular reporting obviously, bracelet, GPS, all

the kinds of things that make it virtually impossible --

THE COURT:  I guess the question is the way to formulate it in the judgment here, understanding that there will be a period of time before that portion of the sentence kicks in.

I suppose that it is sufficient to say that the defendant will participate in a program of deradicalization under the supervision of the probation department.  I don't know what technology will be when the defendant gets out.  It seems to me foolish for me to choreograph it beyond that.

Does that sound right to you?

MS. KELLMAN:  Yes, Judge.  As long as the first part is not too long.

THE COURT:  I can't promise that.

Anything further, Ms. Kellman?

MS. KELLMAN:  Yes.  I think Ms. Kunstler would like to speak briefly.

MS. KUNSTLER:  Briefly, your Honor.

THE COURT:  Ms. Kunstler, briefly.

MS. KUNSTLER:  Your Honor, I just wanted to speak as the person who spent the most time with Mr. Almehmeti over the past few years.  And I wanted to speak particularly to the "not there yet" comment that the government fixated on in their presentation.

Getting to that place with Mr. Almehmeti was reaching

a place of trust.  And it was reaching a place where being afraid that we would abandon him, being afraid that it would make us think less of him, being afraid that it wasn't the right thing to say.

And it was a really big deal getting there.  I think, frankly, a lot of defendants say what we want them to say.  They perform that role.  Whether they mean it or not, who knows.  They know what they're supposed to say at sentencing.

Mr. Almehmeti knew what he was supposed to say, but he wanted more than that.  He wanted to engage honestly.  He wanted to be open with us about the path he took.  All of these are terrific signs, the whole process that Ms. Carr goes through in her report and that we talk about in our sentencing memo about how he got there and what motivated him.

It wasn't just what Ms. Kellman said, that he had a beard and people looked at him funny.  It was really being seduced by propaganda.  It was the chemical attacks and bombings that were attributed to Asaad that radicalized a lot of young people because those bombings were used as powerful tools of propaganda.  These were images of atrocities of children and families who were injured.

Ms. Carr in her report goes through how that is used as a tool, how those feelings of horror and empathy and sympathy, like good feelings that young people have, are then used and perverted.

Getting to a place with our client where he was open with us about what he was exposed to and how it made him feel was opening to us to participate with him in a dialogue about what's real and what's fake and what's true and what's not and what's good and what's bad.

These are just conversations that our client is open to.  These are conversations that our client is willing to have.  These are conversations that he's ready for.

It was not easy to get there, but this is work that it's important to do.  Whatever sentence your Honor imposes, a lengthy term of incarceration is just a barrier between the next time our client gets to have that conversation with another person.  And I think that's a real shame that our Bureau of Prisons doesn't have that, that we don't offer that, that, frankly, we've taken this long.  It's almost 20 years since 911, and we're now thinking about the kinds of tools we need here to really make a difference in peoples' lives.

Your Honor, we agree that your sentence should send a message.  The message that we think it should send is a different one though.  Our client is a person who is ready to make change.  He's a person who is willing.  He's a person worth saving.

We think your sentence should balance the considerations it needs to balance with also a message of hope and with a message of a belief in this young person who can get

there and is starting to get there.

THE COURT:  All right.

Ms. Kunstler, let me just pause and thank and commend you -- I'll have more to say in my remarks -- just for an unusually thoughtful and detailed sentencing submission and particularly as to the point that you made about the defendant not being there.

I very much admired the nuance and honesty that came with that statement.  I certainly have plenty of cases in which a much more cheerful and emphatic pronunciation is made.

And there are times it's authentic, and there are times when one has reason to doubt it.  I appreciated that there was gray and nuance here.  In turn, that confirmed the honesty of the statement.

MS. KUNSTLER:  Thank you, your Honor.

THE COURT:  Thank you.

Mr. Almehmeti, do you wish to make a statement?

THE DEFENDANT:  No.  Not at this time.

THE COURT:  This is your opportunity, because when I take the bench after our break, I will be imposing sentence.

THE DEFENDANT:  I understand.  Thank you.

THE COURT:  Very good.  Let's break till noon.  It's about 11:51.  At noon I'll take the bench and impose sentence.  Thank you.

MS. KELLMAN:  Thank you, Judge.

(Recess)

THE COURT:  All right.  Be seated.

Counsel, is there any reason why sentence should not now be imposed?

MR. BOVE:  No, your Honor.

MS. KELLMAN:  No, your Honor.

THE COURT:  All right.  As I have stated, the guideline range that I find that applies to this case is between 360 and 540 months' imprisonment.

Under the Supreme Court's decision in *Booker* and the cases that have followed it, however, the guideline range is only one factor that a court must consider in deciding the just and reasonable sentence.

The Court must also consider the other factors set forth in the sentencing statute, Title 18, U.S. Code, Section 3553(a).  These factors include:

The nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence imposed to afford adequate deterrence to criminal conduct; the need for the sentence imposed to protect the public from further crimes of the defendant; and the need for the sentence imposed to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner.

The Court must also avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

The Court is also required to impose a sentence sufficient but not greater than necessary to comply with the purposes that I've just summarized.  And here I find that the sentence I'm about to pronounce is sufficient but not greater than necessary to satisfy the purposes of sentencing that I've just reviewed.

Mr. Almehmeti, I've given a great deal of thought and attention to the appropriate sentence in your case in light of the appropriate purposes of sentencing as reflected in the statute.

I am quite well familiar with your case.  Your case came close to trial in late 2017.  I resolved a number of pretrial motions.  Through that process, I acquired familiarity with your case.  And I have carefully read and reread the parties' sentencing submissions.

This case is very troubling and very complicated.  I do feel, however, well-equipped to assess the many factors at issue, many of which are competing with one another.

I should say at the outset that the sentencing submissions I received from both sides, the defense and the

government, were absolutely first rate, as were your presentations today.

You've each made the arguments in support of your respective positions with great force and eloquence and integrity.  I thank both sides for the superb and truly thoughtful submissions that I received.

Here are my thoughts.  Under Section 3553(a), one set of factors that I am to consider involves the seriousness of the defendant's offense, the need for the sentence I impose to reflect just punishment, and the need for the sentence I impose to promote respect for the law.  In other words, the sentence must fit the crime.

Your conduct, Mr. Almehmeti, the conduct set out in the presentence report and the conduct for which you're being sentenced, is extremely serious.  And to your counsel's credit, they have not pretended otherwise.

The defense submission has instead largely focused and, properly so, on giving the Court a context in which to understand how you came to take the steps that you did relating to ISIS.

But I think it is worth reviewing in detail what you did, and I do so because it underscores how alarming your actions were and how deep a potential threat they posed, both to our society and to people abroad.

I'm incorporating by reference all the facts set out

in the presentence report, and I will also from time to time draw on the elaboration on those facts contained in the government's sentencing submission which, in turn, draws on the Rule 16 discovery in this case with which I have become well familiar.

And what I'm going to do is describe certain aspects of your conduct that illustrate these concerns, and what I particularly want to make clear is the difference between thought and conduct.

In cases involving terrorism and the dissemination of terroristic propaganda, the defense is sometimes made that the defendant did no more than express himself or traffic in ideas.

That defense has not been explicitly made here.  The defense has duly noted that your actions as of the time of your arrest fell far short of planning an actual terrorist attack, either at home or abroad.

Nevertheless, it is important to focus just on what your conduct was.  So what was it.  In your plea allocution, you admitted providing material support to ISIS, a foreign terrorist organization, by trying to aid another person, the undercover, in his efforts to travel to Syria to join ISIS.

You also admitted lying in your passport application for a new passport for yourself so that you too could ultimately travel to Syria to join ISIS.

But as the presentence report reflects, the actions

that you undertook tending to promote ISIS and tending to endanger society at home and abroad went well beyond that.

First and most strikingly, after you twice were denied entry to the UK, which occurred in October and then in December 2014, you began to stockpile munitions in your home.

Beginning in June 2015, you purchased the following: Two cold steel 53NCT Tanto spike knives; an Ontario 499 Air Force survival knife; a credit-card sized folding knife; a 24-inch survival pocket chain saw; a Rothco reversible face mask; a set of Smith & Wesson handcuffs; and gloves with steel knuckles.

The decision to buy these was yours and yours alone. It wasn't until your apartment was searched in May 2016 that the FBI found your collection of combat knives and military-style equipment. And of course they found the large ISIS flag displayed over on the wall above in your apartment.

They found the laptop computer, the cell phone belonging to you which contained a vast amount of ISIS promotional material, including an array of materials glorifying ISIS fighters. They included videos of ISIS fighters engaged in combat and beheading prisoners.

Because the undercover operation resulted in your arrest, we cannot know -- and we will never know for certain -- how events involving these munitions would have played out had you not been arrested.

A court can do not more than draw reasonable inferences.  But the rest of the record supplies important clues as to your intentions.  The ISIS propaganda materials found in your procession included extensive propaganda encouraging domestic terrorism in the U.S. and the killing of innocent people here.

It includes your glorification of ISIS beheading people.  You possessed copious photographs and literature glorifying these acts, and your statements to the undercover officers were to the same effect.

Your attempts to go and fight for ISIS abroad and to assist the undercover in doing so also put in context your decision to stockpile weapons that could be used to restrain, gut, or did he capitate another human being.

The timing of your purchases is also relevant context. In late 2014, ISIS released a speech by its then spokesperson, Abu Muhammed al-Adnnai, instructing ISIS supporters in the West that if they were unable to travel overseas to join ISIS, they this carry out lone-wolf attacks in their homelands and kill non-Muslims by any means possible.

viewed in light of this evidence, the munitions you were stockpiling in your home were alarming.  Your buying and collecting them says to me you were prepared eventually to use these weapons, most likely offensively and most likely directed towards civilians here in the United States.

As you surely appreciated, you were not going to be able to leave the country with a collection of spike knives or a pocket chain saw.  You had no conceivable need in your apartment in the Bronx for handcuffs or a face mask or the chain saw or the knives or steel knuckles.

There was no benign use to which these were going to be put.  And it certainly took some real effort and some cost to find and acquire this diverse equipment.

The only rational inference is that you were storing up for at least a potential future attack.  And the fact that you began to acquire them after you were twice denied the ability to leave the United States makes your possession of them all the more suggestive.

It suggests that you were considering, if you were unable to help ISIS abroad, helping it at home by engaging in some form of domestic attack, perhaps along the lines of the lone-wolf attacks that were on the rise and then being encouraged.

In the end, all if this is inference.  The government didn't find evidence of an imminent attack.  It didn't find emails or texts or photos or layouts or recon as to the site of an attack.

And of course, to the extent you were preparing for a possible future attack, preparation does not guarantee action.  Perhaps in the crucible, you would have stopped short of

wearing the mask and using those knives and handcuffs and the chain saw on another human being.

Perhaps in the moment, some greater maturity or insightfulness or humanity would have taken hold, or maybe just the fear of apprehension of punishment would have held you back.

On the other hand, perhaps you would have attempted unspeakable mayhem in our city. Others have done so. One person who has done so is the Chelsea Bomber, Rahimi, with whom you later came to correspond enthusiastically in the MCC about ISIS propaganda.

Because you were arrested and incapacitated from doing such harm, we will never now how events would have played out if law enforcement had not gotten wise to you.

But your actions, Mr. Almehmeti, speak loudly as to what your intentions at the moment were. And every indication from your possession of that weaponry and the combat gear and the surrounding circumstances is that you were up to no good.

Every indication is that you were on course to wreak havoc. I find this aspect of your conduct extraordinarily troubling. Thank goodness that law enforcement stepped in when it did. They stopped you. You did not stop yourself.

From the perspective of the 3553(a) factors that require just punishment and that require that the sentence imposed reflect the gravity of the conduct in question and

promote respect for the law, this dimension of your conduct alone, your ordering and housing weapons usable for death, torture, and decapitation, consistent with a domestic lone-wolf attack at home, points towards a long, long sentence.

Separately, you repeatedly attempted to travel overseas with the explicit goal of supporting ISIS. That makes your crime more serious. You were stopped first in October 2014 when the authorities found camouflage pants and nunchakus in your luggage in Manchester Airport in the UK.

Two months later you tried to enter a different UK airport, Heathrow. This time it was your cell phone and laptop computer that revealed a number of images of ISIS flags and of improvised explosive device attacks.

As reflected in the government's sentencing memo, your communications made clear your intention to move from England toward ISIS-controlled territory in the Middle East.

You inquired about how to get from Tunisia to ISIS-controlled Libya. You sent along a user name on the Kik-encrypted messaging application that was associated with a British member of ISIS who was soon thereafter killed in Syria fighting apparently for ISIS.

Despite your admissions as to your purpose for traveling to England, you told the authorities who stopped you in Manchester in October 2014 that you were going to help run the family business in Albania.

When you were arrested in Heathrow two months later, the search of your devices revealed a cache of materials reflecting your allegiance to ISIS. These are the ones captured in Exhibit A to the government's sentencing memo.

I've reviewed it. These include you and others making ISIS gestures; lectures from an ISIS leader promoting terrorism; jihadist ideology; and martyrdom; brutal ISIS propaganda promoting the killing of non-believers; videos of ISIS executing prisoners and civilians by either shooting them in the back of the head while kneeling or beheading them and other videos encouraging followers to achieve martyrdom by carrying out suicide attacks on innocent civilians.

The agents searching your home also found the will that you wrote in the event that you lost your life as a terrorist martyr. They found comments you posted on social media celebrating the November 2015 suicide bombing and mass suicide attacks in Paris, France.

They found videos justifying and celebrating suicide bombing. They found a video that mimics you carrying out a suicide bombing. It shows you with a fuse attached to your head shouting, "Allahu Akbar" as you were engulfed in a loud explosion.

After the undercover operation got underway, you confirmed your commitment to ISIS. You told the undercovers you wanted to travel to fight along with others on behalf of

ISIS.

You referred to ISIS territory as an "amusement park." You told one of the undercovers that you liked to watch music videos of ISIS fighters decapitating prisoners because it kept you motivated when you were exercising.

You told an undercover that you wanted to get Raaqqah in particularly because it was the heart of ISIS' operations. You agreed to assist the undercover posing as an ISIS supporter to travel to Syria to join ISIS.

You showed the undercover a propaganda video showing the brutal decapitation of a captive. You helped the undercover buy supplies. You instructed him in using secure, encrypted messaging apps to use when communicating with other ISIS supporters. You took the undercover to the airport, and you told the undercover you were ready to go to Syria yourself.

You told the same thing, apparently by phone, to your brother who incarcerated in Albania on weapons and assault charges. And of course you submitted the false passport application in Count Two.

The old one carried rejection stamps on it. You sought a new one in an attempt to prevent the authorities thwarting you again from traveling overseas en route to ISIS.

I want to take a moment at this point and address the defense's argument in its reply letter of December 4 that the evidence does not show that your goal at the time you attempted

to enter the UK in late 2014 was to reach Syria.  The defense argues that your intentions in traveling then were to meet Safa, the woman you loved and sought to marry.

At the risk of stating the obvious, these two intentions are not mutually exclusive.  And the evidence above supplies good reason to infer that you intended to travel beyond England to fight for ISIS.

But even if there were room for doubt about your intentions when you originally sought to enter England, your intentions later were crystal clear, both when you assisted the undercover and when you yourself sought a fresh passport.

The presentence report makes clear that you did so to enable you to ultimately join ISIS.  I'm referring now to paragraphs 35 to 42.  After you submitted the false passport application, you told undercover officers that you had done so because you "didn't want the rejection stamps from the UK" and because you needed the new passport to travel not to Albania and Europe "but to other places ... you know what I mean." Paragraph 40.

And cryptically, you also spoke to friends on recorded calls about your desire to travel to ISIS.  Apart from calling it an "amusement park," you also said, "I don't have a P," presumably meaning a passport, "... but I obviously want to go."

My best assessment is that all along from 2014

forward, you were attempting to make it to ISIS.  But even if that intention first arose later in time, it is beyond dispute that that came to be your fervent intention, so much so that you were willing to commit the federal felony of making false statements on a passport application in order to enable you to get there.

Continuing on with my review of your conduct, another troubling aspect of it is your circulation of materials promoting ISIS and specifically violence in support of ISIS. That too was a destructive course of conduct.

Most recently after you were incarcerated at the MCC, you and Ahmad Khan Rahimi connected.  He of course is serving multiple life sentences for carrying out the Chelsea bombing.

The two of you attempted to radicalize other inmates by sharing and disseminating terrorist propaganda materials which you received in discovery.  You attempted to burn discs of these materials.

These included an issue of a propaganda publication that gave instructions on how to build a pressure-cooker bomb that celebrated the Chelsea bombing and that encouraged followers to kill civilians through lone-wolf attacks in the West.

I'm mindful, Mr. Almehmeti, that it was when you were in prison on earlier charges in the United States that you yourself were apparently radicalized.  That was the point in

your life's journey when you committed to ISIS.

You befriended, while in the Fishkill Correctional Facility, Mohamed Mamdouh who had plotted to blow up synagogues in Manhattan.  And he pled guilty to terrorism crimes in New York state court.

He may have been among the reasons why your allegiance shifted from a local Albanian gang to ISIS while you were in state custody.  After you were released from state custody, you visited Mamdouh in jail in 2014.  There you were captured in the photograph that day making an ISIS hand gesture.

Your own radicalization in favor of ISIS while in prison underscores that your circulating such materials to other inmates cannot be written off as an idle act unlikely to produce results.

You are proof positive that an effort to convert members of a presumably disaffected prison population to ISIS has the capacity to succeed.  You and Rahimi circulated ISIS propaganda material to cultivate in prison another generation of potential ISIS supporters.

Potentially this could have resulted in converts who bought the ideas you were pushing, including converts who had the capacity for violence, whether as lone-wolf or otherwise.

Your own words make clear that this was your intent. Earlier, during one of the meetings with the undercover -- this was before your arrest -- you said if you ever were

incaracerated -- and quoting now paragraph 48 of the presentence report, referring to you -- "He would seek to radicalize others in the jail and indicated that he had previously radicalized other inmates during his prior period of incarceration resulting from his state convictions."

Now, at the time you made that statement, it might have seemed like bragging or hyperbole, but you carried through on your words. That is reason to take all the more seriously the other pledges and declarations you made along the way, including your resolve to fight and kill and die, if necessary, for ISIS.

I could continue to elaborate by developing in more detail these areas of your conduct. The bottom line though is this: Over a period of several years in a variety of ways and in a variety of contexts, both alone and in concert with others, both while in free society and while in prison, you took steps to support ISIS' evil, violent mission at home and abroad. Through a variety of actions, you backed up your statements that you were dedicated to joining and fighting for ISIS.

Your actions made clear that you were ready, willing, and able to promote ISIS, to recruit for ISIS, to travel for ISIS, to fight for ISIS, and to kill for ISIS and, if necessary, to die for ISIS.

You sought to enlist in Syria for the cause. You

assisted another to travel there to fight for ISIS, and you stocked your Bronx apartment with terrifying munitions suited to a lone-wolf attack on domestic soil of the sort you frequently celebrated in the communications you collected and shared.  And your efforts to promote ISIS continued even after your arrest on these charges in prison.

So from the perspective of the first set of 3553(a) factors involving the gravity of the offense, I find your conduct deadly serious, aberrant, and terrifying.

You were a ticking time bomb.  Had you not been apprehended, there is every reason to assume that grave harm would likely have come to somebody or perhaps many somebodies, whether at home or abroad, whether at your hand or the hand of somebody you abetted or encouraged.

The fact that you were caught before someone got hurt of called does not make your intentions in preparation more innocuous.  As a matter of just punishment and as a matter of making sure that the sentence fits the crime, your conduct demands a very long punishment well in excess of the ten-year term that your counsel has sought.

Under Section 3553(a), I am also to consider the interest in general deterrence.  It refers to the need for the sentence I impose to send a clear message to other people that is sufficient to deter them from engaging in similar crimes. That interest is present here too.

As a civilized society, we have an interest in discouraging domestic terrorism and the spread of terror abroad. To be sure, the literature on general deterrence teaches that general deterrence is primarily a function of the certainty and swiftness of detection of criminal acts.

Effective efforts like those by the law enforcement officers in this case to detect and promptly apprehend and prosecute those engaged in promoting terror and terrorist groups are the single best way to deter copycats.

The length of the sentences imposed, scholarship teaches, is much less important. It is not, however, irrelevant. And I judge there to be a general deterrent interest served by imposition of a sentence sufficiently long to discourage any rational person from thinking that it is worth paying that price.

Under Section 3553(a), I also have to consider the need for specific deterrence. That refers to the need for the sentence I impose to send a message to the specific defendant before me -- and here, meaning you, Mr. Almehmeti -- that is sufficient to deter him from committing future crimes. I judge that interest to be profound here.

In many cases, the defendant before me is a first offender. In those cases, defense counsel will often argue that the defendant will learn from this first brush with the criminal justice system.

The argument made is that the very shock of being arrested and convicted and sentenced, even if the sentence is short, will be a wake-up call for the defendant.  It will discourage him from ever risking his liberty again.

And often, as Ms. Kellman, among others, will attest, I have found arguments along those lines to be quite persuasive.  Those arguments, however, are not available to you.

You have two prior convictions.  In 2010, you were convicted of robbery in the third degree.  According to the PSR, you and a codefendant grabbed the hood of a victim's coat.

Your codefendant punched him in the head several times, later in the face.  He fell to the ground.  You two demanded his property, his credit car, his debit card, his MetroCard, his driver's license, a set of keys, and an unspecified amount of cash.

The presentence report reflects that you stated at the time that you were a member of an Albanian gang.  You were sentenced to probation.  It was later revoked in 2012, and you were resentenced to one to three years' imprisonment.

And that was for an offense you committed later in 2010, an assault in the third degree involving forcible touching.  You were sentenced to concurrent terms of one year imprisonment and 90 days' imprisonment.

The important point is that neither of these brushes

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

with the criminal justice system served as a wake-up call for you.  I don't know specifically what the judges in those earlier cases were thinking when they imposed the sentences that they did.  But I have to assume that they hoped that the sentence they were imposing on the young man before them would be sufficient to get his attention and discourage him ever again from committing crimes.

Alas, that is not what happened.  You committed the second crime soon after the first while on probation.  You then spent a not inconsiderable amount of time in prison, a year or so, which is substantial for anyone, particularly somebody like you in your late teens.

And that didn't deter you either.  After your release, you then committed this combination of crimes and related anti-social conduct that I've outlined at length.

In other words, your prior brushes with the criminal justice system didn't deter you at all.  The crimes and relevant conduct for which you're being sentenced today is far more destructive than any of your prior crime.  It follows that if there is any hope for the sentence I impose here to truly get your attention and deter you from committing further crimes -- and I can't be sure that there is -- it would have to be much longer than the sentences you've previously served.

Finally, under Section 3553(a), I have to consider the interest in public protection or incapacitation.  That refers

to the benefit the free public gets from your being in federal prison where, by definition, you can't commit crimes that endanger them.

That factor is paramount here. You were caught in the act of attempting to go overseas to fight for ISIS. You were caught in the act of assisting someone else to go do that.

You were caught in the possession of a cache of weapons and supplies that appeared intended to facilitate a domestic attack. After being apprehended, you partnered with an infamous lone-wolf terrorist attacker to promote ISIS among criminal defendants in the MCC. All this conduct unavoidably makes you a clear and present danger to society right now if you were at liberty.

As a judge, applying Section 3553(a), I am charged with assuring the that sentence I impose will reasonably protect the public. Given what I have just said, how could any sentence, other than a very long one, be up to that challenge.

What reasonable assurance, other than blind hope, could a person have that if released from prison any time soon, you would not be poised to resume these dangerous ways.

Thus far, I've considered at great length, I'm sorry to say, factors that by their nature tend to favor a substantial sentence. And for all the reasons I've covered, they do warrant quite a long sentence.

I am, however, mindful that there are other factors

that must be considered as part of a complete and thorough sentencing analysis.  And these include various factors that favor you in the sentencing equation, factors that point, all other things being equal, towards a lower sentence.  And I want to review them carefully with you now.

And in understanding the factors in your life that I find mitigating, I was assisted by the defense's thoughtful sentencing memo and its attachments.

These included the quite perceptive mitigation report prepared by Melanie Carr regarding your life history.  They also include the report by Dr. Lawrence Steinberg, a psychologist, addressing, albeit in the context of a different case, the nature of juvenile and young adult development and maturation.  And I also considered letters in support of you and certificates, among other materials.

First of all, Mr. Almehmeti, you accepted responsibility for the two crimes with which you were charged. You did so by pleading guilty and by admitting to these offenses.

The government is correct that you have not gone much beyond that.  You haven't repudiated ISIS or, for that matter, terrorism.  And your commitment to ISIS is ultimately what motivated these two crimes.  That would have reflected a fuller acceptance of responsibility.  That's unavoidable.

And I hope -- I really hope -- that in the future you

will reflect back on these events and that you will reject and repudiate a creed that encourages the beheadings of innocent people as a way to make a point.

Nevertheless, you did forthrightly admit the crimes with which you were charged.  That makes a difference to me, as it does under the sentencing guidelines.

It spared the legal system resources, and it reflects an acknowledgment that you broke the law in these two ways. The sentence I impose will be higher than your counsel has sought by a lot.  You will not be pleased with it.

But please know that it will be materially lower than it would have been had you gone to trial and been convicted of these crimes.  Your decision to plead guilty, in other words, was a wise one.

To make the point very concrete, had you been convicted at trial of these offenses and had all other information before me at sentencing been the same, my best assessment is that the sentence I would have imposed would have been at least three years longer, if not more.

I want you to reflect back on what I just said when you reflect while you're in prison about whether it was worth it to plead guilty.  It absolutely was.

Second, under Section 3553(a), I am to consider a defendant's history and characteristics.  At this point, I'm referring to your history, other than your criminal history

which I've covered at length.

I read with great interest the defense submission and the attached reports. These gave me insight into background. They helped me understand what some of the factors were that contributed to your embrace of ISIS and the crimes arising from that for which you're being sentenced.

I learned that you grew up in Albania and that you came to the United States around age six or seven with your parents. Your parents were the outsiders in Albania. Your father had been in prison for his opposition to the regime there, and the regime change when you were age three was tumultuous and chaotic. There was extreme poverty there, and life was hard.

The transition to the U.S. was hard too. Your parents didn't speak English. Your family didn't belong to any community, and your family lived significantly in isolation.

Schools were bad. You were mocked by other students for your hair, your clothing, and your broken English, among other things. There was a lot of fighting. Classes were out of control, and there was a lot of gang violence in your neighborhood in the Bronx. There were shootings, physical violence, and drugs.

You did not fit in. You were frequently jumped. You were held up by switchblade-wielding gang members. You got drawn into marijuana use early, at age 12 or so.

Eventually at age 15, you joined a local Albanian gang, the Albanian Boys, Inc. or ABI, and that gave you some protection but also exposed you to crime. Your schoolwork and your academics fell apart, and that's when you first committed crimes, the robbery in 2010, the forcible touching in October in 2010. I note that although you pled guilty, I recognize today you were asserting your innocence to that crime, and I have no occasion to resolve that dispute.

You wound up in Rikers Island prison which of course is no place for a minor to be. After you emerged from state prison with new-found religious beliefs, your parents were not supportive of those. Your mother spat on the floor once in disdain when you returned from a mosque wearing religious garb.

She once threatened to cut your hair while you were sleeping, and you were hurt by their disapproval. Your parents eventually returned to Albania, but you stayed here, and that may well have deprived you of some positive influences. Your father was in declining health. He later died in Albania after you were charged in this case, and I was very sorry to hear of that too. Your mother, however, is very supportive of you.

And I thank you for being here today.

She describes you as having been a wonderful person who was always well behaved. She faults herself for not being present enough in your life perhaps to steer you in a better direction.

I learned as well that you've spent a lot of time alone, particularly after your parents left the U.S. You were living alone in your apartment as of the time of your arrest.

You had gotten married in December of 2015, but first your parents and later your wife opposed the relationship. She appears to have been living with her parents at the time of your arrest.

Overall, I can see a young person without strong roots here in a new country and without strong parental guidance that can provide ballast to a young person who is growing up and trying to find his place in the world. Ms. Kellman quite aptly describes your adolescence as reflecting a "struggle for belonging."

All this helps me understand why you might have been susceptible to the call of faith and/or a new ideology as you were exposed to it in state prison and later through online videos.

The defense describes you as having taken on the idea, eventually the identity, of a radicalized extremist group and and as having totally endorsed the group's narrative. That account of your trajectory I find persuasive and understandable.

I understand and accept too the defense's observation about how your age made you susceptible to making bad choices. There is a great deal of scholarship that says young men, in

particular in their late teens and early 20's, are still growing up and that they're more apt than others to make reckless, bad decisions.  That is particularly so when they are influenced by older, charismatic figures.

I have seen that dynamic in play in many of my cases, including those involving urban ethnic gangs.  That may have been at play at points here too.

That said, I do not buy at all the defense suggestion that the undercover officers radicalized you.  I'm not buying that at all.  And the defense's reply memo largely walks back that suggestion.

You were probably drawn to ISIS and its ideology before the onset of the sting operation.  The documentary record reflects that.  Indeed, your desire to support ISIS by traveling abroad is the reason that led the government to initiate the sting operation.

The government didn't pick you out of nowhere.  They didn't pick on you at all.  They focused on you for good reason.  There was ample predication that you were hungry, ready, willing, and able to fight for ISIS.

You had gone to the UK twice in an attempt to do that.  Twice you had been stopped and sent back.  The government didn't do any of that.  This was not a case of entrapment or of radicalization by the government, period, full stop.

This was an amply justified and well conceived

undercover operation. Yes, it could have been designed in other ways, but the way it was designed was imminently reasonable. As Mr. Bove said, it gave you a last, clear chance to repudiate ISIS. Instead, you doubled down on ISIS.

The government undercovers had to pose as persons of similar belief in order to gain your trust. If they had posed as accountants or lawyers, it would have been a fruitless undercover operation.

They didn't radicalize you. You were already there when they entered the picture. To confirm the point, after you were arrested when they were out of the picture, you went back to promoting ISIS, this time with Rahimi in the MCC.

The big picture here as to your background is that your youth, your isolation, your alienation, your limited roots here, and your imprisonment at a young age -- all of that helps me understand the choices you made, first to commit the robbery and now, much more seriously, to commit these much more serious offenses.

And I note that your brother was also drawn to crime. That may reinforce the point that the environment in which you came of age was one with lots of influences, bad influences and temptations.

However, I do need to say this: I have had many cases with defendants whose backgrounds were far, far, far worse than yours.

You came from an intact family.  Your parents were purposeful people.  They abided by the law.  They weren't perfect, but they ultimately were on your side.

You were not born addicted to drugs.  You are not saddled with endemic mental issues.  And while your family had limited means, the level of deprivation was far less than in many cases I've seen, way less than many cases I've had with Ms. Kellman alone.

You had obstacles to overcome.  Life did not deal you an easy hand.  But environment and background are not destiny.  At various points, you had choices to make.  It was your choice to commit the robbery that put you in prison.

And after you were released from prison, it was your choice to embrace ISIS and its various creed.  Nothing about embracing Islam required you also to embrace ISIS.  That was your choice.

It was your choice to try to go to Syria via England to fight for ISIS.  It was your choice, when that failed, to go and buy all that weaponry that was later found in your apartment.

Nobody told you to buy combat knives, handcuffs, a mask, or a pocket chain saw.  I don't even know where one would go to find a pocket chain saw.  These are choices.  It is the choices we make, far more than our backgrounds, that defines who we truly are.  You are being punished today for your

choices, not for your difficult background.  Your background and age made you more vulnerable to radicalization.  But in the end, it was a choice.

I have also considered the argument from the defense that your conditions of confinement in the MCC have been hard, in part, on account of the inherent conditions there these days and, in part, on the account of the special administrative measures that have separated you from others.

In past cases in which a defendant's conditions of confinement have been unusually hard, whether in foreign prison, awaiting extradition, or at the MDC last year when it became effectively uninhabitable, I and my colleagues have, in calculating the just sentence, often considered each day spent in pretrial confinement as more onerous than a day in a BOP prison whose conditions are more humane.

That principle applies here too.  You have spent nearly two years, often in near solitary confinement.  I am not opining on the validity of your designation or of the disciplinary measures that have been taken against you within the BOP.  But I do accept the hard nature of the isolated conditions in which you have been held.  I regard these as mitigating.  I have these firmly in mind today.

As to your time in custody, I also note that while you made some bad decisions in custody with respect to Rahimi which I've covered, you've also put your time there to good use.

You've obtained a number of certificates, including in business acumen, entrepreneurship, corporate skills, and leading by example. You completed the Focus Forward program.

Focus Forward described you as a great student, who came well prepared to class and enthusiastically joined in discussions. You were described as an able public speaker who addressed the class on why your father's example inspired you.

They applaud you for having a coherent path going forward after your release which is ultimately to operate a funeral home. And that is an area in which you long have demonstrated an interest, going back to 2015 when you volunteered to work as an assistant at a funeral service institute.

I give you credit for having a coherent plan for your life going forward and for making good use of your time in custody. In that vein, I note that although you were not working at the time of your arrest, you've had some gainful employment in the past, including doing delivery and plumbing and cleaning work.

That reflects well on you. Your experiences and the training you have so far received in prison and which I hope you will continue to receive in prison will situate you well to build a constructive life after your release. Your decision to put some of your time in prison to good use in the ways I've just described is encouraging to me.

In reflecting on your history and characteristics, I've also considered the several letters I've received about you from people who knew you before the arrest and from some who worked with you in programs which ended after your arrest. And I want to review with you briefly excerpts from a couple of those letters now.

First of all, from your mother.

I just want to make sure I talk to your mother. Can I just see your hand. Thank you very much for the beautiful letter that you wrote on behalf of your son, and thank you for coming here today. I can only imagine how hard this is, and I applaud you for the courage you've shown to be here today.

Your mother, Vjollca Alimehmeti, writes: "What happened to my son was unusual. And the moment I'm writing, I still can't believe. It seemed to me the worst nightmare. Sajmir mere comes from a family with good values that always has operated its life with these basic principles, be honest and faithful. Be brave and courageous. Don't hurt anyone. Never give up. Be respectful. He was always very peaceful, a loyal and lovely boy. He is a lovely and lovely young man. He was always there for help. When I was sick, he would care from me making a massage with cold compresses to my forehead to lower the temperature, the same care he would take for his father too."

I also read the letter from what I took to be your

cousin, Ragda (phonetic).  I infer that she's a cousin.  She says that you were always unusually well behaved, honorable, respectful, and mindful towards people you came into contact with.  She says that she's certain that you feel sorry for your mistakes.

I read the letter as well from your friend and your former fiance Safa.  She says:  "Sajmir and I used to be engaged.  From the time we began speaking, I knew we had a connection. Sajmir was a very understanding person.  He would always be there for me while I was going through really tough times.  He gave me support like no one else had done before.  I felt safe knowing I had him.  Sajmir would constantly check up on me to see how I'm doing and to make sure that I was always okay."

These letters remind me, as I'm constantly reminded in this job, that people are complicated.  These are impressive testimonials.  They are from people you should admire.

These are people who, by all indications, anyway, have led peaceable lives, embracing good values, not violence or hate.  Their embrace of you gives me a basis for hope that as you mature the positive side and your characteristics and history, that these people see you in you will prevail over the darker impulses on display in the conduct for which you're being sentenced today.

On the day a person is sentenced, it is appropriate

that they be considered in light of the totality of their life experience, the good as well as the bad.  And I will do so today.

Mr. Almehmeti, please know that these letters show me a different side of you than is reflected in your offense conduct.  These letters have been to your benefit today.

Finally, in reflecting on the just sentence, I have considered the sentences that other judges have imposed in cases involving, among other things, material support for terrorism.

No two cases are alike.  Your case, Mr. Almehmeti, does not find, in my assessment, a perfect comparator or even one that is very close.  The cases in which defendants have traveled or attempted to travel abroad to support terrorist causes and have returned do not, at least on first blush, appear to have had defendants who stockpiled weapons at home. I'm not finding any pocket chain saws there.

That, among other points, is a very important distinction.  Many of the cases in which defendants are charged with material support of terrorism who are sentenced to 180 months in prison were sentenced at a time when the maximum sentence for that offense was just that, 180 months.  They got the maximum.  Today the maximum for that offense is 240 months.

Perhaps some of those defendants would have gotten a higher sentence had the statutory maximum permitted it.  I just

don't know. I did find Judge Abrams' decision in the case of *United States v. Raishani* to be a useful comparison point.

I read the sentencing transcript there. The defendant there was charged with material support of terrorism for which he received a 20-year sentence. He also received a five-year sentence to run concurrently on a separate conspiracy count.

There are areas of similarity and areas of contrast between this case and that. Among areas of contrast, the defendant there was older than you and, in that respect, more accountable, and he left his family behind to try to go fight for ISIS.

On the other hand, the defendant there did not stockpile weapons in his home. The record there did not supply evidence of any preparation towards potential domestic terrorism.

The defendant there did not have any prior convictions, and there is no analogue there to the post-arrest conduct in the MCC in which the defendant, you, and Rahimi tried to indoctrinate other inmates to support ISIS.

In the end, my judgment, as I've indicated, is that a very long sentence here is required for all of the reasons I've reviewed. With due respect for the defense for whom I have the utmost admiration, the ten-year sentence that has been recommended is simply a nonstarter. It would disserve the interests in assuring that the punishment fit the crime and the

paramount interests in specific deterrence and its companion, public protection.

As for the 30-year sentence that the probation department and the government each endorse, the government has a minimum.  The probation department has a specific recommendation.

I do not find that by any means unreasonable.  As Judge Abrams put the point in *Raishani*, there is no greater danger to society than terrorism.  There is no greater danger to society than that posed by people who think that they can impose their will on others through senseless, incomprehensible violence.

In particular, from the perspective of protection of the public of the potential attack by the defendant at home or abroad, a longer sentence would undeniably provide a longer period of protection.

But the Court's charge under Section 3553(a) and its parsimony principal is ultimately to impose not just a reasonable sentence but the lowest sentence that could be reasonably fashioned to accommodate the 3553(a) factors.

My judgment is that there are lower reasonable sentences than 30 years that can do that.  There is no magic to that number.  It happens to be a round number.  It happens to be the bottom of the guideline range.

That does not make it right or wrong.  To treat 30

years as somehow presumptive is, in my view -- and I wrote this out, Ms. Kellman, before you used the word "anchoring."

It is a classic example of unhelpful anchoring, of unhelpful magnetic attraction to a round number.  The defense is quite right that there are factors here that separate this case from paradigmatic terrorism cases where the guidelines recommend a 30-year to life sentence.

In particular, there was no attack here, and there were no concrete plans for an attack.  The defendant was apprehended early in a process that might or might not have led to more serious steps.

And the various mitigating factors that I have reviewed, including the defendant's age and the slew of circumstances that made him particularly susceptible to being radicalized separate this case from others.

And I'm mindful too, as I said, of the pattern of sentences in material support cases.  Even taking into account that that statute, until recently, permitted only a 15-year sentence, there are cases in which a conviction under that statute was paired with convictions under other that statutes that increased the a judge's headroom.  The cases yielding a 30-year sentence or close it where the primary violation is material support are few and far between.

The sentence I impose, while very long and a little than twice what the defense recommends, will therefore fall

materially below 30 years.  It is a sentence that in my considered judgment and after what I hope is clear is a lot of consideration, fairly balances the 3553(a) factors and is consistent with the broad patterns of sentences in this area. I have considered whether a lower sentence yet can be justified under the 3553(a) factors.  With regret, I concluded it cannot.

I will now state the sentence I intend to impose.  The attorneys will have a final opportunity to make legal objections before the sentence is finally imposed.

Mr. Almehmeti, would you please rise.

After assessing the particular facts of your case and the factors under Section 3553(a), including the sentencing guidelines, it is the judgment of the Court that you are to serve a sentence of 264 months, that is, 22 years, imprisonment in the custody of the Bureau of Prisons to be followed by a period of five years' supervised release.

I impose a sentence of 20 years on Count One and 22 years on Count Two, those terms to run concurrent.

I will recommend to the Bureau of Prisons that they allow you to participate in any deradicalization program that either presently exists or that is developed during the time of your incarceration.

As to supervised release, I impose a term of three years on Count One and five years on Count Two.  Those are the maximum terms available, and they are to run concurrently.

As to supervised release, the standard conditions of supervised release shall apply. In addition, you shall be subject to the following mandatory conditions:

You shall not commit another federal, state, or local crime.

You shall not illegally possess a controlled substance.

You shall not possess a firearm or destructive device.

You shall refrain from any unlawful use of a controlled substance.

And you must cooperate in the collection of DNA as directed by the probation officer.

You must also meet the special condition that is set out in the presentence report. I will recapitulate it in full in the judgment.

Briefly though, you are to submit your residence, place of business, vehicle, property, computers, and the like to a search on the basis that the probation department has reasonable suspicion that contraband or evidence of a violation of the conditions of supervised release may be found.

Why am I doing that. Your criminal record before this offense reflected a violation of the terms of release. Your second offense was committed while you were on parole from the first, and your conduct here reflected, even after your arrest, your condition involvement in deeply anti-social conduct while

in prison.

I am deeply hopeful that after this long term in prison, you will be in a much better place, the place the defense hopes for you.  But we all have to acknowledge the possibility that you will have temptations after you are released to commit some crime or infraction.

It will be useful for you to know that the probation department, while you are on supervised release, has maximum eyes on you.  It will be useful for you to know that they have an opportunity, a maximal opportunity, to review your device, your car, your home, whatever the case may be.  If that holds whatever impulses you may have in check, that will be ultimately to your good and to the good of the public.

I have the legal authority to impose a fine.  I'm not going to do so.  I'm persuaded you don't have the ability to pay it.

Government, I take it restitution and forfeiture are not sought here?

MR. BOVE:  That's correct, Judge.

THE COURT:  All right.  I'm also required to impose and do impose a mandatory special assessment of $100 per count or $200 which shall be due immediately.

Does either counsel know of any legal reason why this sentence shall not be imposed as stated?

MR. BOVE:  No objection. Judge.

MS. KELLMAN: No, your Honor.

THE COURT: Then the sentence as stated is imposed.

Mr. Bove, are there any open counts or underlying indictments?

MR. BOVE: There is an underlying indictment, Judge, and we move to dismiss it.

THE COURT: That motion is granted.

Mr. Almehmeti, I need to advise you of the following: To the extent you haven't given up your right to appeal your conviction and your sentence through your plea of guilty, you have a right to do those things. You have right to appeal your conviction and your sentence.

If you're unable to pay for the costs of an appeal, you may apply for leave to appeal in forma pauperis. The notice of appeal must be filed within 14 days of the judgment of conviction.

Ms. Kellman, are there any recommendations you would like me to make to the Bureau of Prisons regarding the location or the nature of confinement?

MS. KELLMAN: Your Honor, can I get back to the Court about that midweek next week?

THE COURT: Yes. Ms. Kellman, I would ask you to get it to me as soon as possible. Just because of some availability issues on behalf of my deputy and I, we would like to get the judgment out.

So if you could reflect on it, if at all possible today, that would be to my benefit.  If you need to do it until next week, of course I'll give you the time.

MS. KELLMAN:  I'll do it as quickly as possible.

THE COURT:  Very good.  Anything further?  Anything in terms of recommendations in terms of programs or things while he's in the Bureau of Prisons?

MS. KELLMAN:  I think your Honor has covered that, but we'll give it to you if there are any.

THE COURT:  Very good.  Please do.

Anything further from the government?

MR. BOVE:  No, your Honor.

THE COURT:  Anything further from the defense?

MS. KELLMAN:  No, your Honor.

THE COURT:  Mr. Almehmeti, I want to wish you all the best.  It is with a heavy heart that I impose the sentence that I do today.  With that said, I hope you remember all the wonderful things that your family members and your former fiance wrote about you.  That is nowhere reflected in the conduct for which you're being sentenced.

Please remember that the people who know you best see those good sides of you.  Let that be a light.  Let be that a destination and a guide to your conduct as you go forward.

You are a very, very young man.  Trust me.  I know this.  Even with the length of that sentence, when you are

released from prison, particularly if you earn credit for good behavior, you will be, by my math, in the early part of your 40's. You've got a long life to live, and I encourage you to live it and live it well.

We stand adjourned.

MS. KELLMAN: Thank you, Judge.

(Adjourned)